## IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

| | |
|---|---|
| **MANDA RICHARDS**<br>10205 Washingtonian Blvd., #348<br>Gaithersburg, MD 20878<br><br>*On behalf of herself individually and*<br>*similarly situated persons.*<br><br>Plaintiffs<br><br>v.<br><br>**NEWREZ LLC d/b/a SHELLPOINT**<br>**MORTGAGE SERVICING**<br>1100 Virginia Drive, Suite 125<br>Fort Washington, PA 19034<br>SERVE ON:<br>CSC-Lawyers Incorporating Service,<br>    Resident Agent<br>7 St. Paul Street, Suite 820<br>Baltimore, MD 21202<br><br>Defendants | Civil Case:<br><br>C-02-CV-20-001061 |

### CLASS ACTION COMPLAINT
### &
### REQUEST FOR JURY TRIAL

Plaintiff Manda Richards ("**Richards**") ("collectively "**Plaintiff**" or "**Named Plaintiff**"), on her individual behalf and on behalf of similarly situated individuals defined *infra*, by their attorneys, Phillip R. Robinson and the Consumer Law Center LLC and pursuant to MD. RULE 2-231 (Class Actions), sues NewRez LLC (f/k/a New Penn Financial, LLC) d/b/a Shellpoint Mortgage Servicing ("Shellpoint" or "Defendant"). The Plaintiff, on behalf of herself and similarly situated persons, demand a trial by Jury on all counts for which a right to trial by jury is allowed and, in support of their Class Action Complaint, state:

Case 1:20-cv-01282-ELRR Document 22 Filed 05/22/20 Page 2 of 33

### INTRODUCTION

1.      In these instances, such as the underlying matters involving Shellpoint, the mortgage servicer places its interest and pattern of unsafe and unsound mortgage service practices above the remedial rights of homeowners and consumers.  Moreover, Shellpoint unfairly and deceptively ignores its statutory and contractual duties including those which were agreed to as part of their license to legally operate in the State of Maryland and nationwide.

2.      These practices are compounded when homeowners, like Richards and the putative class members, are entitled to certain protections and accurate information about their mortgages but Shellpoint knowingly and recklessly utilizes inaccurate information transferred to it by its predecessor and thereby infects the true status of the mortgage and demands sums not lawfully due and owing from borrowers because it has performed no reasonable investigation to the inaccurate mortgage loan data it knowingly acquired and imported into its computer systems.

3.      Shellpoint is a mortgage servicer subject to the Real Estate Settlement Procedures Act, 12 U.S.C.A. §§ 2605, 2609 ("RESPA") and its implementing regulations. Specifically, Shellpoint

a.      Is not entitled to use funds held by it related to an escrow account for any purpose other than the "payment of taxes, insurance premiums, and other charges with respect to the property…in a timely manner as such payments become due."  12 U.S.C.A. § 2605(g).

b.      For established escrow accounts it is required to provide an annual accounting of the borrower's mortgage escrow account which accurately describes "the amount of the borrower's current monthly payment, the portion of the monthly payment being placed in the escrow account, the total amount paid into the escrow account during the period, the total amount paid out of the escrow account during the period for taxes, insurance premiums, and other charges

(as separately identified), and the balance in the escrow account at the conclusion of the period."
12 U.S.C.A. § 2609(c)(2)(A).

        c.      Is required to maintain policies and procedures that are reasonably designed to provide accurate disclosures to borrowers including annual escrow statements. 12 C.F.R. § 1024.38(a)-(b).

        d.      Is required to maintain policies and procedures that ensure it is receiving accurate information to its predecessor servicers. 12 C.F.R. s. 1024.38(b)(4)(ii).

    4.      Shellpoint is also a debt collector in relation to the Named Plaintiff and the putative class members pursuant to the Fair Debt Collections Practices Act ("FDCPA") as defined below. As a debt collector, Shellpoint "may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C.A. § 1692f.

    5.      There is no question that RESPA was intended and is considered remedial legislation. *See e.g. Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013)("As a remedial statute, RESPA is construed broadly to effectuate its purposes"); *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-66 (9th Cir. 2012)("RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose"). *See also* DODD–FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, PL 111-203, July 21, 2010, 124 Stat 1376. Dodd-Frank was specifically enacted to "improv[e] accountability and transparency in the financial system...[and] to protect consumers from abusive financial services practices." *Id.*

    6.      Yet, as a matter of standard policy and practice, Shellpoint disregards the express requirements in 12 U.S.C.A. § 2605(c)(k), and 12 C.F.R. § 1024.38(a)-(b) in relation to the Plaintiff and putative class members by (i) failing to timely and reasonably identify itself to federally

related mortgage borrowers, (ii) utilizing knowingly incorrect loan data transferred to it without making without any reasonable investigation to correct the inaccuracies, and (iii) while imposing loan charges and fees to the borrowers in secret. Shellpoint knows that the information transferred to it by its predecessor servicers is infected and prone to multiple errors but takes no reasonable steps to correct those errors but simply compounds the errors by utilizing the flawed data as part of its business practice and routine.

7.    Shellpoint had no right to misreport or misstate the data it received from its predecessor servicer(s)escrow balance sums it collected and maintained on behalf of the Plaintiff and similar borrowers to its successor servicers. Yet, as a direct and proximate result of Shellpoint's violations of its mortgage servicing duties as described herein, Plaintiffs and the putative class members they represent herein have been harmed by Shellpoint's (i) utilization of knowingly incorrect loan data obtained by its predecessor(s) servicers while imposing and collecting improper fees and charges to the Named Plaintiff's and the putative class members' loan accounts with no proper notice to them; (ii) reporting of same derogatory information to the credit reporting agencies while not disclosing the information to the borrowers; and (iii) concealment of material loan information to Named Plaintiffs and class members. These damages include statutory damages available pursuant to 12 U.S.C.A. § 2605(f), 15 U.S.C.A. § 1692k, and actual damages equal to the fees and charges imposed and/or collected by Shellpoint.

### JURISDICTION AND VENUE

8.    This Court has jurisdiction asserted for the claims herein because BSI transacts business, performs work in, and has interested in real property, and provides services in Maryland and Anne Arundel County, Maryland. *See e.g. Pacific Mortg. and Inv. Group, Ltd. v. Horn*, 100

Md.App. 311, 324 (Md.App.,1994)(person who "buys and sells [] mortgage liens has done more than merely transacted business…but has, in fact, carried on a regular business").

9.      This Court also has jurisdiction for the claims asserted because the injuries caused by Shellpoint to the Plaintiff and certain of the putative class members occurred in Maryland. Further, Shellpoint owns real property, or has an interest in real property in the State of Maryland and Anne Arundel County thereby subjecting itself to the jurisdiction of this Court.

10.      The Court has declaratory judgment authority pursuant to CTS & JUD. PROC. § 3-409 and MD. RULE 2-231(c)(2).

11.      Venue is proper in this Court as the acts and conduct alleged all occurred in Maryland.  Venue is further proper in this Court since Shellpoint's predecessor agreed as part of this Court's approved class action agreement in *Devan v. Wilcox; Wilcox v. Wilmington Savings Fund Society, FSB, as Trustee for the Primestar-H Fund I Trust, et al.* (Case No. C-02-cv-14-000099)("Primestar Settlement"), to which Richards was a party as a class member who never opted out of the settlement, that "Any dispute relating to [the Primestar Settlement] may be resolved in the Circuit Court for Anne Arundel County, Maryland which Court shall retain jurisdiction and venue with respect to the consummation, implementation, enforcement, construction, interpretation, performance, and administration of the Agreement…The Parties agree to submit to the exclusive jurisdiction and venue for the purposes described above." *See* Primestar Settlement at ¶ 56.

## PARTIES

12.      Plaintiff Manda Richards ("Richards") is a natural person who owns the real property known as 11710 Old Georgetown Road, Unit 224, Bethesda, Maryland (20817) ("Richards Property").  Richards is also the borrower on the mortgage loan subject to this action which is

associated with the Richards Property and was utilized entirely for personal, consumer purposes ("Richards Loan"). The Richards Loan is a federally related mortgage.

13.     Shellpoint is a wholly owned subsidiary of Shellpoint Partners LLC, a Delaware limited liability company. Shellpoint Partners LLC is wholly owned by NRM Acquisition LLC and NRM Acquisition II LLC, both of which are Delaware limited liability companies. Both NRM Acquisition entities are wholly owned by New Residential Mortgage LLC, a Delaware limited liability company. New Residential Mortgage LLC is wholly owned by New Residential Investment Corporation, a Delaware corporation. New Residential Investment Corporation is publicly traded on the New York Stock Exchange under the ticker symbol NRZ. In addition:

a.     NRZ advertises on its website the reason why it is focused on Shellpoint's business model which acquires the mortgage servicing rights from others. "A mortgage servicing right (MSR) provides a mortgage servicer with the right to service a pool of residential mortgage loans in exchange for a portion of the interest payments made on the underlying residential mortgage loans. Advances are required capital outlays by the servicer to fund missed payments from delinquent borrowers and foreclosure-related expenses. The servicer has limited risk of not being reimbursed for advances, because advances are almost always 'top of the waterfall' in the event of a property sale" (https://www.newresi.com/about-us). In other words, Shellpoint makes more money on behalf of NRZ by churning fees and making advances related to borrowers it believes are delinquent or in foreclosure and there is "limited risk" that those sums will not be reimbursed to it—even if it has no right to impose the fees and charges in the first instance.

b.     Shellpoint is a mortgage lender and servicer as defined by FIN. INST. § 11-501(j)(n).

    c.      Shellpoint is a debt collector pursuant to 15 U.S.C. §1692a(6) as it acquired the servicing right to the Plaintiffs' loans and certain of the similarly situated persons they represent when it believed the loans were delinquent or in default.

    d.      Shellpoint is also a collector as defined by CTS. & JUD. PROC. § 5-1201(d) and COM. LAW § 14-201(b).

    e.      Shellpoint is a mortgage servicer subject to RESPA and the remedies and protections for borrowers stated in 12 U.S.C.A. § 2605.

### FACTUAL ALLEGATIONS

#### *General Allegations About Shellpoint's Knowledge*

14.      All persons, including licensed mortgage lender/servicers in the State of Maryland like Shellpoint, are expected to know the law—including the laws governing their activities. As part of its license to even conduct business in the State of Maryland Shellpoint "has a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the advertisement, solicitation, making, servicing, purchase, or sale of any mortgage loan." MD. CODE REGS. 09.03.06.20. Richards and other borrowers like Richards are third party beneficiaries of MD. CODE REGS. 09.03.06.20.

15.      The Court of Appeals in 2005 recognized that a real estate professional who had no direct communication with a borrower nevertheless had a duty to a consumer under the Maryland Consumer Protection Act and Maryland common law to make a "reasonable investigation" of the true facts in the real estate transaction on which the borrower (and other parties) would rely in order to complete the transaction. *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276 (2005). This duty of care applies to Shellpoint as its work involves secured, consumer mortgage loans subject to Maryland and Federal laws like RESPA, FDCPA, and the Fair Credit Reporting Act ("FCRA").

16.     Pursuant to 12 C.F.R. § 1024.38(b)(1)(i), Shellpoint is required to "[p]rovide accurate and timely disclosures to a borrower as required by [12 C.F.R. § 1024.38] or other applicable law." Pursuant to 12 C.F.R. § 1024.35(b)(5), Shellpoint is not permitted to "impos[e]… a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower." It is unreasonable and a violation of its duties for Shellpoint to impose and collect sums never properly disclosed to the borrower.

17.     Pursuant to 12 U.S.C.A. § 2605(c)(1) Shellpoint "shall notify the borrower of any such assignment, sale, or transfer."

18.     Pursuant to 12 U.S.C.A. § 2605(k)(1)(C)(E), Shellpoint has duties to the Plaintiff and putative class members to (i) take appropriate steps to avoid foreclosure as part of its standard servicer's duties and (ii) comply with any other obligation(s) found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of 12 U.S.C.A. § 2605. Amongst these obligations are the servicer's duties to comply with state laws and regulations that are not expressly preempted by RESPA; in other words, Congress and the CFPB expressly intended for RESPA to work in concert with state regulation. *See e.g.* 12 U.S.C.A. § 2605(h) and 12 C.F.R. § 1024.33(d) (expressly limiting preemption to certain notice issues).

19.     Shellpoint has a further duty to send periodic statements to the Plaintiff and putative class members identifying certain information as required by 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41.[1] *See also* COM. LAW § 12-106.

---

[1]     The CFPB official interpretation of 12 CFR § 1026.41(a) states that:

20.     The Maryland Mortgage Fraud Protection Act, REAL PROP. § 7-401, *et seq.*, estab-lishes a statutory duty upon Shellpoint to disclose to mortgage borrowers, homeowners, and its predecessor servicers with respect to the mortgage lending process in an honest and truthful man-ner. *Ademiluyi v. PennyMac Mortgage Inv. Trust Holdings I, LLC*, 929 F. Supp. 2d 502, 531 (D. Md. 2013); *Castle v. Capital One, N.A.*, No. CIV.A. WMN-13-1830, 2014 WL 176790, at *5 (D. Md. Jan. 15, 2014; *Stovall v. SunTrust Mortgage, Inc.*, No. CIV.A. RDB-10-2836, 2011 WL 4402680 (D. Md. Sept. 20, 2011).

21.     In addition, Shellpoint also understands and is aware that it is widely recognized in the secondary mortgage market that much of the loan data transferred by other mortgage entities to it is inaccurate as exemplified by the following:

      a.  The Mortgage Servicing Collaborative ("MSC") of the Urban Institute's Hous-ing and Finance Policy Center has identified in its comprehensive report, *The Case for Mortgage Servicing Data Standards* (Urban Institute, 2018) (the "MSC Report) that "[D]uring the foreclosure crisis when hundreds of billions of dollars of servicing portfolios were transferred from one servicer to another in a short period...Some [transfers between servicers] were affected by wide-spread data errors that led to borrower harm through missed opportunities for loss mitigation, misapplication of escrow payments, or erroneous fees. Ser-vicers incurred significant financial costs, penalties, and reputational harm." *Id.* at 6 (citations omitted).

---

"The periodic statement requirement in § 1026.41 applies to the 'creditor, assignee, or ser-vicer as applicable.' The creditor, assignee, and servicer are all subject to this requirement ....., but only one statement must be sent to the consumer each billing cycle. When two or more parties are subject to this requirement, they may decide among themselves which of them will send the statement."

b. A 2017 market survey of the servicing industry conducted by the Federal

Housing Finance Agency, i.e. *Future of Mortgage Servicing: Market Sur-*

*vey Results* (Apr. 2018), identified the known challenges faced by the mort-

gage servicing market including that "[a]pproximately 60% of respondents in-

dicated the key challenges for servicing transfers are ensuring data accuracy

and completeness, and minimizing borrower impacts." *Id.* at 6. More specifi-

cally the FHFA survey found,

- Respondents stated that varied data and document standards followed
  by different servicers leads to data inconsistencies and gaps during the
  [Mortgage Servicing Rights (MSR)] transfer process.
- Respondents also expressed that system limitations inhibit the ability to
  effectively execute MSR transfers.
- Servicer transfer processes can be manual and time consuming with the
  need to map every data field, even when transferring to the same servic-
  ing system.
- 50% of nonbanks also highlighted document custody as one of
  their top three challenges in transferring servicing. *Id.*

c. The credit rating agencies who review the secondary mortgage market of resi-

dential mortgage-backed securities for investors also account that loans availa-

ble on the secondary market are characterized by "impaired payment histories

[which impact]…the servicer's ability to foreclose and liquidate the property."

FitchRatings: Structured Finance, U.S. RMBS Non-performing Loan Criteria –

Effective Aug. 12, 2016 to Dec. 1, 2016 at Page 6.

22.     The problems involved in the integrity of loan data in servicing transfers is well

known by state-based regulators (including Shellpoint's regulators as a licensed collection agency

and mortgage lender) as well. *See e.g.* Conference of State Bank Supervisors' Proposed Regula-

tory Standards for Non-Bank Mortgage Servicers at Page 5, 11 ("Regulators and the industry have

also recognized widespread data quality and integrity issues, especially in the context of transfer-
ring servicing rights. Non-bank mortgage servicers often struggle to integrate acquired loan port-
folios, and to locate legal and collateral documents associated with the transferred loans. All of
these issues are exacerbated if a servicer's operational capacity has not kept pace with its
growth…[these issues involve not only] data mapping problems so often experienced during a
large transfer, but also the compatibility of the data").

23.     A former nationwide mortgage servicer, i.e. Ditech Financial LLC ("Ditech") f/k/a
Green Tree Servicing LLC, is currently in Chapter 11 Bankruptcy Proceedings in the United States
Bankruptcy Court for the Southern District of New York (Case No. 19-10412). Before filing for
bankruptcy protection, Ditech was well known to have utilized incorrect and unreliable mortgage
data related to the residential loans it serviced including some loans of the putative class members
acquired by Shellpoint's affiliates within 12 months of this filing. This is exemplified as follows:

a.     The CFPB filed a complaint Ditech on this basis in the United States District
Court for the for the District of Minnesota (Case No. 15-2064) addressing Ditech's inaccurate
mortgage, record keeping practices and many related issues.

b.     In the June 17, 2019 Asset Purchase Agreement in which Shellpoint's par-
ent, NRZ, acquired Ditech's MSRs, including the right to collect upon the certain of the class
members' loan in this action, did not provide adequate representations and warranties to NRZ and
Shellpoint that the data transferred to it was accurate and/or reliable. Further, NRZ and Shellpoint
knew Ditech's bankruptcy was due in part to its systems failures and inability to manage mortgage
loan servicing functions without cutting corners that led to inaccurate data, record keeping prac-
tices, and other related issues.

***Factual Allegations Relevant to Plaintiff Richards***

24.     On or about August 31, 2005, Richards acquired the Richards Property, by Deed recorded in the land records for Montgomery County (Book 30829, Page: 109) for the sum of $169,500.00. To accomplish this purchase Plaintiff borrowed the sum of $159,030.00 from American Home Mortgage Acceptance, Inc. ("Richards Loan") which was utilized by Richards exclusively for personal, consumer purposes. The terms and conditions of the Richards Loan are toxic and memorialized in an Adjustable Rate Note.    The Richards Loan qualified as a federally related mortgage at its origination.

25.     On April 4, 2014, the Richards Loan was sold and assigned to Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as trustee for the Primestar-H Fund I Trust ("Primestar"). The assignment is also recorded in the land records for Montgomery County (Book 48543, Page: 437).    At the time Primestar-H acquired the Richards Loan, its loan servicer was Statebridge Company LLC.

26.     While Primestar owned the Richard's Loan, it agreed to the Primestar Settlement. Final approval of the Primestar Settlement by this Court occurred on July 5, 2016.  No appeals were taken from the Order of the Court granting final approval.  Pursuant to the Primestar Settlement, Primestar agreed that it was not entitled to attempt to collect from Richards any deficiency sums related to the Richard's loan and it was limited to *in rem* relief only (when permitted to do so under Maryland law).

27.     Later, on October 26, 2016 the Richards Loan was sold and assigned by Primestar to Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as trustee for the Brougham Fund I Trust ("Brougham"). The assignment is also recorded in the land records for Montgomery County (Book 54433, Page: 34).  Once again, on October 8, 2019 the Richards

21

Loan was sold and assigned by Brougham to Morgan Stanley Mortgage Capital Holdings LLC ("Morgan Stanley"). The assignment is also recorded in the land records for Montgomery County (Book 58473, Page: 145).   Richards was never notified of Morgan Stanley's acquisition of her loan as required by 15 U.S.C. § 1641(g) and only learned about it from a review of Maryland law records in February 2020.

28.     Neither Brougham nor Morgan Stanley are entitled to any greater rights than their assignor(s) had to give them and Brougham and Morgan Stanley are not permitted to violate the terms of the Primestar Settlement, indirectly through Shellpoint, as they each simply stand in the shoes of Primestar and have no greater rights than Primestar had in the Richards Loan.

29.     From on or before October 13, 2016 to about November 1, 2019, Servis One, Inc. d/b/a BSI Financial Services ("BSI"), acted as the mortgage servicer on behalf of Primestar and then Brougham. BSI's mortgage operations have been subject to regulatory and private enforce-ment actions in which it has been disclosed that BSI's mismanagement of mortgage loans it ser-vices, including the Richard's Loan, has been subjected to multiple erroneous errors. These pub-licly available actions and disclosures by BSI include:

a.     On May 15, 2019, BSI entered into a stipulation and Consent Order with the Consumer Financial Protection Bureau ("CFPB") related to its mortgage servicing and transfer practices in which it was in which the CFPB found and concluded BSI had routinely transferred to subsequent servicers mortgage loan data information that was incomplete and ensured that the information and documents transferred was accurate.

b.     In the matter of *Graham v. Servis One, Inc.*, pending in the United States District Court for the Eastern District of Pennsylvania (Case No. 2:18-cv-4377) it has been disclosed that a coding error in BSI's electronic systems related to certain borrowers, including Richards, caused it to send inaccurate statements to borrowers from May 1, 2018 to November 1, 2019.

30.     At all times relevant to this action, Shellpoint has had record and/or actual knowledge of BSI's mortgage servicing errors identified in the previous paragraph but has taken no reasonable steps to inquire about the accuracy of loan data it received from BSI related to Richards or any other former BSI borrower whose loan was transferred to it.

31.     As was her right, Richards sought bankruptcy protection under Chapter 7 of the Bankruptcy Code and received a discharge of her personal liability from the Richards Loan pursuant to 11 U.S.C. § 727 on May 31, 2017 (Case No. 15-25605)(ECF. 55).  Richards later sought further protection under Chapter 13 of the Bankruptcy Code (Case No. 18-15772) where she (i) received an order confirming her proposed bankruptcy plan (ECF. 29), (ii) notified BSI and all her other creditors of her change in mailing address (ECF. 35), and (iii) disputed BSI's purported proofs of claim which claimed Richards owed sums in excess of what was due and owing on the Richards Loan (*see e.g.* ECF. 42, 46, 61, 72-75).

32.     At all times relevant to this action, Shellpoint has had record and/or actual knowledge of the factual allegations identified in the previous paragraph but still has taken no reasonable steps to inquire about the accuracy of loan data it received from BSI related to Richards or any other former BSI borrower whose loan was transferred to it.  Instead it has simply utilized that incorrect information and adopted it into its own records thereby infecting the accuracy of the loan account it manages related to Richards and the Richards Loan.

33.     BSI acted as the mortgage servicer on behalf of the owners of the Richards Loan until about November 1, 2019 when the servicing purportedly transferred to another—i.e. Shellpoint. At the time of this transfer, BSI did not notify Richards of the transfer as required by 12 U.S.C.A. § 2605(b)(i.e. "Goodbye Letter"). Instead, BSI did not provide Richards a copy of the untimely notice until March 16, 2020 (when it provided a backdated notice to her counsel which it never before provided to Richards).

34.     At the time of servicing transfer to Shellpoint, Shellpoint believed the Richards Loan was in default and it also did not timely notify Richards of the transfer as required by 12 U.S.C.A. § 2605(c)("Hello Letter"). Instead, Richards was not provided the Shellpoint notice required by 12 U.S.C.A. § 2605(c) until January 22, 2020 when it was provided by Shellpoint's attorney Bizhan Beiramee. However, the notice provided by Shellpoint's attorney was materially defective in that it was:

          a.     Not addressed to Richard's actual mailing address but was knowingly and deceptively addressed to a former address which she had not resided at for a year or more.

          b.     Was dated November 12, 2019 but was not delivered to Richards by Shellpoint until January 22, 2020—68 days after the time required for the notice pursuant to 12 U.S.C.A. § 2605(c).

35.     Upon information and belief based upon the address utilized by Shellpoint in its belated Hello Letter, Shellpoint simply incorporated BSI's knowingly inaccurate loan data transferred to it for addressing the Hello Letter and never sought to verify the accuracy of the data and information.

36.   Since it became Richards' loan servicer. Shellpoint has also failed to send periodic statements to Richards identifying certain information as required by 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41. *See also* COM. LAW § 12-106.

37.   Richards only obtained copies of the purported periodic statements on April 6, 2020 when she gained access to the on-line portal maintained by Shellpoint related to the Richards Loan.

38.   Upon information and belief based upon the address utilized by Shellpoint in its belated periodic statements, Shellpoint simply incorporated BSI's knowingly inaccurate loan data transferred to it for addressing the purported periodic statements and never sought to verify the accuracy of the data and information.

39.   Upon information and belief, Shellpoint had reason to know that the address it utilized for Richards for the Hello Letter and periodic statements since it became her servicer through the filing of this complaint was wrong because it or its authorized vendor received notice of the returned mail or inaccuracy from the United States Postal Service that indicated that the address it utilized was wrong but Shellpoint took no reasonable steps to correct the errors or provide timely notice to Richards.

40.   Richards continued making her mortgage payments to BSI in November 2019 and February 2020 pursuant to her agreements in the bankruptcy case because (i) Shellpoint had not properly disclosed its interest to the Bankruptcy Court and (ii) Shellpoint never timely provided to Richards with its required Hello Letter  that would identify Richard's account number with it and its payment address.  Upon information and belief BSI forwarded those payments to Shellpoint and Shellpoint received the payments.  However, Shellpoint has not cashed the payments.

41.   In March 2020, Richards sent Shellpoint a payment in the sum of $1,000 (check number 1052) to replace the February 2020 payment to BSI which had never been cashed.  In

March 2020 Richards also sent Shellpoint another check (no. 1072) for $1,000 which has not been cashed by it either. Neither March 2020 check to Shellpoint has been returned. Both payments were mailed to the address provided on Shellpoint's belated Hello Letter.

42.    Shellpoint has received payments for thousands of dollars but has not credited them to the account associated by it to the Richards Loan. Previously, BSI has received payments for thousands of dollars, but Richards has not received credit for them either.

43.    Shellpoint does know how to communicate with Richards when it intends to do so. For example:

a.    On March 17, 2020 Shellpoint emailed to Richards am email communication with the following subject: **"Is coronavirus disrupting your life? We're here to help."**

b.    In January 2020, while Richards was represented by counsel in the bankruptcy case, Shellpoint knowingly contacted Richards directly even though it knew she was represented by counsel.

44.    Since it became the servicer for the Richards loan and began utilizing the infected mortgage data it received from BSI without any reasonable verification, Shellpoint imposed and/or collected the following fees and charges (other than principle and interest) onto Richard's loan account but never disclosed those fees to Richards as required by 15 U.S.C.A. § 1638(f), 12 C.F.R. § 1026.41, and COM. LAW § 12-106. These include:

|   | Description | Transaction Date | Amount |
|---|---|---|---|
| a. | "Other Fee Assessment" | November 18, 2019 | $105.00 |
| b. | "Other Fee Disb" | November 18, 2019 | $105.00 |
| c. | "Late Charge Assess" | February 12, 2020 | $60.23 |
| d. | "Late Charge Assess" | February 17, 2020 | $59.82 |

| e. | "Other Fees Disc." for Title Costs | March 10, 2020 | $350.00 |
| f. | "Legal Fees Disb." | March 24, 2020 | $900.00 |

45.     The fees and charges imposed identified in the proceeding paragraph are actual damages to Richards in that Shellpoint was not entitled to impose since it did not timely disclose its Hello Letter or even provide to Richards the accurate periodic statements as required by Federal and State law. Alternatively, the fees described in the previous paragraph are not permitted since they each appear to be sums barred by the Primestar Settlement. Upon information and belief, the errors and improper charges by Shellpoint are directly the result of NRZ's business practices in relation to the MSRs it has acquired from another to churn all sorts of non-bona fide fees and advances which it will recoup under its business model since these fees and "are almost always 'top of the waterfall' in the event of a property sale."

46.     Since it became the servicer for the Richards loan and began utilizing the infected mortgage data it received from BSI without any reasonable verification, Shellpoint has also reported to the credit reporting agencies, including TransUnion, that Richards' is personally liable on the Richards Loan when in fact she is personally discharged of any liability. The false reporting is done by Shellpoint for the purpose of attempting to coerce Richards into making payments on the Richards Loan for sums and charges she does not even owe or were even disclosed to her.

47.     As a direct and proximate result of Shellpoint's adoption and utilization of mortgage data related to the Richards Loan which has errors and without any reasonable verification or a policy and practice to even correct the errors it detects, Shellpoint has harmed Richards by not conveying accurate and timely disclosures and imposing and collecting fees and charges with no proper notice to Richards. Richards has also suffered informational injuries as a result of Shellpoint's conduct related to information Congress and the General Assembly found to be relevant

and material under Federal and State laws. Shellpoint's failure to convey the necessary infor-

mation created uncertainty and fear for Richards who was denied the information required by Con-

gress and the General Assembly to be necessary in the mortgage servicing arena and were vital to

the successful achievement of the goals intended for the remedial laws at issue and are the ones

most critical for consumers, without which consumers suffer the most significant harm or risk of

harm. Congress could not have given a clearer indication of its determination that this informa-

tional injury creates a material case or controversy by permitting Richards to recovery statutory

damages as a result of the violations subject to this action.

### CLASS ALLEGATIONS

48. The Named Plaintiff brings certain claims, *infra*, on behalf of classes of similarly

situated persons related to Defendant Shellpoint under MD. RULE 2-231 defined as follows:

    a.     **Untimely Hello Letter Class:** Richards and White propose, as the defini-

tion of the Untimely Hello Letter Class, that it be defined as follows:

> All residential mortgage loan borrowers for whom Shellpoint has not timely pro-
> vided a 12 U.S.C.A. § 2605(c) notice in the three years proceeding the filing of this
> action.

    b.     **Untimely Notice Class:** Richards and White also propose, as the definition

of the Untimely Notice Class, that it be defined as follows:

> All individuals in the United States who within one year of commencement of this
> action Shellpoint (i) did not timely provided timely periodic statement as required
> by 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41 related to those individual's
> residential mortgage debts or did not timely provide a notice pursuant to 12
> U.S.C.A. § 2605(c) and (ii) where Shellpoint's records indicate that the debt had
> not been current for 30 or more consecutive days at the time Shellpoint began ser-
> vicing it.

49.     Richards qualifies as a member of the Untimely Hello Letter Class and the Untimely Notice Class and proposes to be appointed by the Court as the Named Plaintiff for the Untimely Hello Letter Class and the Untimely Notice Class.

50.     Excluded from each of the putative classes are any person who falls within the definitions if the person is (i) an employee or independent contractor of the Shellpoint; (ii) a relative of an employee or independent contractor of the Shellpoint; or (iii) an employee of the Court where this action is pending.

51.     The Class definitions in ¶ 48 as limited by ¶ 50 may be amended or modified.

52.     The members of the (i) Untimely Hello Letter Class and the (ii) Untimely Notice Class are capable of being described without difficult managerial or administrative problems.  The members of each putative class are also readily identifiable from the information and records in the possession or control of Shellpoint or its affiliates and agents and from public records.  Shellpoint is required to maintain this information for the entire class period.  *See e.g.* Md. Code Regs. 09.03.06.04.

53.     The putative classes are sufficiently numerous, exceeding more than one hundred persons each, that individual joinder of all members is impractical.  This allegation is based on a data search of public records which identify that thousands of public complaints have been filed against Shellpoint and it services thousands of residential, mortgage loans throughout the United States and as a matter of public records in the State of Maryland alone, Shellpoint has an interest in hundreds of consumer, mortgage loans that were in default or believed to be in default during the class period.

54.     There are questions of law and fact common to the (i) Untimely Hello Letter Class, and (ii) Untimely Notice Class which predominate over any questions affecting only individual

members of the putative classes and, in fact, the wrongs alleged against Shellpoint by (i) Untimely Hello Letter Class and (ii) Untimely Notice Class members and the remedies sought by Named Plaintiff and the putative class members against the Shellpoint are identical.

55.     These common questions of law or fact for the Untimely Hello Letter Class members include but are not limited to:

    a.     whether Shellpoint has a legal duty to provide to the class members a timely Hello Letter pursuant to 12 U.S.C.A. § 2605(c);

    b.     whether Shellpoint has any policy and actual practice and procedure to identify correct mailing addresses for borrowers with whom it receives return mail from the United States Postal Service to ensure notices required by 12 U.S.C.A. § 2605(c) are provided to borrowers;

    c.     whether Shellpoint has any policy and actual practice and procedure to ensure it is receiving accurate information to its predecessor servicers as required by 12 C.F.R. § 1024.38(b)(4)(ii);

    d.     whether Shellpoint is entitled to impose and/or collect fees and charges from borrowers who have not received a timely 12 U.S.C.A. § 2605(c) notice;

    e.     whether Shellpoint has a pattern and practice of violating 12 U.S.C.A. § 2605.

    f.     Whether Shellpoint's conduct violated the RESPA;

    g.     Whether the members of the class are entitled to fees imposed and/or collected upon their accounts from Shellpoint as actual damages; and

    h.     Whether the members of the class are entitled to additional statutory damages as a result of Shellpoint's pattern and practice of violating RESPA.

56. These common questions of law or fact for the Untimely Notice Class members include but are not limited to:

a. whether Shellpoint has a legal duty to ensure notices sent by it, including notices pursuant to 12 U.S.C.A. § 2605(c), 15 U.S.C.A. § 1638(f), and 12 C.F.R. § 1026.41, are sent to the correct address(es) for the consumer;

b. whether Shellpoint has a legal duty to provide to the class members a timely periodic statement pursuant to 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41;

c. whether Shellpoint has any policy and actual practice and procedure to identify correct mailing addresses for borrowers with whom it receives return mail from the United States Postal Service to ensure notices required by 12 U.S.C.A. § 2605(c), 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41are provided to borrowers;

d. whether Shellpoint has any policy and actual practice and procedure to ensure it is receiving accurate information to its predecessor servicers as required by 12 C.F.R. § 1024.38(b)(4)(ii);

e. whether Shellpoint is entitled to impose and/or collect fees and charges from borrowers who have not received a timely 12 U.S.C.A. § 2605(c), 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41 notices;

f. Whether Shellpoint is a "debt collector" as that term is defined under the FDCPA;

g. Whether Shellpoint's conduct violated the FDCPA;

h. Whether the members of the class are entitled to the fees and charges collected from them without receiving the timely notices required by 12 U.S.C.A. § 2605(c), 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41 as actual damages; and

i.      Whether the members of the class are entitled to additional statutory dam-

ages as a result of the frequency, persistence, and intentionality of Shellpoint's conduct.

57.      Shellpoint's defenses (which defenses are denied) would be typical or identical for

each of the member of the (i) Untimely Hello Letter Class, (ii) Untimely Notice Class and will be

based on the same legal and factual theories.

58.      Certification of the (i) Untimely Hello Letter Class and (ii) Untimely Notice Class

under MD. RULE 2-231 is appropriate as to the members of teach putative class in that common

questions predominate over any individual questions and a class action is superior for the fair and

efficient adjudication of this controversy.

59.      A class action will cause an orderly and expeditious administration of claims by the

members of the (i) Untimely Hello Letter Class and (ii) Untimely Notice Class and economies of

time, effort and expenses will be fostered and uniformity of decisions will be insured.

60.      The only individual questions concern the identification of members of the (i) Un-

timely Hello Letter Class and (ii) Untimely Notice Class.  This information can be determined by

a ministerial examination of public records or from Shellpoint's business records or other sources,

which are admissible as an exception to the hearsay rule and as a statement by a party.

61.      Richard's class claims are typical of the claims of the (i) Untimely Hello Letter

Class and (ii) Untimely Notice Class members pursuant to MD. RULE 2-231 since they are based

on and arise out of identical facts constituting the wrongful conduct of the Shellpoint.

62.      Richards will also fairly and adequately represent and protect the interests of the (i)

Untimely Hello Letter Class and (ii) Untimely Notice Class.  Richards is similarly situated with,

and have suffered similar injuries as, the putative classes she proposes to represent. She has also

retained counsel experienced in consumer class actions including actions involving unlawful collection and mortgage servicing practices. Richards does not have any interests which might cause her not to vigorously prosecute this action or are otherwise averse to the interests of the members of the (i) Untimely Hello Letter Class and (ii) Untimely Notice Class. She feels she and the putative class members have been wronged, wishes to obtain redress of the wrong, and wants Shellpoint stopped from failing to comply with its mandatory duties that form the basis of the class claims.

63.     The (i) Untimely Hello Letter Class and (ii) Untimely Notice Class, members have suffered actual damages, losses, and harm similar those sustained by Richards.

### COUNT I: VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT ("RESPA"), 12 U.S.C.A. § 2605
**(On behalf of the Named Plaintiff Individually and
on behalf of the Untimely Hello Letter Class against Shellpoint)**

64.     The Named Plaintiff adopts by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth. This claim on brought on behalf of Richards individually and on behalf of the Untimely Hello Letter Class members against Shellpoint.

65.     The Named Plaintiff and Untimely Hello Letter Class members are "borrowers" entitled to the protections codified at 12 U.S.C.A. § 2605.

66.     Shellpoint is a mortgage servicer subject to the mandatory requirements of 12 U.S.C.A. § 2605 in relation to the Named Plaintiff and Untimely Hello Letter Class members. Pursuant to 12 U.S.C.A. § 2605(c), Shellpoint had a legal duty to timely "notify the borrower of any such assignment, sale, or transfer…not more than 15 days after the effective date of transfer of the servicing of the mortgage loan."

67.     Disregarding its mandatory duties in 12 U.S.C.A. § 2605(c), Shellpoint did not provide timely notice to the Named Plaintiff and the Untimely Hello Letter Class members.

68.     In addition, upon information and belief Shellpoint had notice that its purported 12 U.S.C.A. § 2605(c) notices were not timey delivered to the Named Plaintiff and the Untimely Hello Letter Class members from the United States Postal Service and other customary sources (including from its predecessor(s)) but it took no action to use that notice to resend 12 U.S.C.A. § 2605(c) notices to corrected addresses for the borrowers.

69.     As a direct and proximate result of Shellpoint's untimely notices pursuant to 12 U.S.C.A. § 2605(c), the Untimely Hello Letter Class members, the Named Plaintiff and the class members have been damaged by Shellpoint's imposition and collection of fees and charges onto their accounts transferred to Shellpoint but Shellpoint has concealed its identity in time and form required by § 2605(c).

70.     Upon information and belief, based upon the experiences of the Named Plaintiff and those described in the a Complaint filed in this Court styled *White v. NewRez LLC d/b/a Shellpoint Mortgage Servicing*, and the following facts and allegations, Shellpoint has a pattern and practice of noncompliance with the requirements of 12 U.S.C.A. § 2605 and its implementing regulations for borrowers like the Named Plaintiff and Untimely Hello Letter Class members including as of April 11, 2020 there are more than three thousand public complaints against Shellpoint in the CFPB's complaint database which concern or related to its mortgage business. Within those complaints are approximately more than 50 related to various disclosure problems related to Shellpoint.

### COUNT II: VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
**("FDCPA"), 15 U.S.C. § 1692, *et seq.***
**(On behalf of the Named Plaintiff Individually and**
**on behalf of the Untimely Notice Class against Shellpoint)**

71.     The Named Plaintiff adopts by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth. This claim on brought on behalf of Richards individually and on behalf of the Untimely Notice Class members against Shellpoint.

72.     Shellpoint acquired its interest in the loans of the Untimely Notice Class members when it alleges (directly and indirectly) and believed the loans were in default and therefore Shellpoint is a Debt Collector within the meaning of 15 U.S.C. § 1692a(6).

73.     Shellpoint, as part of its debt collection activities in relation to the Untimely Notice Class members, has statutory duties to sent notices to the plaintiff and class members pursuant to 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41 and 12 U.S.C.A. § 2605(c). As described herein, it had failed to send timely notices to the plaintiff and Untimely Class members or even reasonably attempt to forward those notices once it had reason to know they were not delivered.

74.     In relation to the Plaintiffs and the Untimely Notice Class members, Shellpoint is also a debt collector pursuant to 15 U.S.C. §1692a(6) because its principal business activity utilizes instrumentalities of interstate commerce or the mails related to the enforcement of security interests as described in 15 U.S.C. §1692f(6) which bars certain debt collectors, like them, from threatening to take any nonjudicial action to effect dispossession of property when there is no present right to possession of the property claimed as collateral when the debt collection action is barred as a matter of law.

75.     By failing to provide the Plaintiff and the Untimely Notice Class members with timely periodic statements pursuant to 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41 or hello letters pursuant to 12 U.S.C.A. § 2605(c) while charging fees and other charges to their loans, Shellpoint has acted unfairly or with unconscionable means to collect or attempt to collect from

the Plaintiffs and the Untimely Notice Class members in violation of 15 U.S.C. § 1692f. Alternatively by failing to use reasonable procedures and practices to either (i) ensure the addresses it purports to mail such notices are correct or (ii) updated when it receives notice from the United States Postal Service of non-delivery while continuing to charge fees and other charges to Untimely Notice Class members' loans, Shellpoint has acted unfairly or with unconscionable means to collect or attempt to collect from the Plaintiffs and the Untimely Notice Class members in violation of 15 U.S.C. § 1692f.

76. Plaintiff and the Untimely Notice Class members have suffered actual economic and non-economic damages, as more fully described *supra* as a result of the Shellpoint's illegal debt collection practices and direct and indirect actions described herein.

77. The FDCPA provides for statutory damages in addition to actual damages. The Plaintiffs and the Untimely Notice Class members are entitled to their actual damages and statutory damages allowed under the FDCPA.

## COUNT III: VIOLATIONS OF MARYLAND'S CONSUMER DEBT COLLECTION ACT ("MCDCA"), COM. LAW § 14-201, *et seq.*, & MARYLAND'S CONSUMER PROTECTION ACT ("MCPA"), COM. LAW §§ 13-101 *et seq.* (On behalf of the Plaintiff Richards Individually against Shellpoint)

78. Richards adopts by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth. These claims are brought on her behalf individually.

79. At all times described herein Shellpoint has acted as a collector by attempting to collect upon alleged, invalid debts and sums claimed due from Richards arising out of consumer transactions—her mortgages loan used for personal, consumer purposes related to the Property. COM. LAW §14-201(b).

80.     Shellpoint is aware of the Federal and State laws governing its activities described herein but recklessly disregarded those laws and duties without any consideration of the negative consequences to Richards.

81.     Shellpoint also attempted to collect and did in fact collect unlawful sums from Richards without giving her credit for the payments made and the agreements governing her loan (including during the time her loan was subject to bankruptcy proceedings).

82.     Shellpoint also refuses to give Richards credit for the sums she paid its predecessors and instead has knowingly and recklessly relied on the false and defective information it acquired from them.

83.     Shellpoint has also falsely claimed as part of its collection efforts to credit reporting agencies that Richards personally owes sums that she has been discharged from any liability.

84.     Maryland's debt collection and mortgage lending laws and Shellpoint's duties under Maryland law, do not permit them to utilize methods and means of collection not permitted by law or the relationship governing the parties.  Shellpoint knows the law.  However, it knowingly and recklessly attempted to interfere or otherwise infect Richards' rights based on alleged sums not lawfully due.  By such acts Shellpoint has engaged in conduct which violates §§ 804 through 812 of the Federal Fair Debt Collection Practices Act including but not limited to 15 U.S.C. §§ 1692e, § 1692f. COM LAW §14- 202(11).

85.     In the alternative to the claim asserted in the previous paragraph, Shellpoint's acts and omissions also violates COM LAW §14- 202(8).

86.     Shellpoint's violations of the MCDCA are also *per se* violations of the MCPA. COM. LAW § 13-301(14)(iii).

87.     The mortgage loan servicing and collection practices described herein by Shell-point, as set forth herein, are governed by the Maryland Consumer Protection Act ("MCPA"), COM. LAW. § 13-101, *et seq*.

88.     COM. LAW. § 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts. The collection and attempted collection of the sums by Shellpoint from Richards that are not due and the failure of it to give credit to the payments it and its predecessors actually received on the loan as part of its debt collection practices involves both the extension of credit and the collection of debts.

89.     COM. LAW. § 13-303 also prohibits unfair or deceptive trade practices in the sale or provision of consumer services, such as those provided by Shellpoint.

90.     The MCPA defines unfair or deceptive trade practices to include, *inter alia*, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive. COM. LAW §§13-301(1) and (3).

91.     Shellpoint's acts and omissions described herein, and including but not limited to seeking and demanding sums not legally or contractually due from Richards and the Maryland Convenience Fee Class members, constitutes unfair and deceptive trade practices in violation of COM. LAW § 13-301(1)(3) and COM. LAW §§13-303(4)(5).

92.     Richards members reasonably relied upon the material acts and actions of Shell-point as exemplified *supra* and demonstrated also herein (i) by her communications with Shell-point, and her (ii) continued payments demanded by Shellpoint. Shellpoint's acts omissions are simply unreasonable, unfair, abusive, and deceptive.

93.     Had Shellpoint not acted unfairly and deceptively, Richards would not have suf-
fered the damages and losses they have described *supra.*

94.     Plaintiff has pled sufficient facts to put Shellpoint on notice as to the claims against
it as exemplified *supra* (i.e. dates of key acts and representations of Shellpoint and its agents and
representatives; and the regulatory and statutory duties of Shellpoint which it simply ignored and
thereby infected the subject transactions to ensure harm and damage to Richards.

## PRAYERS FOR RELIEF

I.   WHEREFORE, Pursuant to Count I of this Complaint, Named Plaintiff re-
     quests the Court to certify the Untimely Hello Letter Class pursuant to
     MD. RULE 2-231 and appoint the Named Plaintiff as class representative
     and the undersigned counsel as Class Counsel;

II.  WHEREFORE, Pursuant to Count I of this Complaint, Named Plaintiff and
     the Untimely Hello Letter Class members ask this Court to determine the
     issue of Shellpoint's liability to the Untimely Hello Letter Class members
     and award (i) actual damages for its violations of 12 U.S.C.A. § 2605(c)
     pursuant to 12 U.S.C.A. § 2605(f)(2)(A) equal to the sums collected by
     Shellpoint, (ii) statutory damages pursuant to 12 U.S.C.A. §
     2605(f)(2)(B) in the amount of $1,000,000, and (iii) reasonable attorney
     fees and reasonable costs as authorized by 12 U.S.C.A. § 2605(f)(3).

III. WHEREFORE, Pursuant to Count II of this Complaint, Named Plaintiff re-
     quests the Court to certify the Untimely Notice Class pursuant to MD.
     RULE 2-231 and appoint the Named Plaintiff as class representative and
     the undersigned counsel as Class Counsel;

IV.  WHEREFORE, Pursuant to Count II of this Complaint, Named Plaintiff and the Untimely Notice Class members ask this Court to determine the issue of Shellpoint's liability to the Maryland Convenience Fee Class members and award (i) actual damages for its violations of 15 U.S.C. § 1692f pursuant to 15 U.S.C.A. § 1692k(a)(1) equal to the sums collected by Shellpoint in excess of $75,000 (in an aggregated amount), (ii) statutory damages pursuant to 15 U.S.C.A. § 1692k(a)(2) in the amount of $500,000, and (iii) reasonable attorney fees and reasonable costs as authorized by 15 U.S.C.A. § 1692k(a)(3).

V.  WHEREFORE, pursuant to Count III of this Complaint, Richards on her behalf individually asks this Court to determine the issue of Shellpoint's liability to her and award (i) actual damages for its violations of COM LAW §14-202(8)(11), COM. LAW § 13-301(1)(3), and COM. LAW §§13-303(4)(5) pursuant to COM. LAW § 14-203 and COM. LAW § 14-408 in a sum in excess of $75,000 to include an award of reasonable attorney fees and reasonable costs as permitted and authorized by COM. LAW § 13-301(14)(iii) and COM. LAW § 13-408(b); and

VI.  WHEREFORE, Named Plaintiff requests the Court provide such other or further relief as the Court deems appropriate including attorney fees and costs in relation to Count of this Complaint.

Respectfully submitted,

*//s//Phillip R. Robinson*
Phillip R. Robinson
Client Protection No. 0006210356
Consumer Law Center LLC
8737 Colesville Road, Suite 308
Silver Spring, MD 20910
Phone (301) 448-1304
phillip@marylandconsumer.com

*Attorneys for the Plaintiff and Putative Class Members*

## RULED 20-201 CERTIFICATION

I hereby certify that this filing does not contain any restricted information.

*/s/Phillip R. Robinson*
Phillip R. Robinson
Client Protection No. 0006210356
Consumer Law Center LLC
8737 Colesville Road, Suite 308
Silver Spring, MD 20910
301-448-1304
phillip@marylandconsumer.com
*Attorneys for the Plaintiff and Putative Class Members*

## JURY DEMAND

Plaintiff, on her behalf and on behalf of the putative class members, by her undersigned counsel requests a jury trial in this matter.

*//s//Phillip R. Robinson*
Phillip R. Robinson
Client Protection No. 0006210356
Consumer Law Center LLC
8737 Colesville Road, Suite 308
Silver Spring, MD 20910
Phone (301) 448-1304