IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MANDA RICHARDS and
MATTHEW MALDONADO,

    *Plaintiffs*,

    v.                                 Civil Action No. ELH-20-1282

NEWREZ  LLC  d/b/a  SHELLPOINT
MORTGAGE SERVICING,

    *Defendant*.

## MEMORANDUM OPINION

This putative class action, lodged by plaintiffs Manda Richards and Matthew Maldonado, concerns the allegedly deceptive mortgage service practices of defendant NewRez, LLC ("NewRez"), f/k/a New Penn Financial, LLC, d/b/a Shellpoint Mortgage Servicing ("Shellpoint").[1]  Richards is domiciled in Maryland and Maldonado is domiciled in California. They are homeowners whose mortgages were transferred to Shellpoint.

Richards originally filed suit in the Circuit Court for Anne Arundel County. ECF 2. Thereafter, both Richards and Maldonado filed an Amended Complaint (ECF 3) in State court. Defendant subsequently removed the case to federal court (ECF 1, Notice of Removal), asserting subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1337; diversity jurisdiction, pursuant to 28 U.S.C. § 1332; and federal question jurisdiction, pursuant to 28 U.S.C. § 1331. *Id.*

The Amended Complaint (ECF 3) contains three counts. Plaintiffs allege violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.* (Count I); the Fair

---

[1] The parties sometimes identify defendant as "NewRez LLC", *i.e.*, without a comma after "NewRez."

Debt Collection Practices Act ("FDCPA" or the "Act"), 15 U.S.C. §§ 1692 *et seq.* (Count II); the

Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code (2013 Repl. Vol., 2014

Suppl.) §§ 14–204 *et seq.* of the Commercial Law Article ("C.L.") (Count III), and the Maryland

Consumer Protection Act ("MCPA"), C.L. §§ 13–301 *et seq.* (Count III).

With respect to the putative classes, plaintiffs identify three groups.  Plaintiffs assert

Count I on behalf of themselves and the "Untimely Hello Letter Class."  It is defined, *id.* ¶ 73(a),

as:

> All residential mortgage loan borrowers in California and Maryland for whom
> Shellpoint has not timely provided a 12 U.S.C.A. § 2605(c) notice in the three
> years proceeding [sic] the filing of this action.

Count II is asserted on behalf of both named plaintiffs and the "Untimely Notice Class."

It is defined, *id.* ¶ 73(b), as:

> All individuals in California and Maryland who within one year of
> commencement of this action Shellpoint (i) did not timely provided [sic] timely
> periodic statement [sic] as required by 15 U.S.C.A. § 1638(f) and 12 C.F.R. §
> 1026.41 related to those individual's residential mortgage debts or did not timely
> provide a notice pursuant to 12 U.S.C.A. § 2605(c) and (ii) where Shellpoint's
> records indicate that the debt had not been current for 30 or more consecutive
> days at the time Shellpoint began servicing it.

In addition, Count II is asserted on behalf of Maldonado and the "COVID-19 Class."  It is

defined, *id.* ¶ 73(c), as:

> All individuals in the United States who within one year of commencement of this
> action Shellpoint (i) agreed to a COVID-19 forbearance agreement for April
> through June 2020 related to those individual's residential mortgage debts and (ii)
> Shellpoint imposed or collected fees and charges beyond the contractual payments
> due on the individual's account and (iii) where Shellpoint's records indicate that
> the debt had not been current for 30 or more consecutive days at the time
> Shellpoint began servicing it.

Count III, based only on Maryland law, is asserted solely by Richards.

2

Shellpoint has moved to dismiss plaintiffs' Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6). ECF 13. Defendant contends that the Court lacks personal jurisdiction over Shellpoint as to Maldonado's claims and the related out-of-state class members. Further, it asserts that plaintiffs lack standing to pursue their claims in Count I and Count II. Shellpoint also moves to strike plaintiffs' proposed class definitions and Maldonado's jury prayer, pursuant to Rules 12(f) and 23(d)(1)(D). And, it moves for a more definite statement, pursuant to Fed. R. Civ. P. 12(e), as to Richards's individual claims in Count III. Finally, Shellpoint requests a transfer of the case to the Southern Division of this District. The motion is supported by a memorandum of law (ECF 13-1) (collectively, the "Motion") and five exhibits. ECF 13-3 to ECF 13-7.  Plaintiffs oppose the Motion. ECF 16. Defendant has replied. ECF 19.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant defendant's Motion in part and deny it in part.

## I.  FACTUAL SUMMARY[2]

### A.  Background

Shellpoint is a Delaware limited liability company with its principal place of business in Greenville, South Carolina. ECF 13-3, ¶ 3; ECF 3, ¶ 14. Shellpoint Partners, LLC is the sole member of Shellpoint. ECF 13-3, ¶ 3. Shellpoint Partners, LLC; its owners, NRM Acquisition, LLC and NRM Acquisition II, LLC; their owner, New Residential Mortgage, LLC; and its

---

[2] As discussed, *infra*, in the posture of this case, I must assume the truth of the facts as alleged by plaintiffs.  And, I may consider exhibits appended to the suit, without converting the Motion to one for summary judgment.

In the Memorandum Opinion, I cite to the electronic pagination.  It does not always correspond to the page number imprinted on a particular submission.

owner, New Residential Investment Corporation ("NRZ"), each have a principal place of business in New York. *Id.* ¶ 4; *see also* ECF 3, ¶ 14.[3]

Shellpoint is both a mortgage servicer and a debt collector, according to plaintiffs. ECF 3, ¶¶ 3, 4, 14. They state: "Shellpoint makes more money on behalf of NRZ by churning fees and making advances related to borrowers it believes are delinquent or in foreclosure and there is 'limited risk' that those sums will not be reimbursed to it—even if it has no right to impose the fees and charges in the first instance." *Id.* ¶ 14.

Richards is a borrower with respect to a mortgage loan for her property in Bethesda, Maryland. *Id.* ¶ 12. Maldonado is a borrower as to a mortgage loan for his home in Chino, California. *Id.* ¶ 13. On November 1, 2019 and February 1, 2020, respectively, Shellpoint acquired the servicing rights to plaintiffs' loans from other servicing companies. *Id.* ¶¶ 29, 30. At the time of transfer, Shellpoint allegedly believed that the loans of both plaintiffs were in default. *Id.* ¶¶ 42, 60.

Plaintiffs allege that "as a matter of standard policy and practice, Shellpoint disregards the express requirements" of its statutory and regulatory obligations to borrowers. *Id.* ¶ 6. In particular, plaintiffs complain about Shellpoint's (i) "fail[ure] to timely and reasonably identify itself to federally related mortgage borrowers"; (ii) "utilizing knowingly incorrect loan data transferred to it without making . . . any reasonable investigation to correct the inaccuracies"; and (iii) "imposing loan charges and fees to the borrowers in secret." *Id.*

Further, plaintiffs claim that they were harmed by defendant's (i) "utilization of knowingly incorrect loan data obtained by its predecessor(s) servicers while imposing and collecting improper fees and charges to the Named Plaintiff's [sic] and the putative class

---

[3] The domicile of the members of the LLCs is not of concern, because the Court does not rely on diversity for subject matter jurisdiction.

members' loan accounts with no proper notice to them; (ii) reporting of same derogatory information to the credit reporting agencies while not disclosing the information to the borrowers; and (iii) concealment of material loan information to Named Plaintiffs and class members." *Id.* ¶ 7.  Further, plaintiffs contend that Shellpoint "knows that the information transferred to it by its predecessor servicers is infected and prone to multiple errors but takes no reasonable steps to correct those errors but simply compounds the errors by utilizing the flawed data as part of its business practice and routine." *Id.* ¶ 6.

According to plaintiffs, "as part of its routine business practice," Shellpoint "imposes, churns, and collects a varied of [sic] collection fees related to the Plaintiffs' and class members' mortgage accounts including late fees, property valuation fees, property inspection fees, breach letter fees, etc." *Id.* ¶ 31.  Plaintiffs maintain, among other things, that such fees are not permitted under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Public Law No. 116-136. *Id.*

### B.  Allegations as to Plaintiff Richards

Richards acquired her property in Bethesda on August 31, 2005, for the sum of $169,500.00. *Id.* ¶ 32. To accomplish the purchase, Richards borrowed $159,030.00 from American Home Mortgage Acceptance, Inc. (the "Richards Loan"). *Id.* According to plaintiffs, this loan qualified at origination as a "federally related mortgage." *Id.*

On April 4, 2014, the Richards Loan was sold and assigned to Wilmington Savings Fund Society, FSB, as trustee for the PrimeStar-H Fund I Trust ("Primestar"). *Id.* ¶ 33. At this time, Primestar's loan servicer was Statebridge Company LLC. *Id.*  When Primestar owned the Richards Loan, "it agreed to the Primestar Settlement," which was approved by the Circuit Court for Anne Arundel County in July 2016.  *Id.* ¶ 34. Pursuant to this settlement, Primestar "agreed

that it was not entitled to attempt to collect from Richards any deficiency sums related to the Richard's [sic] loan and it was limited to *in rem* relief only." *Id.*

Thereafter, on October 26, 2016, Primestar sold the Richards Loan to Wilmington Savings Fund Society, FSB, as trustee for the Brougham Fund I Trust ("Brougham"). *Id.* ¶ 35. From October 13, 2016 to about November 1, 2019, Servis One, Inc. d/b/a BSI Financial Services ("BSI"), acted as the mortgage servicer on behalf of Primestar and then Brougham. *Id.* ¶ 37. Then, on October 8, 2019, the Richards Loan was sold to Morgan Stanley Mortgage Capital Holdings LLC ("Morgan Stanley"). *Id.* Richards was never notified of Morgan Stanley's acquisition of her loan. *Id.*

In the meantime, in 2015 Richards had filed for bankruptcy under Chapter 7 of the Bankruptcy Code. *Id.* ¶ 39.[4] On May 31, 2017, Richards "received a discharge of her personal liability from the Richards Loan pursuant to 11 U.S.C. § 727." *Id.*; *see* Case No. 15-25605, ECF 55 (D. Md.).

Then, in 2018, Richards sought protection under Chapter 13 of the Bankruptcy Code. ECF 3, ¶ 39; *see* Case No. 18-15772 (D. Md.). In that case, Richards "received an order confirming her proposed bankruptcy plan"; "notified BSI and all her other creditors of her change in mailing address"; and "disputed BSI's purported proofs of claim which claimed Richards owed sums in excess of what was due and owing on the Richards Loan." ECF 3, ¶ 39.

On May 15, 2019, BSI entered into a stipulation and Consent Order with the Consumer Financial Protection Bureau ("CFPB") related to its mortgage servicing and transfer practices. *Id.* ¶ 29(a). The CFPB concluded that "BSI had routinely transferred to subsequent servicers mortgage loan data information that was incomplete." *Id.* In addition, in *Graham v. Servis One,*

---

[4] Richards does not indicate whether she lived at this property when she filed for bankruptcy or whether she vacated the residence due to the bankruptcy.

*Inc.*, No. 2:18-cv-4377 (E.D. Pa.), it was "disclosed that a coding error in BSI's electronic systems related to certain borrowers, including Richards, caused it to send inaccurate statements to borrowers from May 1, 2018 to November 1, 2019." ECF 3, ¶ 29(b).

A few months later, on November 1, 2019, Shellpoint acquired from BSI the servicing rights to the Richards Loan, along with "certain putative class member loans." *Id.* ¶ 29; *see also id.* ¶ 41. When the Richards Loan was transferred to defendant, "Shellpoint believed that the Richards Loan was in default. . . ." *Id.* ¶ 42. And, according to plaintiffs, Shellpoint had "knowledge that its predecessor servicer—i.e. [BSI] has been subject to regulatory and private enforcement actions in which it has been disclosed that BSI's mismanagement of mortgage loans it services…has been subjected to multiple erroneous errors." *Id.* ¶ 29; *see id.* ¶¶ 37, 38.

Yet, according to plaintiffs, Shellpoint "has taken no reasonable steps to inquire about the accuracy of loan data it received from BSI related to Richards or any other former BSI borrower. . . ." *Id.* ¶ 38. In addition, plaintiffs allege that although Shellpoint has had knowledge of Richards's bankruptcy proceedings, it "still has taken no reasonable steps to inquire about the accuracy of loan data it received from BSI. . . ." *Id.* ¶ 40. Instead, according to plaintiffs, Shellpoint "has simply utilized that incorrect information and adopted it into its own records thereby infecting the accuracy of the loan account it manages related to Richards and the Richards Loan." *Id.*

Moreover, Shellpoint did not notify Richards of the transfer, as required by 12 U.S.C. § 2605(c) ("Hello Letter"). *Id.*[5] In particular, Richards complains that she did not receive a Hello Letter from Shellpoint until January 22, 2020. *Id.* And, according to plaintiffs, the letter was

---

[5] Section 2605(c) of 12 U.S.C. provides: "Each transferee servicer to whom the servicing of any federally related mortgage loan is assigned, sold, or transferred shall notify the borrower of any such assignment, sale, or transfer." And, that notice should be provided within 15 days of the transfer. *Id*

"materially defective" because it was sent to Richards's former address, where she had not resided for more than a year. *Id.* Further, the notice was dated November 12, 2019, even though it was not delivered to Richards until January 22, 2020—68 days after the time required under 12 U.S.C. § 2605(c). *Id.*

Plaintiffs allege that, since the transfer, "Shellpoint has also failed to send periodic statements to Richards identifying certain information," as required under 15 U.S.C. § 1638(f) and 12 C.F.R. § 1026.41. *Id.* ¶ 44.[6] Richards "only obtained copies of the purported periodic statements on April 6, 2020 when she gained access to" Shellpoint's online portal. *Id.* ¶ 45.[7]

Based on the address that Shellpoint used for its Hello Letter and periodic statements, plaintiffs believe that Shellpoint "simply incorporated BSI's knowingly inaccurate loan data transferred to it for addressing the Hello Letter and never sought to verify the accuracy of the data and information." *Id.* ¶ 43; *see also id.* ¶ 46. According to plaintiffs, Shellpoint "had reason to know that the address" it was using was wrong because it "received notice of the returned mail or inaccuracy from the United States Postal Service that indicated that the address it utilized was wrong. . . ." *Id.* ¶ 47.

Richards posits that she continued to make her mortgage payments to BSI in November 2019 and February 2020, pursuant to the agreements in her bankruptcy case, because Shellpoint had failed to properly disclose its interest to the bankruptcy court and had not sent Richards a Hello Letter "that would identify Richard's [sic] account number . . . and its payment address."

---

[6] Section 1638(f) of 15 U.S.C. provides: "The creditor, assignee, or servicer with respect to any residential mortgage loan shall transmit to the obligor, for each billing cycle, a statement…" *See also* 12 C.F.R. § 1026.41(1)(2) (implementing regulations) ("A servicer of a transaction subject to this section shall provide the consumer, for each billing cycle, a periodic statement.").

[7] Richards does not specify why she could not gain access to the online portal until that date.

*Id.* ¶ 48. Plaintiffs believe that BSI "forwarded" Richards's payments to Shellpoint, but "Shellpoint has not cashed the payments." *Id.*

Further, in March 2020, Richards sent Shellpoint two payments of $1,000 each at the address provided on Shellpoint's Hello Letter. *Id.* ¶ 49. But, neither of the checks has been cashed or returned. *Id.* Plaintiffs claim that Shellpoint and BSI have received payments "for thousands of dollars" from Richards, but Richards has not received credit for any of them. *Id.* ¶ 50.

In addition, since becoming the mortgage servicer for the Richards Loan, Shellpoint has allegedly "imposed and/or collected" numerous fees and charges as to Richards's account, "other than principle and interest," yet it "never disclosed those fees to Richards…." *Id.* ¶ 52. These include, *id.*:

|   | Description | Transaction Date | Amount |
|---|---|---|---|
| a. | "Other Fee Assessment" | November 18, 2019 | $105.00 |
| b. | "Other Fee Dib" | November 18, 2019 | $105,00 |
| c. | "Late Charge Assess" | February 12, 2020 | $60.23 |
| d. | "Late Charge Assess" | February 17, 2020 | $59.82 |
| e. | "Other Fees Disc" for Title Costs | March 10, 2020 | $350.00 |
| f. | "Legal Fees Disb." | March 24, 2020 | $900.00 |

Plaintiffs allege that these fees and charges constitute "actual damages to Richards" because Shellpoint was "not entitled to impose" such fees and charges "since it did not timely disclose its Hello Letter" or provide Richards with accurate periodic statements. *Id.* ¶ 53. Alternatively, plaintiffs contend that these fees are not permitted because "they each appear to be sums barred by the Primestar Settlement." *Id.* According to plaintiffs, "the errors and improper

charges by Shellpoint are directly the result of NRZ's business practices in relation to the MSRs [*i.e.*, "mortgage servicing rights"] it has acquired from another to churn all sorts of non-bona fide fees and advances which it will recoup under its business model. . . ." *Id.*

Moreover, plaintiffs claim that Shellpoint has reported to the credit reporting agencies, including TransUnion, that Richards "is personally liable on the Richards Loan when in fact she is personally discharged of any liability." *Id.* ¶ 54. According to plaintiffs, this "false reporting is done by Shellpoint for the purpose of attempting to coerce Richards into making payments on the Richards Loan for sums and charges she does not even owe or were [not] even disclosed to her." *Id.*

Because Shellpoint used data relating to the Richards Loan that contained errors, plaintiffs contend that Shellpoint "has harmed Richards by not conveying accurate and timely disclosures and imposing and collecting fees and charges with no proper notice to Richards." *Id.* ¶ 55. Richards has also allegedly "suffered informational injuries as a result of Shellpoint's conduct. . . ." *Id.*

### C. Allegations relating to Plaintiff Maldonado

In 1999, Maldonado acquired his property in California and borrowed funds to do so. *Id.* ¶ 56. On July 26, 2007, Maldonado refinanced his original loan with Countrywide Home Loans n/k/a Bank of America, NA ("Maldonado Loan"). *Id.* ¶ 57.  His loan qualified as a federally related mortgage at its origination.  *Id.* ¶ 58. The loan was "modified sometime in 2013-14." *Id.*; *see* ECF 13-7 ("Loan Adjustment Agreement"). Until January 31, 2020, Bayview Loan Servicing, LLC ("Bayview") acted as the mortgage servicer of the Maldonado Loan. ECF 3, ¶ 59.

Shellpoint acquired the servicing rights to the Maldonado Loan on February 1, 2020. *Id.* ¶ 60. Plaintiffs allege that, at the time of transfer, Shellpoint knew that Bayview's records were "prone to errors and contained irregularities" and had been subject to regulatory enforcement actions that disclosed Bayview's "mismanagement of mortgage loans it services…." *Id.* ¶ 30; *see id.* ¶ 63. Upon acquisition of the Maldonado Loan, Shellpoint allegedly "began churning fees and making advances related to borrowers without a reasonable basis to do so." *Id.* ¶ 62. Further, Shellpoint took "no reasonable steps to inquire about the accuracy of" the data and just used the "incorrect information" that it adopted from Bayview. *Id.* ¶ 65.

According to plaintiffs, at the time of transfer, Shellpoint "believed the Maldonado Loan was in default . . . ." *Id.* ¶ 66. Moreover, Shellpoint did not notify Maldonado of the transfer with a Hello Letter, as required by 12 U.S.C. § 2605(c), until February 27, 2020. *Id.* And, the notice was "materially defective" because it was dated February 14, 2020, but it was postmarked on February 17, 2020, and it was not delivered until February 27, 2020. *Id.* Plaintiffs allege that Shellpoint "had reason to know that it" was sending "untimely correspondence" because "its' [sic] contractual relationship with various mail vendors specifies that it must pay more money to timely send correspondence to borrowers and Shellpoint instead elected to not pay the premium fee that would have been imposed by its vendor…." *Id.* ¶ 68.

Since becoming the mortgage servicer for the Maldonado Loan, Shellpoint has allegedly imposed or collected numerous fees and charges in connection with Maldonado's loan account. *Id.* ¶ 69. These charges include, *id.*:

| | Description | Transaction Date | Amount |
|---|---|---|---|
| a. | "Property Inspection" | April 27, 2020 | $13.00 |
| b. | "Property Inspection" | April 3, 2020 | $13.00 |

 c. "Property Pres Payment (Bayview)" March 3, 2020 $110.00

 d. "Late Charge (Bayview)" January 20, 2020 $86.68

In addition, on April 14, 2020, Shellpoint entered into a "COVID-19 forbearance agreement with Maldonado," by which Shellpoint agreed to "forbear receipt payments on the Maldonado Loan until July 2020." *Id.* ¶ 70(c). In light of this agreement, plaintiffs contend that it was "unfair, deceptive, and unconscionable for Shellpoint to churn additional fees and costs onto the Maldonado Loan when it has no reasonable basis to assume the Maldonado Property is abandoned or in disrepair. . . ." *Id.*

## II. STANDARDS OF REVIEW

### A. RULE 12(b)(1)

Shellpoint raises a facial challenge to the Court's subject matter jurisdiction. ECF 13-1 at 25. It argues that plaintiffs lack standing to pursue their claims because their alleged injuries are not causally connected to the conduct complained of and are otherwise not concrete. *Id.*

Under Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); s*ee also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Hutton v. Nat'l Bd. of Examiners Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck v.*

*McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)); *see also Kerns*, 585 F.3d at 192.  Alternatively, in a factual challenge, "the defendant maintains that the jurisdictional allegations of the complaint are not true."  *Hutton*, 892 F.3d at 621 n.7 (citing *Beck*, 848 F.3d at 270).  In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Beck*, 848 F.3d at 270; *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014); *Evans*, 166 F.3d at 647.

### B.  RULE 12(b)(2)

Shellpoint moves to dismiss Maldonado's claims and the out-of-state class claims for lack of personal jurisdiction, predicated on Fed. R. Civ. P. 12(b)(2).  ECF 13-1 at 6-15.  "[A] Rule 12(b)(2) challenge raises an issue for the court to resolve, generally as a preliminary matter."  *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016).  Under Rule 12(b)(2), a defendant "must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge."  *Id.*; *see UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350 (4th Cir. 2020).  And, the burden is "on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence."  *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *see Grayson*, 816 F.3d at 267.

When "the existence of jurisdiction turns on disputed factual questions the court may resolve the [jurisdictional] challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question."  *Combs*, 886 F.2d at 676.  In its discretion, a court may also permit discovery as to the jurisdictional issue.  *See Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993).  However, neither discovery

nor an evidentiary hearing is required in order for the court to resolve a motion under Rule 12(b)(2). *See generally* 4A WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 1351 (4d ed. 2019).

"The plaintiff's burden in establishing jurisdiction varies according to the posture of a case and the evidence that has been presented to the court." *Grayson*, 816 F.3d at 268. "When personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a *prima facie* case of jurisdiction." *Hawkins v. i-TV Digitalis Tavkozlesi zrt*., 935 F.3d 211, 226 (4th Cir. 2019); *see Grayson*, 816 F.3d at 268. In that circumstance, "the district court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Hawkins*, 935 F.3d at 226; *accord Sneha Media & Entm't, LLC. v. Assoc. Broad. Co. P Ltd.*, 911 F.3d 192, 196 (4th Cir. 2018); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc*., 334 F.3d 390, 396 (4th Cir. 2003). However, "[u]nlike under Rule 12(b)(6), the court may also consider affidavits submitted by both parties, although it must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction." *Hawkins*, 935 F.3d at 226; *see UMG Recordings, Inc.*, 2020 WL 3476993, at *3; *Grayson*, 816 F.3d at 268; *Consulting Eng'rs Corp. v. Geometric Ltd*., 561 F.3d 273, 276 (4th Cir. 2009); *Mylan Labs.*, 2 F.3d at 62.

Defendant has submitted the affidavit of Amber Knight, a Shellpoint employee. ECF 13-3 (the "Shellpoint Affidavit").[8] The Court may consider it to resolve the jurisdictional questions.

---

[8] The affiant states that she is "an authorized representative" of Shellpoint with personal knowledge of the facts in the Affidavit. However, she never indicates the position she holds with Shellpoint.

## C.  Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But,

mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer"

that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"  *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243); *see Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (citation omitted).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'"  *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).  Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]"  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Moreover, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Defendant submitted five exhibits with its Motion. These include the Shellpoint Affidavit (ECF 13-3); the Deed of Trust for each plaintiff (ECF 13-4; ECF 13-5); an Order of March 26, 2019, from Richards's bankruptcy proceeding (ECF 13-6); and Maldonado's loan modification form (ECF 13-7).

As indicated, I will consider the Shellpoint Affidavit (ECF 13-3) as to the question of personal jurisdiction under 12(b)(2). Each Deed of Trust and the bankruptcy court order are matters of public record. And, plaintiffs do not contest their authenticity. Therefore, I may take judicial notice of these documents (ECF 13-4 to ECF 13-6), pursuant to Fed. R. Evid. 201, without converting the Motion to one for summary judgment.  In addition, the loan modification form is referenced in and integral to the Amended Complaint. And, plaintiffs do not contest its authenticity. Therefore, I may also consider ECF 13-7.

### D.  RULE 9(b)

Fed. R. Civ. P. 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *See*, *e.g.*, *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that a Maryland Consumer Protection Act claim that "sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)"); *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims.").

19

Under Rule 9(b), a plaintiff alleging claims that sound in fraud "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (quotation omitted). In other words, "Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (quotation omitted).

Rule 9(b) serves several salutary purposes. In *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999), the Fourth Circuit identified four purposes (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc.*, 755 F.Supp. 1055, 1056–57 (S.D. Ga. 1990):

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

However, the plain text of Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784. Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F.

20

Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, No. HAR-92-3421, 1993 WL 454355, at \*9 (D. Md. Sept. 14, 1993)); *accord Piotrowski v. Wells Fargo Bank, N .A.*, No. DKC 11–3758, 2013 WL 247549, at \*5 (D. Md. Jan. 22, 2013).

### III. DISCUSSION

Defendant contends that the Court lacks personal jurisdiction over Shellpoint as to Maldonado's claims and the out-of-state class members as to the claims of both plaintiffs. ECF 13-1 at 6-13.  Further, Shellpoint asserts that plaintiffs lack standing to pursue their claims in Counts I and II and have failed to allege fulfillment of a contractual requirement for pre-suit notice as to both counts. *Id.* at 15-17, 25-29. In addition, Shellpoint posits that plaintiffs fail to state a claim for relief under the FDCPA. *Id.* at 18-24. Defendant also moves to strike plaintiffs' proposed class definitions and Maldonado's jury prayer, pursuant to Rules 12(f) and 23(d)(1)(D). *Id.* at 29-30, 34. And, defendant moves for a more definite statement, pursuant to Rule 12(e), as to Richards' individual claims under Count III. *Id.* at 31-34. Last, it requests a transfer of this case to the Southern Division of this District. *Id.* at 35-40.

I shall address each of defendant's contentions, in turn.

### A. PERSONAL JURISDICTION

#### 1. Maldonado

As to Maldonado's claims, defendant argues that the Court lacks specific and general jurisdiction over Shellpoint. ECF 13-1 at 6-9. In addition, Shellpoint contends that the Court lacks personal jurisdiction over the out-of-state class members, pursuant to the Supreme Court's holding in *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, ___ U.S. ___, 137 S. Ct. 1773 (2017) ("*Bristol-Myers*"). *See* ECF 13-1 at 11-14.

Plaintiffs contend that Shellpoint is subject to jurisdiction in Maryland because Shellpoint owns or has an interest in real property in Maryland.  ECF 3, ¶ 9; ECF 16 at 12.  Further, they

assert that this Court has personal jurisdiction because Shellpoint is "licensed as a Maryland mortgage lender/servicer… and as a result it does business in Maryland and has subjected itself to having its practices reviewed by Maryland courts." ECF 16 at 14; *see* ECF 3, ¶ 14.  And, they argue that this Court has personal jurisdiction because Richards and certain class members were injured in Maryland by Shellpoint.  ECF 3, ¶ 9.[9]

Moreover, plaintiffs assert in their Opposition that Maldonado has the right to appear voluntarily and join as a plaintiff in a pending suit, because he is otherwise a putative class member.  ECF 16 at 13.  In addition, plaintiffs maintain that "Maldonado waived any due process objections he had by his voluntary appearance and consented to having his claims heard in Maryland."  *Id.* at 14.

### a.

Fed. R. Civ. P. 4(k)(1)(A) authorizes a federal district court to exercise personal jurisdiction over a defendant in accordance with the law of the state where the district court is located.  *Carefirst of Md.*, 334 F.3d at 396.  It is well settled that, "to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment."  *Id.*; *see Clarke Veneers & Plywood, Inc. v. Mentakab Veneer & Plywood, SDN BHD*, 821 F. App'x 243, 244 (4th Cir. 2020).

Maryland's long-arm statute is codified at Md. Code (2013 Repl. Vol.), § 6-103(b) of the Courts & Judicial Proceedings Article ("C.J.").  It authorizes "personal jurisdiction over a person, who directly or by an agent," *id.*:

---

[9]  In addition, plaintiffs allege jurisdiction "because BSI transacts business . . . in Maryland."  ECF 3, ¶ 8. BSI is not a party to the case, however.

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

Maryland's courts have "consistently held that the purview of [Maryland's] long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." *Beyond Systems, Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 15, 878 A.2d 567, 576 (2005) (citing *Mohamed v. Michael*, 279 Md. 653, 657, 370 A.2d 551, 553 (1977)); *see CSR, Ltd. v. Taylor*, 411 Md. 457, 472, 983 A.2d 492, 501 (2009) (stating that the long-arm statute authorizes the exercise of personal jurisdiction "'to the full extent allowable under the Due Process Clause'" (citation omitted)); *Bond v. Messerman*, 391 Md. 706, 721, 895 A.2d 990, 999 (2006); *Pinner v. Pinner*, 240 Md. App. 90, 104, 201 A.3d 26, 34 (2019).

Although the long-arm and constitutional due process requirements are distinct, they can be evaluated in tandem. *See Beyond Sys*, 388 Md. at 15, 878 A.2d at 576 ("[O]ur statutory inquiry merges with our constitutional examination."); *accord Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996) ("Because the limits of Maryland's statutory authorization for the exercise of personal jurisdiction are coterminous with the limits of the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one."). Therefore, I shall consider whether the exercise of personal jurisdiction over defendant comports with due process.

The Supreme Court has long held that personal jurisdiction over a nonresident defendant is constitutionally permissible so long as the defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). Courts have separated this test into individual "prongs," first ascertaining whether the threshold of "minimum contacts" is met, and then considering whether the exercise of jurisdiction on the basis of those contacts is "constitutionally reasonable." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002). Nonetheless, the "constitutional touchstone" of personal jurisdiction is that "'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Due process jurisprudence "recognize[s] two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers*, 137 S. Ct. at 1780 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers,* 137 S. Ct. at 1780 (emphasis in original) (citing *Goodyear*, 564 U.S. at 919). However, in *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014), the Supreme Court made clear that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." In particular, as to "'an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent

place, one in which the corporation is fairly regarded as at home.'" *Id.* (quoting *Goodyear*, 564 U.S. at 924).

Notably, "broad constructions of general jurisdiction" are "generally disfavored." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir. 1993). The Supreme Court has said: "[T]he inquiry ... is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'" *Daimler*, 571 U.S. at 138-39 (quoting *Goodyear*, 564 U.S. at 919) (alteration in original).

As indicated, for a corporation, "the place of incorporation and principal place of business are 'paradig[m] ... bases for general jurisdiction.'" *Daimler*, 571 U.S. at 137 (bracket in *Daimler*) (citation omitted). Although the *Daimler* Court acknowledged that the principal place of business and place of incorporation are not the only places in which a corporation may be considered "at home," it emphasized that "[t]hose affiliations have the virtue of being unique— that is, each ordinarily indicates only one place," and it declined to extend general personal jurisdiction based on activities that would render the corporation subject to adjudication in "every other State in which [the corporation's] sales are sizable." *Id.* at 137-39.

The Supreme Court's decision in *BNSF Ry. Co. v. Tyrrell*, __ U.S. __, 137 S.Ct. 1549 (2017), is informative. There, the plaintiffs sued a railroad in a Montana state court for injuries sustained outside of Montana, and the railroad moved to dismiss the case for lack of personal jurisdiction. *Id.* at 1553-54. The Court invoked *Goodyear*, 564 U.S. 915, and *Daimler*, 571 U.S. 117, in concluding that the Montana state court did not have personal jurisdiction over the railroad, despite the fact that the railroad operated over 2,000 miles of in-state track and had over 2,000 in-state employees. *BNSF Ry. Co.*, 137 S.Ct. at 1559. "In-state business," it concluded,

"does not suffice to permit the assertion of general jurisdiction over claims like [those of the plaintiffs] that are unrelated to any activity occurring in Montana." *Id.* at 1559; *see also Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 138 (4th Cir. 2020) (concluding that the act of obtaining a business license in a state does not create general jurisdiction).

Specific jurisdiction, on the other hand, exists where the "the suit arise[s] out of or relate[s] to the defendant's contacts with the forum.'" *Daimler*, 571 U.S. at 127 (citation omitted) (alterations in original); *see Burger King*, 471 U.S. at 472–73 (Specific jurisdiction may be established over a defendant who "has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities.") (citation omitted) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Bristol-Myers*, 137 S. Ct. at 1780 (alterations in original) (quoting *Goodyear*, 564 U.S. at 919).

Of import here, "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being hauled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). "For this reason, 'specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Bristol-Myers*, 137 S. Ct. at 1780 (quoting *Goodyear*, 564 U.S. at 919). And, specific jurisdiction is assessed on a claim-by-claim basis. *See Pan-Am. Prod. & Holdings, LLC v. R.T.G. Furniture Corp.*, 825 F. Supp. 2d 664, 678 (M.D.N.C. 2011) ("When specific jurisdiction is asserted, jurisdiction must be established for each claim alleged."); *Gatekeeper, Inc. v. Stratech Sys., Ltd.*, 718 F. Supp. 2d 664, 666-68 (E.D. Va. 2010)

(interrogating the doctrinal basis for this rule); WRIGHT & MILLER, § 1069.7 ("[A] plaintiff also must secure personal jurisdiction over a defendant with respect to each claim she asserts.").

The Fourth Circuit has formulated a three-part test for use in determining whether there is specific jurisdiction over a defendant. The three prongs are: "'(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.'" *Consulting Eng'rs*, 561 F.3d at 278 (quoting *ALS Scan*, 293 F.3d at 712); *accord Sneha Media & Entm't*, 911 F.3d at 198; *Perdue Foods, LLC v. BRF, S.A*., 814 F.3d 185, 188 (4th Cir. 2016); *Carefirst*, 334 F.3d at 397.

### b.

It is undisputed that Shellpoint is neither incorporated nor headquartered in Maryland. Shellpoint is a Delaware limited liability company with its principal place of business in South Carolina. ECF 3, ¶ 14; ECF 13-3, ¶ 3. Thus, as to Maldonado's claims, in order for him to establish general jurisdiction over Shellpoint he must show that Shellpoint's contacts with Maryland are so substantial as to render it "at home" in this State. *See Goodyear*, 564 U.S. at 919.

As a mortgage servicing company, Shellpoint holds servicing rights for properties in all 50 states. ECF 13-3, ¶ 8. And, according to the Shellpoint Affidavit, 2.82% of Shellpoint's servicing rights relate to mortgages in Maryland. *Id.* ¶ 9. This suggests that Shellpoint has contacts with Maryland that qualify as systematic and continuous. But, they are not substantial enough to "render [Shellpoint] essentially at home in" the State; Shellpoint's Maryland operations represent only a small fraction of the company's overall operations. *Id.*; *see Daimler*,

571 U.S. at 139 n.20 ("[T]he general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-state contacts.... General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide.").

Indeed, if the Court were to exercise general jurisdiction over Shellpoint based on the facts presented here, then Shellpoint would likely be subject to general jurisdiction in all 50 states. And, the "*Daimler* Court rejected the [] assertion that general jurisdiction could be exercised 'in every State in which a corporation engages in a substantial, continuous, and systematic course of business.'" *Fidrych*, 952 F.3d at 133 (quoting *Daimler*, 571 U.S. at 138 ("A corporation that operates in many places can scarcely be deemed at home in all of them.")).

The Court in *BNSF Ry. Co.*, 137 S. Ct. 1549, emphasized that a corporation is "at home" only in its "place of incorporation and its principal place of business," unless there is an "exceptional case" that "render[s] the corporation at home" elsewhere. *Id.* at 1558 (internal quotations omitted). An "exceptional case," it explained, would be one such as *Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437 (1952), in which "war had forced the defendant corporation's owner to temporarily relocate the enterprise from the Philippines to Ohio," such that "Ohio then became 'the center of the corporation's wartime activities.'" *BNSF Ry. Co.*, 137 S.Ct. at 1558 (construing *Perkins*, 342 U.S. 437) (quoting *Daimler,* 571 U.S. at 130 n.8).

In *Perkins*, general personal jurisdiction was found in Ohio because the company's president moved to Ohio, conducted all decision making, management, and correspondence from his office in Ohio, and fully "discharged his duties as president and general manager" in Ohio. *Perkins*, 342 U.S. at 448. In discussing *Perkins*, the Supreme Court highlighted in *Daimler* that "Ohio could be considered 'a surrogate for the place of incorporation or head office.'" *Daimler*,

571 U.S. at 130 n.8 (quoting Arthur T. von Mehren & Donald T. Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 HARV. L. REV. 1121, 1144 (1966)).

Plaintiffs' allegations as to Shellpoint do not come close to an "exceptional case." *BNSF Ry. Co.*, 137 S.Ct. at 1558 (internal quotations omitted). There "is nothing that would distinguish [Shellpoint's] relationship with [Maryland] from its relationship with any of the other states where it does business but where it is not incorporated or headquartered[.]" *Fidrych*, 952 F.3d at 134. Accordingly, because Shellpoint's contacts do not rise to the level of rendering it at home in Maryland, the requirements for the exercise of general jurisdiction are not satisfied in this case with respect to Maldonado's claims.

Therefore, I turn to the issue of specific jurisdiction. Shellpoint argues that plaintiffs do not allege facts sufficient to show specific jurisdiction as to Maldonado's claims because the Amended Complaint "fails to link Maldonado's injuries or Shellpoint's conduct to Maryland." ECF 13-1 at 7. I agree.

Maldonado is domiciled in California. His claims arise out of Shellpoint's activities in servicing his mortgage for his property, located in California. *See, e.g.*, ECF 3, ¶ 56. As a named plaintiff, however, Maldonado must demonstrate his own "connection between the forum [*i.e.*, Maryland] and the specific claims at issue." *Bristol-Myers*, 137 S. Ct. at 1781; *see Lincoln v. Ford Motor Co.*, JKB-19-2741, 2020 WL 5820985, at *5 (D. Md. Sept. 29, 2020) ("[T]his Court will require each named plaintiff in a class action suit to demonstrate personal jurisdiction over a defendant"); *Roy v. FedEx Ground Package Sys.*, 353 F. Supp. 3d 43, 56-57 (D. Mass. 2018) ("District courts generally have extended the specific jurisdiction principles articulated in *Bristol-Myers* to the analysis of personal jurisdiction over named plaintiffs in federal class actions."); *Shell v. Shell Oil Co.*, 165 F. Supp. 2d 1096, 1107 n.5 (C.D. Cal. 2001) (stating that

"it is by now well settled that [venue and personal jurisdiction requirements] to [file] suit must be satisfied for *each and every named plaintiff* for the suit to go forward") (emphasis in the original).

Significantly, Maldonado has not alleged any facts that demonstrate a connection between his claims and Maryland. *See Chernus v. Logitech, Inc*., No. 17-672(FLW), 2018 WL 1981481, at *2 (D. N.J. Apr. 27, 2018) (finding the court did not have personal jurisdiction over a nonresident named plaintiff in a putative nationwide class action where the named plaintiff's injury lacked a connection to the forum state); *Greene v. Mizuho Bank, Ltd*., 289 F. Supp. 3d 870, 874 (N.D. Ill. 2017) (finding that because the named plaintiff was not an Illinois resident and the complaint did not allege any Illinois contact with his claims, *Bristol-Myers* required dismissal for lack of personal jurisdiction); *Spratley v. FCA US LLC*, 3:17-CV-62, 2017 WL 4023348, at *6–7 (N.D.N.Y. Sept. 12, 2017) (applying *Bristol-Myers* and finding that the court lacked specific jurisdiction over the claims of the out-of-state named plaintiffs who showed no connection between their claims and the defendant's contacts with the forum state).

For example, nowhere in the Amended Complaint does Maldonado allege that he took out a loan in Maryland, made any loan related payments in Maryland, or otherwise suffered any harm in Maryland.  Other than the general allegation that Shellpoint transacts business in this District, the Amended Complaint fails to allege that Shellpoint has taken any actions in Maryland that form the basis of Maldonado's claims. Moreover, the "mere fact that *other* [resident] plaintiffs" suffered harm in Maryland, "and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims. As [the Supreme Court has] explained, 'a defendant's relationship with a ... third party, standing alone, is an insufficient basis for jurisdiction.'" *Bristol-Myers*, 137 S.Ct. at

1781 (quoting *Walden v. Fiore*, 571 U.S. 271, 286 (2014)) (alterations by this Court; emphasis by *Bristol-Myers* Court).

In *Bristol-Myers*, 137 S.Ct. 1773, a combination of California and non-California residents filed suit in a state court in California against Bristol-Myers Squibb ("BMS"), alleging that they had been injured by the drug Plavix.  *Id.* at 1778.   BMS is incorporated in Delaware and headquartered in New York.  137 S. Ct. at 1778.  The "nonresidents were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California." *Id.* at 1781.  The Court concluded that "the mere fact that other plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injures as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.*  Thus, like the nonresidents in *Bristol-Myers*, Maldonado cannot establish personal jurisdiction over Shellpoint by bootstrapping his claims to those of his co-plaintiff, Richards, who is domiciled in Maryland.

Accordingly, as to Maldonado's claims against Shellpoint, the Court lacks specific personal jurisdiction.

### c.

The question remains whether Maldonado's claims should be dismissed without prejudice or, instead, transferred to a more appropriate forum.  In the Opposition, plaintiffs appear to assume that if the Court finds that it lacks personal jurisdiction over any of the claims, then they would be remanded to state court. ECF 16 at 12 n.2. And, it asserts, that the Court can decide to remand the case, *sua sponte*. *Id.*

Section 1447(c) of 28 U.S.C. authorizes the district court to remand a removed case to state court only under certain circumstances. Specifically, at any time, a district court may

remand a case, *sua sponte*, based on a lack of subject matter jurisdiction. *See Doe v. Blair*, 819 F.3d 64, 66-67 (4th Cir. 2016) (citing *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 198–99 (4th Cir. 2008)); *Martin Groff Const. Co., Inc. v. Betskoff*, 434 F. App'x 266, 266 (4th Cir. 2011). But, as to a defect other than subject matter jurisdiction, the court may remand the case only if a party makes a timely motion for the court to do so, *i.e.*, within thirty days of the filing of the removal. *See Ellenburg*, 519 F.3d at 198-99 ("[A] district court is prohibited from remanding a case *sua sponte* based on a procedural defect absent a motion to do so from a party.").

Plaintiffs do not make a request to transfer Maldonado's claims to another district, pursuant to 28 U.S.C. 1406(a), in the event of a finding of lack of personal jurisdiction.  Nor have plaintiffs moved to remand the case.

Accordingly, I shall dismiss Maldonado's claims, without prejudice, pursuant to Fed. R. Civ. P. 12(b)(2).  Moreover, because Maldonado is the only named plaintiff for the "COVID-19 class," this class claim must also be dismissed.[10]

### 2.  Out-of-State Class Members

Shellpoint contends that, pursuant to the Supreme Court's holding in *Bristol-Myers*, this Court "lacks both general and specific personal jurisdiction over [it] for the claims of out of state members of the proposed national classes. . ."  ECF 13-1 at 11.

As discussed, *Bristol-Myers* "concerned the exercise of personal jurisdiction by state courts over state law claims in a mass tort action" and did not involve any absentee litigants. *Weisheit v. Rosenberg & Assocs., LLC*, JKB-17-0823, 2018 WL 1942196, at *5 (D. Md. Apr. 25,

---

[10] Because I am dismissing the claims as to Maldonado, I need not address any of the defendant's remaining arguments that are specific to Maldonado, such as defendant's motion to strike Maldonado's jury prayer.  ECF 13-1 at 34-35.

2018).  Therefore, it "is unclear what impact *Bristol-Myers* has" with respect to personal jurisdiction over nonresident, absentee litigants in a class action case in federal court.  *Id.*

The Seventh Circuit recently applied *Bristol-Myers*'s rule to a class action suit in federal court, stating: "We see no reason why personal jurisdiction should be treated any differently from subject-matter jurisdiction and venue: the named representatives must be able to demonstrate either general or specific personal jurisdiction, but the unnamed class members are not required to do so." *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 447 (7th Cir. 2020).  However, to my knowledge, the Fourth Circuit has not yet opined on the impact of *Bristol-Myers* in the context of putative class actions. Nevertheless, trial courts in this district and elsewhere have consistently expressed skepticism about the extension of *Bristol-Myers* to unnamed plaintiffs in federal class actions.  *See Nat'l Fair Hous. All. v. Bank of Am., N.A.*, No. CCB-18-1919, 401 F. Supp. 3d 619, 628 (D. Md. 2019) (The "animating federalism concerns that drove the Court to divest California of the power to hear certain claims of out-of-state plaintiffs may apply differently in federal court where the forum tribunal and any alternative tribunal represent the same sovereign."); *Weisheit*, 2018 WL 1942196 (declining to find a proposed amended complaint futile under Rule 15 based on *Bristol-Myers)*; *see also Labrecque v. NewRez LLC*, No. CV-19-00465-TUC-RCC (EJM), 2020 WL 3276699, at *11 (D. Nev. June 16, 2020) ("[F]ederal courts in the Ninth Circuit have taken the lead in declining to extend *Bristol-Myers* to [the class action] context, at least as to the claims of non-named plaintiffs.") (collecting cases); *Murphy v. Aaron's, Inc.*, No. 19-CV-00601-CMA-KLM, 2020 WL 2079188, at *8 (D. Colo. Apr. 30, 2020) ("As long as a federal district court has specific jurisdiction over a nonresident defendant as to claims asserted by a named plaintiff representing the nationwide class action ... that court has jurisdiction over the defendant as to absent nonresident class members' claims.").

In my view, defendant's arguments are premature. "It is class certification that brings the unnamed class members into the action and triggers due process limitations on a court's exercise of personal jurisdiction over their claims." *Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293, 298 (D.C. Cir. 2020) (concluding the motion to dismiss putative class members was premature and should be filed after the class is certified); *see Cruson v. Jackson Nat'l Life Ins. Co*., 954 F.3d 240, 249 (5th Cir. 2020) (finding a personal jurisdiction challenge to unnamed class members could not be raised until class certification).  The case is at inception, and plaintiffs have not yet brought a motion to certify a nationwide class. Thus, at this juncture, I need not decide the precise "contours of a possible class…" or whether the Court has jurisdiction over Shellpoint with respect to the class claims. *Weisheit*, 2018 WL 1924219, at \*5; *see Kadow v. First Federal Bank*, PWG-19-0566, 2020 WL 5230560, at \*12 (D. Md. Sept. 2, 2020) ("Issues regarding class certification are properly deferred until such time as the Court determines whether a class will be certified and what the nature of that class will be.").

## B.  STANDING (COUNTS I AND II)

Pursuant to Rule 12(b)(1), Shellpoint has moved to dismiss Count I (RESPA) and Count II (FDCPA), claiming plaintiffs lack Article III standing because their alleged injuries are not traceable to the alleged failure to send proper notices. ECF 13-1 at 25-29. In addition, Shellpoint contends that plaintiffs' alleged non-monetary injuries are not sufficiently concrete or particularized so as to demonstrate standing. *Id.* at 27-28.

### 1.  General Principles

It is a bedrock principle that Article III of the Federal Constitution confines the federal courts to the adjudication of "actual, ongoing cases or controversies."  *Lewis v. Cont'l Bank Corp*., 494 U.S. 472, 477 (1990) (citations omitted); *see Carney v. Adams*, __ U.S. __, 141 S.Ct.

493, 498 (2020); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020).   "Indeed, 'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'"   *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016)).

"Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Uzuegbunam v. Preczewski,* __ S.Ct. __, 2021 WL 850106, at *3 (Mar. 8, 2021) (citations omitted). Therefore, during the pendency of a case, an actual controversy must exist.   *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *Int'l Bhd. of Teamsters, Local Union No. 639 v. Airgas, Inc.*, 885 F.3d 230, 234 (4th Cir. 2019); *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013). In the absence of a case or controversy, "the court's subject matter jurisdiction ceases to exist . . . ."   *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).

"Two related doctrines…each originating in the case-or-controversy requirement of Article III…underlie [the] determination [of whether a case is justiciable]. First, a plaintiff must demonstrate standing…. Second, the case must be 'ripe.'" *Trump v. New York*, __ U.S. __, 141 S.Ct. 530, 535 (2020) (internal citations omitted); *see Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue.); *Spokeo, Inc.*, 136 S. Ct. at 1547 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *South Carolina v. United States*, 912 F.3d 720, 726

(4th Cir. 2019) ("The standing doctrine derives from the Constitution's limitation on Article III courts' power to adjudicate cases and controversies.") (internal quotation marks and citations omitted).  The *Clapper* Court explained, 568 U.S. at 408: "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."

The doctrine of standing consists of two distinct "strands": constitutional standing, pursuant to Article III, and prudential standing.  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004).  As discussed, *infra*, "the standing inquiry asks whether a plaintiff ha[s] the requisite stake in the outcome of a case . . . ."  *Deal v. Mercer County Board of Ed.*, 911 F.3d 183, 187 (4th Cir. 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)).  Under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a particularized injury," which is a requirement that "serves vital interests going to the role of the judiciary in our system of separated powers."   *Hollingsworth v. Perry*, 570 U.S. 693, 696 (2013).

To establish Article III standing, a plaintiff must satisfy three elements.   *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). They are, *id.* (internal quotation marks and citations omitted):

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*See also Uzuegbunam*, 2021 WL 850106, at *3; *Spokeo, Inc.*, 136 S. Ct. at 1548; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014); *Clapper*, 568 U.S. at 409; *Friends of the*

*Earth, Inc.*, 528 U.S. at 180-81; *Outdoor Amusement Business Ass'n., Inc. v. Dept. of Homeland Security*, 983 F.3d 671, 680 (4th Cir. 2020); *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 361 (4th Cir. 2020); *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 226-27 (4th Cir. 2019); *South Carolina*, 912 F.3d at 726; *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018); *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207 (4th Cir. 2017); *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015); *Lane v. Holder*, 703 F.3d 668, 671 (4th Cir. 2011); *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011).[11]

"For an injury to be traceable, 'there must be a causal connection between the injury and the conduct complained of' by the plaintiff." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Lujan*, 504 U.S. at 560). However, "the defendant's conduct need not be the last link in the causal chain[.]" *Id.*; *see also Lexmark Int'l, Inc.*, 572 U.S. at 134 n.6 ("Proximate causation is not a requirement of Article III standing[.]"). "[W]here the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendant's conduct 'upon the action of someone else,'" the traceability requirement is satisfied. *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

Of relevance here, the "strictures of Article III standing are no less important in the context of class actions." *Baehr*, 953 F.3d at 252 (citing *Krakauer v. Dish Network, LLC*, 925

---

[11] As the Fourth Circuit explained in *Deal*, 911 F.3d at 189, the two concepts—actual, ongoing injury or imminent injury—are "disjunctive." An "allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Susan B. Anthony*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5); *see Lujan*, 504 U.S. at 564; *South Carolina*, 912 F. 3d at 726. In contrast, "'[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). This requirement serves "to ensure that the alleged injury is not too speculative for Article III purposes." *Wikimedia Found.*, 857 F.3d at 208.

F.3d 643, 652 (4th Cir. 2019)).  In *Frank v. Gaos*, __ U.S. ___, 139 S. Ct. 1041, 1046 (2019), the Supreme Court said that a district court is "powerless to approve a proposed class settlement" if "no named plaintiff has standing."

### 2.   Alleged Harms

Plaintiffs[12] assert a variety of injuries under Counts I and II. The first is financial: plaintiffs claim that they suffered monetary damages in the form of "fees," "late charges," "title costs," and "legal fees" that Shellpoint added to their accounts. ECF 3, ¶¶ 52-53, 55. According to plaintiffs, these fees and charges are "actual damages" because Shellpoint was not entitled to impose any fees or charges without first providing a Hello Letter or other "proper notice." *Id.* ¶¶ 53, 55.

Plaintiffs also allege a number of related injuries. They assert they suffered "informational injuries" and "uncertainty and fear" because Shellpoint was "not conveying accurate and timely disclosures and imposing and collecting fees and charges with no proper notice." *Id.* ¶ 55.

### 3.   Analysis

As noted, this is a putative class action.  But, the Court analyzes standing "based on the allegations of personal injury made by the named plaintiff." *Dreher*, 856 F.3d at 343; *see Baehr*, 953 F.3d at 252-53.

As to plaintiffs' alleged financial injuries, defendant argues that the alleged actual damages as to "fees and costs" "are not facially traceable to the alleged" violations because nothing in the implementing regulations of RESPA or the FDCPA "precludes" Shellpoint from

---

[12] Although Maldonado's claims are subject to dismissal, leaving Richards as the only remaining named plaintiff, I shall continue to refer to "plaintiffs," as relevant, for consistency and convenience.

imposing fees and charges if it fails to send a Hello Letter or periodic statements. ECF 13-1 at 26, 29.  But, defendant cites no case law to support its argument.

Plaintiffs counter that they have alleged the "specific fact, nature and amount of tangible monetary harm incurred by each Representative Plaintiff: i.e. their 'actual damages' caused by Shellpoint's illegal conduct," in violation of RESPA and the FDCPA. ECF 16 at 10 (citing ECF 3, ¶¶ 48-50, 52-53, 55, 61, 69-70, 95, 102).

I am not persuaded by Shellpoint's arguments that plaintiffs have not sufficiently alleged a traceable injury. At this stage of the litigation, the Court must assume the truth of the allegations in the Amended Complaint. Plaintiffs allege that, as a "direct and proximate result" of Shellpoint's untimely notices, they were damaged by "Shellpoint's imposition and collection of fees."  ECF 3, ¶¶ 55, 95.  And, the conduct was never disclosed because of the failure of defendant to notify and communicate with plaintiffs.  Further, plaintiffs claim that defendant's untimely notices violated Shellpoint's duties under the FDCPA and RESPA. In other words, plaintiffs have alleged that they suffered injuries as a result of defendant's conduct. *See Lansdowne*, 713 F.3d at 197; *Cf. Ben-Davies v. Blibaum & Associates, P.A.,* 695 F. App'x 674, 676 (4th Cir. 2017) (finding Art. III standing where complaint alleged that as a "direct consequence" of defendant's alleged "violations of the FDCPA's proscribed practices, she 'suffered and continues to suffer' actually existing intangible harms that affect her personally: 'emotional distress, anger, and frustration.'").

In sum, I am satisfied that plaintiffs have plausibly alleged concrete, financial injuries in the form of charges and fees under Counts I and II. Therefore, plaintiffs have adequately pleaded Article III standing.

### C.  FAILURE TO PLEAD A CONDITION PRECEDENT (NOTICE AND CURE PROVISION) (COUNTS I AND II)

Defendant urges dismissal of Count I and part of Count II because plaintiffs did not comply with the notice provision in each Deed of Trust. ECF 13-1 at 15.

Richards's Deed of Trust provides, in relevant part, ECF 13-4, § 20:

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.

According to Shellpoint, plaintiffs did not provide the requisite notice and opportunity to cure prior to initiating this action. ECF 13-1 at 15-16. Therefore, defendant argues that some of plaintiffs' claims are improper. *Id.*

"When claims arise from actions taken pursuant to the contract or agreement at issue, a valid notice and cure provision is a precondition to the suit." *Taub v. World Financial Network Bank*, 950 F. Supp. 2d 698, 702 (S.D.N.Y. 2013); *see Niyaz v. Bank of Am.*, 1:10-cv-796, 2011 WL 63655, at *2 (E.D. Va. Jan. 3, 2011); *see also Johnson v. Countrywide Home Loans, Inc.*, 1:10-cv-1018, 2010 WL 5138392, at *2 (E.D. Va. Dec. 10, 2010) (granting defendant's motion to dismiss plaintiff's Truth in Lending Act claims, among others, pursuant to a notice and cure provision on the grounds that "all of Plaintiff's allegations ar[o]se from actions taken pursuant to the Deed of Trust").  But, courts have also held that claims that exist independent of a contractual agreement between the parties, such as allegations of deceptive trade practices, are not subject to the notice and cure provisions that might otherwise apply. *See, e.g., Stovall v. SunTrust Morg., Inc.*, No. RDB–10–2836, 2011 WL 4402680, at *7 (D. Md. Sept. 20, 2011) (finding that a notice and cure provision in the deed of trust did not require dismissal of the

borrower's claims because the majority of the claims involved allegations of deceptive business practices); *Gerber v. First Horizon Home Loans Corp.*, No. 05–1554P, 2006 WL 581082, at *3 (W.D. Wash. Mar. 8, 2006) (dismissing a borrower's cause of action for breach of contract due to the borrower's failure to comply with a notice and cure provision, but allowing a claim under the Consumer Protection Act to proceed because this "cause of action, which involves allegations of deceptive business practices, clearly exists independent of any contract between the parties").

In other words, "'[w]hen claims arise from actions taken pursuant to the contract or agreement at issue, a valid notice and cure provision is a precondition to the suit,' but where a plaintiff 'alleges that the [mortgage] agreement violated federal law,' a 'notice and cure provision does not apply[.]'" *Cass v. TitleMax of Georgia, Inc.*, 1:17-cv-02479-MHC-RGV, 2018 WL 1916401, at *6 (N.D. Ga. 2018) (quoting *Taub*, 950 F. Supp. 2d at 702) (alterations in *Cass*); *see St. Breux v. U.S. Bank, Nat'l Ass'n*, 919 F. Supp. 2d 1371, 1375-76 (S.D. Fla. 2013) (concluding that the notice and cure provision of the mortgage contract did not apply to the plaintiff's TILA claim because the claimed TILA violation was a violation of a duty "owed by reason of" TILA, not the mortgage).

It is undisputed that plaintiffs did not provide notice under the Deed of Trust before filing the Complaint in this case. But, they contend that the notice and cure provisions do not apply to Shellpoint because Shellpoint was not a party to either Deed of Trust. ECF 16 at 7. Further, plaintiffs argue that the notice and cure provisions do not apply here because "the majority" of plaintiffs' claims concern "Shellpoint's unfair and deceptive practices" and thus do not arise out of a Deed of Trust. *Id.*

Shellpoint concedes that some of plaintiffs' claims "fall outside the scope of the notice and cure provisions." ECF 19 at 9. But, it explains that it "intentionally limited its argument" to

41

the claims that do not involve deceptive trade practices. ECF 19 at 9. In other words, defendant posits that it has moved to dismiss only the claims for which Shellpoint was entitled to notice, in accordance with each Deed of Trust. *Id.* (citing ECF 13, ¶¶ 93, 99).

*St. Breaux*, 919 F. Supp. 2d 1371, is instructive.  In that case, the plaintiff brought suit under the Truth in Lending Act ("TILA") for allegedly deficient disclosures in a mortgage agreement. Although the plaintiff had not complied with a notice and cure provision for claims "arising from" the other party's actions, the court did not dismiss the suit. *Id.* at 1375-76. Because the TILA violation provided the basis for the claim, rather than the mortgage agreement itself, the court found that the notice provision did not apply. *Id.* at 1376.

Similarly, in this case, plaintiffs do not allege that Shellpoint violated the Deed of Trust or any other contractual agreement.  Rather, plaintiffs allege that Shellpoint violated provisions of RESPA, the FDCPA, and TILA by failing to provide the required notifications to borrowers. In other words, plaintiffs' claims, albeit related to or arising out of the mortgages, "do not allege a breach of mortgage or any duty arising therefrom.*" Foster v. Green Tree Servicing*, 8:15-cv-1878-T-27MAP, 2017 WL 5151354, at *3 (M.D. Fla. Nov. 3, 2017) (finding plaintiffs not required to provide notice pursuant to mortgage because claims arose from alleged violations of consumer protection statutes, not the mortgage); *see Belcher v. Ocwen Loan Servicing, LLC*, No. 8:16–CV–690–T–23AEP, 2016 WL 7243100, at *4 (M.D. Fla. Dec. 15, 2016) ("Belcher has a statutory right of action [FDCPA and FCCPA] that is independent from the requirement under the mortgage agreement to give pre-suit notice.").

Under the circumstances of this case, notice to Shellpoint was not a precondition to suit.

### D.  FAIR DEBT COLLECTION PRACTICES ACT

### 1.  FDCPA Generally

Congress enacted the Fair Debt Collection Practices Act in 1977.  *See* Pub. L. 95–109, 91

Stat. 874 (1977).  The statute is concerned with "rights for consumers whose debts are placed in the hands of professional debt collectors . . . ."  *DeSantis v. Computer Credit, Inc.*, 269 F.3d 159, 161 (2d Cir. 2001); *see also Ruth v. Triumph Partnerships*, 577 F.3d 790, 797 (7th Cir. 2009).  "A significant purpose of the Act" is the elimination of "abusive practices by debt collectors . . . ."  *Brown v. Card Service Center*, 464 F.3d 450, 453 (3d Cir. 2006); *see also Moore v. Blibaum & Assoc., P.A.*, 693 F. App'x 205, 206 (4th Cir. 2017).  It protects consumers from debt collectors who engage in "abusive, deceptive, and unfair debt collection practices," while "insur[ing] that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and . . . promote[s] consistent State action to protect consumers against debt collection abuses."   15 U.S.C. § 1692(e); *see Henson v. Santander Consumer USA, Inc.*, ___ U.S. ___, 137 S. Ct. 1718, 1720 (2017) (stating that the FDCPA "authorizes private lawsuits and weighty fines designed to deter wayward collection practices"); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 576 (2010); *Ben-Davies v. Blibaum & Assoc., P.A.*, 695 F. App'x 674, 676 (4th Cir. 2017); *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 135 (4th Cir. 1996).

The FDCPA is a remedial statute.  Therefore, it is construed liberally in favor of the debtor.  *Brown*, 464 F.3d at 453; *see*, *e.g.*, *Russell v. Absolute Collection Servs., Inc*., 763 F.3d 385, 393 (4th Cir. 2014) (recognizing the canon of statutory interpretation that remedial statutes are to be construed liberally) (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561-62 (1987)); *Glover v. F.D.I.C.*, 698 F.3d 139, 149 (3d Cir. 2012); *Hamilton v. United Healthcare of La.*, 310 F.3d 385, 392 (5th Cir. 2002).

To establish a claim under the FDCPA, "a plaintiff must prove that: '(1) the plaintiff has been the object of collection activity arising from consumer debt; (2) the defendant is a debt

collector as defined by the FDCPA; and (3) the defendant has engaged in an act or omission prohibited by the FDCPA.'" *Boosahda v. Providence Dane LLC*, 462 F. App'x 331, 333 n.3 (4th Cir. 2012) (quoting *Ruggia v. Wash. Mut.*, 719 F. Supp. 2d 642, 647 (E.D. Va. 2010)); *see Webster v. ACB Receivables Mgmt., Inc.*, 15 F. Supp. 3d 619, 625 (D. Md. 2014); *Stewart v. Bierman*, 859 F. Supp. 2d 754, 759 (D. Md. 2012).

Plaintiffs allege violations of 15 U.S.C. § 1692f, *i.e.*, the "Unfair Practices" section of the FDCPA. Section 1692f states: "A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." The statute provides a list of conduct that violates the section, but it also "allows the court to punish any other unfair or unconscionable conduct not covered by the FDCPA." *Lembach v. Bierman*, 528 F. App'x 297, 303 (4th Cir. 2013).

In particular, plaintiffs contend that Shellpoint violated § 1692f by failing to comply with other statutory and regulatory obligations:  12 U.S.C. § 2605(c); 15 U.S.C. § 1638(f); and/or 12 C.F.R. § 1026.41.  According to plaintiffs, Shellpoint violated the FDCPA by failing to provide borrowers, such as plaintiffs, with timely Hello Letters, pursuant to 12 U.S.C. § 2605(c); periodic statements, pursuant to 15 U.S.C. § 1638(f) and 12 C.F.R. § 1026.41; and by failing to employ reasonable procedures and practices to ensure the addresses that it uses correspond with those of the borrowers. ECF 3, ¶ 97-104.

The Hello Letter provision, 12 U.S.C. § 2605(c), provides: "Each transferee servicer to whom the servicing of any federally related mortgage loan is assigned, sold, or transferred shall notify the borrower of any such assignment, sale, or transfer." And, that notice should be provided within 15 days of the transfer. *Id.*  As to periodic statements, 15 U.S.C. § 1638(f) states: "The creditor, assignee, or servicer with respect to any residential mortgage loan shall transmit to the obligor, for each billing cycle, a statement…." That statute's implementing regulation, 12

C.F.R. § 1026.41(a)(2), further states: "A servicer of a transaction subject to this section shall provide the consumer, for each billing cycle, a periodic statement…."

Defendant urges the Court to dismiss Count II on two grounds. It argues that the Amended Complaint fails to allege that Shellpoint is a "debt collector," as defined in 15 U.S.C. § 1692a(6). ECF 13-1 at 23-25. Further, Shellpoint contends that two of plaintiffs' theories for relief under the FDCPA—Shellpoint's alleged failure to send periodic statements and to use reasonable procedures to assure correct addresses—cannot serve as the basis for FDCPA claims. *Id.* at 19-23.

### 2. Debt Collectors

As indicated, defendant contends that the Amended Complaint fails plausibly to allege that Shellpoint is a "debt collector." ECF 13-1 at 23.

The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6); *see Schlegel v. Wells Fargo Bank, N.A.*, 720 F.3d 1204, 1208-09 (9th Cir. 2013); *Police v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 404 (3d Cir. 2000).

The Supreme Court clarified the definition in *Henson*, 137 S. Ct. at 1721: "[T]he Act defines debt collectors to include those who regularly seek to collect debts 'owed . . . *another*.' And by its plain terms this language seems to focus our attention on third party collection agents working for a debt owner—not on a debt owner seeking to collect debts for itself." (Emphasis added). Accordingly, "[a]ll that matters is whether the target of the lawsuit regularly seeks to collect debts for its own account or does so for 'another.'" *Id.*

The Act also "defines the classes of persons that are excluded from the definition of debt collector." 15 U.S.C. § 1692a(6)(F); *Henson v. Santander Consumer USA, Inc.*, 817 F.3d 131, 136 (4th Cir. 2016), *aff'd*, *Henson*, 137 S. Ct. 1718.  Of import here, under the Act, the definition of "debt collector" does not include an entity that is "collecting or attempting to collect any debt . . . to the extent such activity . . . (iii) concerns *a debt which was not in default at the time it was obtained by such person* . . . ."  15 U.S.C. § 1692a(6)(F) (emphasis added).  "To simplify, this exclusion means that a person collecting nondefaulted debts on behalf of others is not a debt collector.  This exclusion was intended by Congress to protect those entities that function as loan servicers for debt not in default."  *Henson*, 817 F.3d at 136.

A "creditor," by contrast, is defined as "any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another."  15 U.S.C. § 1692a(4).  Generally, entities servicing or collecting a debt they were assigned before default are considered "creditors" under the Act.  *See Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003); *Ruth*, 577 F.3d at 796; *see also* 15 U.S.C. § 1692a(4); *id.* § 1692a(6)(F)(iii).

"The structure of the Act suggests" that an entity receiving or attempting to collect money due on a debt "must be one or the other," that is, either a debt collector or a creditor. *Schlosser*, 323 F.3d at 538.  Creditors and debtors are generally "mutually exclusive" categories under the FDCPA.  *Schlosser*, 323 F.3d at 536; *see F.T.C. v. Check Investors, Inc.*, 502 F.3d 159, 173 (3d Cir. 2007) ("[A]s to a specific debt, one cannot be both a 'creditor' and a 'debt collector,' as defined in the FDCPA, because those terms are mutually exclusive."); *accord*, *e.g.*, *Bradford v. HSBC Mortgage Corp.*, 829 F. Supp. 2d 340, 348 (E.D. Va. 2011).

46

The Amended Complaint alleges that Shellpoint is "a debt collector pursuant to 15 U.S.C. § 1692a(6) as it acquired the servicing right to the Plaintiffs' loans and certain of the similarly situated persons they represent when it believed the loans were delinquent or in default." ECF 3, ¶ 14(c); *see also id.* ¶ 98 ("Shellpoint acquired its interest in the loans of the Untimely Notice Class and COVID-19 Class members when it alleges (directly or indirectly) and believed the loans were in default and therefore Shellpoint is a Debt Collector within the meaning of 15 U.S.C. § 1692a(6)."); *id.* ¶ 101 ("Shellpoint is a debt collector pursuant to 15 U.S.C. 1692a(6) because its principal business activity utilizes instrumentalities of interstate commerce or the mails related to the enforcement of security interests as described in 15 U.S.C. § 1692f(6)…").

Defendant claims that these allegations are essentially formulaic recitations of the statutory text and insufficient to state a claim that Shellpoint is a debt collector. ECF 13-1 at 24; ECF 19 at 11-12. Notably, defendant never posits that Shellpoint could not be considered a debt collector under the Act. Rather, it merely argues that the allegations in the Amended Complaint are not sufficient to establish that Shellpoint meets the statutory definition of debt collector.

To be sure, some of the allegations in the Amended Complaint merely parrot the statutory definition of debt collector. *See Anderman v. JP Morgan Chase Bank Nat'l Ass'n*, 803 F. App'x 290, 293 (11th Cir. Feb. 11, 2020) (affirming dismissal where "plaintiffs simply restated the [FDCPA's] definition [of debt collector] in their complaint, without alleging any factual support"); *Saunders v. Capital One Bank (USA), N.A.*, PWG-18-3222, 2019 WL 2869655, at *3 (D. Md. July 3, 2019) (finding complaint that includes a formulaic recitation of the statutory definition of debt collector without any other facts to support the assertion fails to state a claim under the FDCPA). But, that is the starting point.  In contrast to the cases cited by plaintiffs, the Amended Complaint goes beyond mere formulaic recitations of the statutory text.

According to the Amended Complaint, Shellpoint acquired the Richards Loan from BSI, which had "acted as the mortgage servicer on behalf of Primestar and then Brougham," the owners of the loan. ECF 3, ¶¶ 37, 41. Viewing these allegations in the light most favorable to plaintiffs, the Court may infer that Shellpoint, like BSI, was pursuing debt owed to another—the owners of the loan. *See Kennedy v. Hankey Grp.*, WDQ-09-2890, 2010 WL 1664087, at *4 (D. Md. Apr. 22, 2010) ("Construing these allegations in the light most favorable to [plaintiff], the Court may infer that [defendant] acquired the right to pursue debts due under contracts to which it was not a party.").

Moreover, based on the allegations, Shellpoint does not fall into any of the relevant exclusions set out in subsections 1692a(6)(A)-(F) because plaintiffs allege that Shellpoint believed the debt it was acquiring at the time of the transfer was in default. ECF 3, ¶ 43. "Where a servicer believes a loan to be in default at the time it commences servicing, however, courts have found it is not exempt from the FDCPA's definition of 'debt collector.'" *Allen v. Bank of America Corp.*, CCB-11-33, 2011 WL 3654451, at *7 n. 9 (D. Md. Aug. 18, 2011); *see Mitchell v. U.S. Bank Nat'l Ass'n.*, TDC-19-2225, 2020 WL 3050739, at *11 (D. Md. June 8, 2020); *see also Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 359, 361 (6th Cir. 2012) (holding that a loan servicer qualifies as a debt collector if the debt was assigned for servicing after the alleged default occurred); *Schlosser*, 323 F.3d at 539  (concluding that "the exclusion in § 1692a(6)(F)(iii)does not apply because [the defendant mortgage servicer] attempted to collect on a debt that it asserted to be in default and because that asserted default existed when [the defendant] acquired the debt," even though the debt was not actually in default when the defendant acquired it).

Accordingly, Shellpoint's alleged pursuit of debt in default on behalf of the owner of the debt is sufficient to qualify Shellpoint as a "debt collector." As a result, dismissal of the FDCPA claim on this ground is not warranted.

### 3.  Periodic Statements and Customer Addresses

Plaintiffs allege that defendant violated 15 U.S.C. § 1692f by collecting fees and charges when it failed to provide timely periodic statements, as required by the TILA, 15 U.S.C. § 1638(f) and 12 C.F.R. § 1026.41 (implementing regulation of § 1638f), and failed to use reasonable procedures to ensure it was using the correct addresses in contacting borrowers.  ECF 16 at 22.[13]

Section 1638(f) of TILA provides: "The creditor, assignee, or servicer with respect to any residential mortgage loan shall transmit to the obligor, for each billing cycle, a statement" containing information such as the remaining principal, the current interest rate, a description of late payment fees, and specific contact information through which the obligor can obtain more information about the mortgage. *See also* 12 C.F.R. § 1026.41(1)(2) ("A servicer of a transaction subject to this section shall provide the consumer, for each billing cycle, a periodic statement.").

The implementing regulations include exemptions to this requirement. 12 C.F.R. § 1026.41(e). Of relevance here, § 1026.41(e)(5)(i) provides (emphasis added):

> [A] servicer is exempt from the requirements of this section with regard to a mortgage loan if:

> (A) Any consumer on the mortgage loan is a debtor in bankruptcy under title 11 of the United States Code or *has discharged personal liability for the mortgage loan pursuant to* 11 U.S.C. 727, 1141, 1228, or 1328; and

---

[13] Notably, plaintiffs do not allege that failure to use correct addresses constituted a violation of a particular statutory provision.

(B) With regard to any consumer on the mortgage loan: …

(3) A court enters an order in the bankruptcy case providing for the avoidance of the lien securing the mortgage loan, *lifting the automatic stay pursuant to* 11 U.S.C. 362 *with regard to the dwelling securing the mortgage loan*, or requiring the servicer to cease providing a periodic statement or coupon book.

In other words, the requirement to send periodic statements might not apply once a borrower goes into bankruptcy or is discharged from liability following a bankruptcy proceeding. *See, e.g., Cilien v. U.S. Bank Nat'l Ass'n*, 687 F. App'x 789, 792 (11th Cir. 2017) ("Because Plaintiff was a debtor in bankruptcy…[the bank] was exempted from the notice requirements under TILA."); *Loewy v. CMG Mortgage, Inc.*, 385 F. Supp. 3d 1083, 1088 (S.D. Cal. 2019) (finding no violation of TILA provisions because borrower was in bankruptcy).

As indicated, Richards filed for bankruptcy under Chapter 7 of the Bankruptcy Code in 2015.  ECF 3, ¶ 39.  And, on May 31, 2017, Richards received a discharge of her personal liability from the Richards Loan, pursuant to 11 U.S.C. § 727. *Id.*; *see* Case No. 15-25605, ECF 55 (D. Md.). Thereafter, in 2018 Richards sought protection under Chapter 13 of the Bankruptcy Code.  ECF 3, ¶ 39; *see* Case No. 18-15772 (D. Md).  In the Chapter 13 bankruptcy proceedings, the bankruptcy court issued an order lifting the automatic stay, pursuant to 11 U.S.C. § 362, to permit foreclosure proceedings with regard to her property, which was secured by the mortgage loan. *See* ECF 13-6 (Order of March 6, 2019, ECF 49).

Shellpoint acquired the servicing rights to Richards's loan on November 1, 2019, after Richards was discharged from personal liability for the loan and the court had lifted the stay. Therefore, under § 1026.41(e)(5)(i), it appears that Shellpoint was exempt from sending periodic statements to Richards.

Notably, in their Opposition, plaintiffs do not contest that this exemption applies to Shellpoint. In fact, plaintiffs do not directly address defendant's argument with regard to periodic statements.

Moreover, with regard to plaintiffs' second claim, plaintiffs do not allege a separate statutory requirement that obligates servicers to use correct addresses in contacting borrowers. Rather, plaintiffs' claim seems to be based on the same statutes that require the provision of Hello Letters and periodic statements—12 U.S.C. § 2605(c), 15 U.S.C. § 1638(f), and 12 C.F.R. § 1026.41. *See* ECF 16 at 30-31. But, if Shellpoint was not required to send periodic statements to Richards, it was not required to ensure that it had the correct address to send those notices. Thus, plaintiffs' claim that Shellpoint did not use reasonable procedures to ensure the accuracy of its data fails to the extent that it is based on Shellpoint's failure to send periodic statements.

Even if Shellpoint was not exempt from sending periodic statements, the FDCPA claim as to periodic statements would still fail. As noted, this part of plaintiffs' claim under the FDCPA is predicated on a violation of a TILA provision: 15 U.S.C. § 1638(f) and 12 C.F.R. § 1026.41. But, TILA only imposes civil liability on creditors and their assignees. 15 U.S.C. §§ 1640(a), 1641(a). Under TILA, a "creditor" is a person who "(1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is *initially* payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement." 15 U.S.C. § 1602(g) (emphasis added). An assignee of a creditor may be liable "only if the violation for which the action or proceeding is brought is apparent on the face of the disclosure statement...." 15 U.S.C. § 1641(a). This definition does not include

loan servicers "unless the servicer is or was the owner of the obligation." 15 U.S.C. § 1641(f)(1); *see Mourad v. Homeward Residential, Inc.*, 517 F. App'x 360, 364 (6th Cir. 2013) (affirming dismissal of the plaintiff's TILA claim because it was undisputed that the defendant was merely the servicer, and not the owner, of the loan).

According to the factual allegations in the Amended Complaint, Shellpoint is *not* "the person to whom the debt…[was] initially payable," nor is it the owner of the obligation, so it does not constitute a "creditor" under TILA. 15 U.S.C. § 1602(g). Therefore, Shellpoint has no liability for alleged TILA violations. *See Best v. NewRez LLC*, GJH-19-2331, 2020 WL 5513433, at *31 (D. Md. Sept. 11, 2020) ("Plaintiff's [TILA] claim is asserted only against Shellpoint, his servicer, and therefore cannot proceed" because "TILA only imposes liability on creditors and their assignees."); *Kemp v. Seterus, Inc.*, 348 F. Supp. 3d 443, 447 (D. Md. 2018) ("The TILA claims against [defendant], who is the loan servicer, are clearly dismissible."); *Mbongo v. Specialized Loan Servicing, LLC*, PJM-15-2941, 2016 WL 8671841, at *5-6 (D. Md. June 24, 2016) (dismissing TILA claim against servicer because it was neither the loan originator nor an assignee of the loan); *see also Oh v. Ocwen Loan Servicing, LLC*, 18-cv-07214, 2021 WL 131432, at *4-5 (N.D. Ill. Jan. 14, 2021) (dismissing plaintiff's claim for TILA violation based on failure to provide periodic statements because defendant was not a creditor under TILA).

And, courts have consistently ruled that the FDCPA "is not properly used as an enforcement mechanism for the TILA," especially where the plaintiffs could not succeed on a TILA claim, independently. *Large v. LVNV Funding, LLC*, No. 1:09-CV-689, 2010 WL 3069409, at *4-5 (W.D. Mich. Aug. 2, 2010) (citing *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502 (9th Cir. 2002) ("To permit a simultaneous claim under the FDCPA would allow through the back door what [the plaintiff] cannot accomplish through the front door—a private right of

action."); *see Lee v. Northland Group*, No. 02 C 6083, 2003 WL 25765398 (N.D. Ill. Apr. 24, 2003) (ruling that an alleged violation of the TILA could not form the predicate for stating a claim under the FDCPA); *Neff v. Capital Acquisitions & Mgmt. Co.*, 238 F. Supp. 2d 986, 992 (N.D. Ill. 2002) ("Because his FDCPA claim is entirely predicated on a nonexistent TILA violation, [plaintiff's] FDCPA claim must be dismissed."), *aff'd*, 352 F.3d 1118 (7th Cir. 2003); *Robb v. Capital Acquisitions & Mgmt. Co.*, No. 02 C 4829, 2002 WL 31654941 (N.D. Ill., Nov. 21, 2002) (same), *aff'd on other grounds*, 352 F.3d 1118 (7th Cir. 2003).

Accordingly, I shall grant the Motion as to the claims under Count II that are based on Shellpoint's alleged failure to send periodic statements.

### E.  Motion to Strike Class Definition

Shellpoint moves to strike both proposed class definitions, asserting that they are "improper fail-safe class definitions" that impermissibly determine membership based on a finding of liability. ECF 13-1 at 29-30.  "[A] fail-safe class 'is defined so that whether a person qualifies as a member depends on whether the person has a valid claim.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 n.9 (4th Cir. 2014) (quoting *Messner v. North Shore Univ. Health Sys.*, 669 F.3d 802, 825 (7th Cir. 2012)); *Chado v. Nat'l Auto Inspects., LLC*, JKB-17-2945, 2019 WL 1981042, at *4 (D. Md. May 3, 2019) (a fail-safe class is "one that requires a finding of liability before ascertaining whether an individual is a class member."). "If class members are impossible to identify without extensive and individualized fact-finding, or 'mini-trials,' then a class action is inappropriate." *Marcus v. BMW of N. Am.*, LLC, 687 F.3d 583, 593 (3d Cir. 2012); *see EQT Prod.*, 764 F.3d at 1055 (noting that "a class cannot be certified unless a court can readily identify the class members in reference to objective criteria"); *Alig v. Quicken Loans Inc., __ F.3d __*, 2021 WL 899305, at *5 (4th Cir. Mar. 10, 2021) ("Rule 23 also contains an implicit requirement of ascertainability.").

53

Rule 23(c)(1) provides: "At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action."  As a result, "[e]ither plaintiff or defendant may move for a determination of whether the action may be certified under Rule 23(c)(1)."  7AA CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1785 (3d ed. 2018); *see Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 769 (D. Md. 2012) ("A court need not wait until class certification is sought to determine whether a party complies with [Rule] 23.") (brackets added) (citing, *inter alia*, *Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943, 949 (6th Cir. 2011)).  And, of relevance here, Rule 23(d)(1)(D) authorizes the court to require amendment of pleadings "to eliminate allegations about representation of absent persons and that the action proceed accordingly."

Of course, "courts should exercise caution when striking class action allegations based solely on the pleadings." *Manning v. Boston Medical Center Corp*., 725 F.3d 34, 59 (1st Cir. 2013). "As a general matter, a ruling on class certification should normally be based on 'more information than the complaint itself affords,'… and it should be made only 'after a rigorous analysis of the particular facts of the case.'" *Bryant v. Food Lion, Inc.*, 774 F. Supp. 1484, 1495 (D.S.C. 1991) (quoting *Doctor v. Seaboard Coast Lines R.R. Co.*, 540 F.2d 699, 707 (4th Cir. 1976)).  On the other hand, "several circuits, including the Fourth Circuit in an unpublished table decision, have found that Rule 23 permits defendants to file preemptive motions to deny certification before discovery is completed." *Williams v. Potomac Family Dining Grp. Operating Co., LLC*, GJH-19-1780, 2019 WL 5309628, at *4 (D. Md. Oct. 21, 2019) (collecting cases).

Where, as here, defendants seek pre-discovery dismissal of class allegations, the motion "should be granted when it is clear from the face of the complaint that the plaintiff cannot and

could not meet Rule 23's requirements for certification because the plaintiff has 'fail[ed] to properly allege facts sufficient to make out a class' or 'could establish no facts to make out a class.'" *Id.* (quoting *Bessette v. Avco Fin. Servs., Inc.*, 279 B.R. 442, 449 (D.R.I. 2002)) (alteration in *Williams*).   In other words, in such circumstances a court applies the familiar standard embodied in Rule 12(b)(6) to determine whether the pleadings plausibly allege a class.

As indicated, Richards seeks to certify two classes: the "Untimely Hello Letter Class" and the "Untimely Notice Class." The "Untimely Hello Letter Class" is defined, ECF 3, ¶ 73(a), as follows:

> All residential mortgage loan borrowers in California and Maryland for whom Shellpoint has not timely provided a 12 U.S.C.A. § 2605(c) notice in the three years proceeding [sic] the filing of this action.

And, the "Untimely Notice Class" is defined, *id.* ¶ 73(b), as:

> All individuals in California and Maryland who within one year of commencement of this action Shellpoint (i) did not timely provided [sic] timely periodic statement [sic] as required by 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41 related to those individual's residential mortgage debts or did not timely provide a notice pursuant to 12 U.S.C.A. § 2605(c) and (ii) where Shellpoint's records indicate that the debt had not been current for 30 or more consecutive days at the time Shellpoint began servicing it.

Defendant argues that the class definitions require a determination of whether a class member received timely notice before it can be said that such an individual is a member of the class. ECF 13-1 at 29-30. And, to make that determination, it would be necessary to engage in individual fact-finding to identify the members of the class. *Id.* (citing *Zarichny v. Complete Pmt. Rec. Servs., Inc.*, 80 F. Supp. 3d 610, 624 (E.D. Pa. 2015) (striking FDCPA class at pleadings stage because it required individual findings to identify the class members)).

Plaintiffs respond that, in the current posture of the case, it is not appropriate to address class certification issues. ECF 16 at 37. Notably, plaintiffs do not dispute defendant's contention

that the proposed classes are impermissible fail-safe classes. But, they argue that any potential issues can be remedied by redefining the class, rather than striking the class allegations altogether. *Id.* Plaintiffs urge the Court to allow discovery before considering a motion to strike class allegations. *Id.*

As noted, I may only grant a motion to strike class action allegations if class treatment on the face of the complaint leaves little doubt that a class action is not viable. I agree with defendants that the two classes, as currently defined, are fail-safe classes; they will require a finding that the statutorily-required notices were not received by an individual before that individual can be included as a class member. The proposed class definition "would impermissibly require [the Court] to certify a class solely on potential class members' say so" or it would require "individualized fact-finding and litigation" to identify class members. *Zarichny*, 80 F. Supp. 3d at 625-26.

As discussed, plaintiffs' claims under both RESPA and the FDCPA are based on their allegations that Shellpoint did not provide proper notice to its borrowers, pursuant to 12 U.S.C. § 2605(c), and thus was not entitled to impose and collect fees from those borrowers. *See, e.g.*, ECF 3, ¶ 53. Therefore, defining the class to include anyone who did not receive such notice means that only those potential members who would prevail on this issue would be members of the class. "This is an improper fail-safe class that shields the putative class members from receiving an adverse judgment. Either the class members win or, by virtue of losing, they are not in the class, and therefore, not bound by the judgment." *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011); *see Sauter v. CVS Pharmacy, Inc.*, No. 2:13-CV-846, 2014 WL 1814076, at *9 (S.D. Ohio May 7, 2014) (finding proposed class was an impermissible fail-safe class because the proposed class consisted solely of persons who can establish that

defendant violated the relevant statute); *Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158 (N.D. Cal. 2008) (finding proposed class definition to be a classic "fail-safe" class because "[t]o determine who should be a member of these classes, it would be necessary for the court to reach a legal determination that Dell had falsely advertised").

Accordingly, I shall strike the classes as plaintiffs have defined them. But, I shall grant plaintiffs leave to file an amended complaint. *See Messner*, 669 F.3d at 825 ("Defining a class so as to avoid, on one hand, being overinclusive and, on the other hand, the fail-safe problem is more of an art than a science. Either problem can and often should be solved by refining the class definition rather than by flatly denying class certification."); *Sauter*, 2014 WL 1814076, at *9 ("Assuming that the Court finds his proposed classes to be fail-safe, the Plaintiff argues that the Court should permit him to amend his class definitions rather than striking them entirely. The Court agrees."); *St. Louis Heart Ctr., Inc. v. Forest Pharm., Inc.*, No. 4:12-CV-02224, 2013 WL 1076540, at *6 n.7 (E.D. Mo. Mar. 13, 2013) ("Moreover, in the face of a 'fail-safe class,' district courts have broad discretion to redefine the class in order to avoid issues that such a class definition may present."); *see also Cummins v. Ascellon Corp.*, DKC-19-2953, 2020 WL 6544822, at *7 (D. Md. Nov. 6, 2020) ("Several courts have found that a 'fail-safe class definition' is not necessarily fatal in the Fed. R. Civ. P. 23 context.") (internal citations omitted); *Campbell v. First Am. Title Ins. Co.*, 269 F.R.D. 68, 73–74 (D. Me. 2010) (revising the class definition to avoid "the 'fail safe' issue"); *Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232, 250–51 (W.D. Pa. 2008) (same).

## F.  RICHARDS'S INDIVIDUAL CLAIM

In Count III, Richards brings an individual claim against Shellpoint for violations under the MCDCA and the MCPA. ECF 3, ¶¶ 105-121. In particular, Richards alleges that Shellpoint's imposition and collection of fees and charges violated the MCDCA, C.L. §§ 14-202(8), (11)

because Shellpoint "knowingly and recklessly attempted to interfere or otherwise infect Richards' rights based on alleged sums not lawfully due." ECF 3, ¶ 111. According to plaintiff, this also constituted a per se violation of the MCPA, C.L. § 13-301(14)(iii), and unfair and deceptive trade practices, in violation of §§ 13-301(1)(3), 13-303(4)(5). *Id.* ¶¶ 113-118.

Shellpoint moves to dismiss Count III, pursuant to Fed. R. Civ. P. 8(a)(2) and 9(b), for failure to provide adequate notice of the nature of plaintiff's claim. ECF 13-1 at 31. Alternatively, Shellpoint moves for more a definite statement as to Count III, pursuant to Fed. R. Civ. P. 12(e). *Id.* at 32 n.11. Shellpoint contends that Count III is a "shotgun pleading" because it incorporates "prior lengthy recitation" of facts and then lists "numerous theories for relief" under the MCDCA and the MCPA. *Id.* at 32; ECF 19 at 19. In particular, Shellpoint claims that it has not been put on notice "as to which statutes are the subject of Count III, which theories of relief are being pursued in Count III, and which factual allegations are intended to support such relief." ECF 13-1 at 33. In addition, defendant contends that Richards fails to allege the element of knowledge that is required to succeed on an MCDCA claim. *Id.*

Rule 12(e) provides, in relevant part:

A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired.

The Fourth Circuit has stated that Fed. R. Civ. P. 12(e) "must be read in conjunction with Rule 8 ..." *Hodgson v. Va. Baptist Hosp., Inc.,* 482 F.2d 821, 822 (4th Cir. 1973). Pursuant to Fed. R. Civ. P. 8(a), a complaint must contain three elements:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Unlike a Rule 12(b)(6) motion, which tests the legal sufficiency of a complaint, a Rule 12(e) motion for a more definite statement focuses on whether "'a party has enough information to frame an adequate answer . . .'" *Streeter v. SSOE Sys.*, No. WMN-09-01022, 2009 WL 3211019, at *10 (D. Md. Sept. 29, 2009) (quoting *Doe v. Bayer Corp.*, 367 F. Supp. 2d 904, 917 (M.D.N.C. 2005)). Such motions are "designed to strike at unintelligibility rather than simple want of detail. . ." *Seneca One Fin., Inc. v. Structured Asset Funding, LLC*, No. DKC-10-1704, 2010 WL 4449444, at *2 (D. Md. Nov. 4, 2010) (citation and internal quotation marks omitted). And, they "are viewed with disfavor, and are rarely granted." *Cellars v. Pac. Coast Packaging, Inc.*, 189 F.R.D. 575, 578 (N.D. Cal. 1999).

As explained in *Federal Practice and Procedure* § 1376, 5C Charles Alan Wright, et al., (3d ed. 2004) ("Wright"):

> As the cases make clear, [under Rule 12(e)] the pleading must be sufficiently intelligible for the district court to be able to make out one or more potentially viable legal theories on which the claimant might proceed; in other words the pleading must be sufficient to survive a Rule 12(b)(6) motion to dismiss. At the same time, the pleading also must be so vague or ambiguous that the opposing party cannot respond to it, even with a simple denial as permitted by Rule 8(b), with a pleading that can be interposed in good faith or without prejudice to himself.

Of relevance here, Wright adds: "The class of pleadings that are appropriate subjects for a motion under Rule 12(e) is quite small." *Id.* When the information sought in connection with a Rule 12(e) motion "is available or properly sought through discovery, the motion should be denied." *Seneca One Fin., Inc.*, 2010 WL 4449444, at *2. In addition, if the court is satisfied

that the complaint provides enough information to frame a responsive pleading, "a court should deny the Rule 12(e) motion and avoid delay in maturing the case." *Doe*, 367 F. Supp. 2d at 917.

The MCDCA prohibits certain enumerated actions by a debt collector in "collecting or attempting to collect" an "alleged debt arising out of a consumer transaction." C.L. §§ 14-201(b), 14-202; *see also* C.L. § 14-202(1)-(9) (enumerating prohibited actions). Section 14-202(8), in particular, prohibits a debt collector from "[c]laim[ing], attempt[ing], or threaten[ing] to enforce a right with knowledge that the right does not exist."

To succeed on an MCDCA claim, a plaintiff "'must set forth factual allegations tending to establish two elements: (1) that Defendants did not possess the right to collect the amount of debt sought; and (2) that Defendants attempted to collect the debt knowing that they lacked the right to do so.'" *Healy v. BWW Law Group, LLC*, PWG-15-3688, 2017 WL 281997, at *5 (D. Md. Jan. 23, 2017) (quoting *Lewis v. McCabe Weisberg & Conway*, DKC 13-1561, 2014 WL 3845833, at *6 (D. Md. Aug. 4, 2014)). "Maryland Courts have consistently interpreted the MCDCA to require plaintiffs to allege that defendants acted with knowledge that the 'debt was invalid, or acted with reckless disregard as to its validity.'" *Lembach*, 528 F. App'x at 304 (quoting *Shah v. Collecto, Inc.*, DKC-2004-4059, 2005 WL 2216242, at *11 (D. Md. Sept. 12, 2005)).

The MCPA prohibits certain "unfair or deceptive trade practices." C.L. § 13-301. Of relevance here, the MCPA makes it unlawful for a person to use unfair or deceptive trade practices related to the extension of consumer credit or the collection of consumer debts. C.L. § 13-303(4)(5); *see Piotrowski v. Wells Fargo Bank, N.A.*, DKC-11-3758, 2013 WL 247549, at *10 (D. Md. Jan. 22, 2013). The MCPA defines unfair or deceptive trade practice, *inter alia*, as: "False, falsely disparaging, or misleading oral or written statement, visual description, or other

representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;" and "Failure to state a material fact if the failure deceives or tends to deceive." C.L. § 13-301(1)(3); *see Marshall v. James B. Nutter & Co.*, 816 F. Supp. 2d 259, 266 (D. Md. 2011) (explaining that "the MCPA prohibits both the use of false or misleading statements and also the omission of material facts").

With respect to the MCDCA, Richards alleges that Shellpoint collected fees and sums that it did not have the right to collect. ECF 3, ¶ 106, 107, 111. And, she claims that Shellpoint knew the records from its predecessors were inaccurate and that it was therefore not providing its borrowers with proper notice, yet it attempted to collect fees and sums, despite this knowledge. *See, e.g.*, ECF 3, ¶¶ 26-27, 29, 38, 40, 44-50, 52-53, 108. As to the MCPA, Richards alleges that Shellpoint committed various unfair and deceptive trade practices, including: MCDCA violations; seeking sums from Richards that "were not lawfully due"; and making "materially false or misleading statements . . . in connection with its servicing of Richards' loan." ECF 3, ¶¶ 42, 44, 48-50, 52-53, 111, 113.

Although Richards's claims could be clearer, they are not so "vague or ambiguous" as to lead the Court to conclude that Shellpoint "cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). Further, as to the knowledge element of the MCDCA claim, Richards does more than simply "reciting the statutory language." *Roos v. Seterus, Inc.*, RDB-18-3970, 2019 WL 4750418, at *6 (D. Md. Sept. 30, 2019).

Moreover, this case is readily distinguishable from the cases in which courts have dismissed a complaint for being an impermissible shotgun pleading. In *McCrea v. Wells Fargo*, RDB-18-2490, 2019 WL 2513770, at *7 (D. Md. June 17, 2019), for instance, on which defendant relies, the complaint presented "85 paragraphs of factual allegations [against seven

defendants] under the heading 'Statement of Claim,'" and culminated, "without further elaboration, in a list [of] over twenty causes of action." *Id.* at *7. The court found that this structure made it too difficult to align the factual allegations with the causes of action and to discern which defendants were "allegedly responsible for which alleged acts of misconduct." *Id.* In contrast, the Amended Complaint includes four causes of action against one defendant. And, Richards provides factual allegations that are relevant for each count.

In sum, the Amended Complaint provides defendant with "fair notice of what the…claim is and the grounds upon which it rests. *Twombly*, 550 U.S. at 555. The discovery that will follow will certainly add to defendant's fund of information. Accordingly, I conclude that neither dismissal nor a more definite statement is warranted with respect to Count III.

### G.  TRANSFER TO THE SOUTHERN DIVISION

Last, defendant asks the Court to transfer this suit to the Southern Division of this District, pursuant to 28 U.S.C. § 1404.  Shellpoint contends that plaintiffs filed this action in an improper venue when they filed suit in the Circuit Court for Anne Arundel County. ECF 13-1 at 35. As a result, defendant argues, removal led to assignment in the Northern Division of the federal court.

In defendant's view, "this case is currently positioned to be litigated in a venue that contravenes the plain text of L.R. 501(4)(b)(iii), would be less convenient, and less supportive of the interests of justice." *Id.*  Local Rule 501(4)(b)(iii) provides: "A class action shall be assigned to a judge sitting in the division of the Court where a majority of the named plaintiffs reside, but if there is not a majority resident in either division, then the case shall be assigned to a judge sitting in the division of the Court in which the events described in the Complaint took place."

Section 1404(a) of Title 28 of the United States Code states, in relevant part: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any

civil action to any other district *or division* where it might have been brought." (Emphasis added). But, the suit was not initiated in federal court, and there is no basis to conclude that venue was improper in the Circuit Court for Anne Arundel County.

To be sure, § 1404(a) "reflects an increased desire to have federal civil suits tried in the federal system at the place called for in the particular case by considerations of convenience and justice." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). To that end, it helps "to prevent the waste 'of time, energy, and money' and 'to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.'" *Id.* (citation omitted). In a motion to transfer venue pursuant to § 1404(a), the moving party bears the burden of showing, by a preponderance of the evidence, that transfer to another venue is proper. *See Costar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 770 (D. Md. 2009); *Lynch v. Vanderhoef Builders*, 237 F. Supp. 2d 615, 617 (D. Md. 2002). Ultimately, "[t]he decision whether to transfer is committed to the sound discretion of the trial court." *Mamani v. Bustamante*, 547 F. Supp. 2d 465, 469 (D. Md. 2008); *see also In re Ralston Purina Co.*, 726 F.2d 1002, 1005 (4th Cir. 1984).[14]

In the Amended Complaint, plaintiffs assert that venue was proper in the Circuit Court for Anne Arundel County because "certain acts and conduct alleged occurred in Maryland." ECF 3, ¶ 11. And, they posit: "Venue is further proper in this Court [in Anne Arundel County] since

---

[14] Based on the statutory language, the standard for a § 1404(a) transfer can be distilled, as follows: "(1) the transferee court must be a court in which the action could have been brought initially; (2) the transfer must be convenient to the parties and witnesses; and (3) the transfer must be in the interest of justice." *Dow v. Jones*, 232 F. Supp. 2d 491, 499 (D. Md. 2002). Thus, "[a] motion to transfer under § 1404(a) ... calls on the district court to weigh in the balance a number of case-specific factors." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). These include: "(1) the weight accorded to plaintiffs choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Tr. of the Plumbers and Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015); *see, e.g., Mamani*, 547 F. Supp. 2d at 469; *Cross v. Fleet Reserve Ass'n Pension Plan*, 383 F. Supp. 2d 852, 856 (D. Md. 2005).

Shellpoint's predecessor agreed as part of this Court's approved class action agreement" in the Primestar Settlement that any dispute relating to the settlement should be resolved in the Circuit Court for Anne Arundel County. *Id.*

Under Local Rule 501(2), a case that is removed from a state tribunal shall be assigned to a judge "sitting in the division of the Court in which the state tribunal is located." In other words, a removed case is assigned to the division applicable to the particular county where the circuit court action originally was filed. Anne Arundel County is allocated to the Northern Division. *See About the Court*, https://www.mdd.uscourts.gov/about-court (last visited Mar. 17, 2021). Therefore, upon removal of the case from the Circuit Court for Anne Arundel County, the case was properly assigned to the Northern Division.

Contrary to defendant's contention, litigation in the Northern Division does not "contravene[] the plain text of L.R. 501(4)(b)(iii)." Local Rule 501(4) deals with the assignment of "other civil cases," not removal cases. As noted, the assignment of removal cases is set forth in Local Rule 501(2). Moreover, Local Rule 501 "is a rule of administrative convenience, and it is not intended to, nor does it, confer any rights upon any litigant." L.R. 501(1).

Further, defendant does not meet its burden of showing "'by a preponderance of the evidence that the proposed transfer will better and more conveniently serve the interests of the parties and witnesses.'" *Stratagene v. Parsons Behle & Latimer*, 315 F. Supp. 2d 765, 771 (D. Md. 2004) (quoting *Helsel v. Tishman Realty Constr. Co.*, 198 F. Supp. 2d 710, 711 (D. Md. 2002)). Indeed, defendant fails to "'make a particularized showing' or to provide sufficient details with regard to how witnesses or the parties will be inconvenienced" by litigating in Baltimore. *See Topiwala v. Wessell*, WDQ-11-0543, 2012 WL 122411, at *7 n.28 (D. Md. Jan. 12, 2012) ("Any party asserting witness inconvenience must make a particularized showing.")

64

(citation omitted). Given the proximity of the venues, neither venue can be said to be more or less convenient than the other.

Therefore, defendant's request for transfer is denied.

## IV. CONCLUSION

For the foregoing reasons, I shall grant defendant's Motion (ECF 13) in part and deny it in part.   I shall dismiss Maldonado's claims, including the COVID-19 Class claim, without prejudice.  In addition, I shall dismiss Richards's FDCPA claim as to Shellpoint's alleged failure to send periodic statements (Count II). And, I shall grant the motion to strike class allegations, with leave to amend. The Motion is otherwise denied.

An Order follows, consistent with this Memorandum Opinion.


Date:  March 18, 2021                                        _____/s/_____
                                                                              Ellen Lipton Hollander
                                                                              United States District Judge