IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MANDA RICHARDS,
*On behalf of herself individually and
similarly situated persons*

    *Plaintiff*,

    v.

NEW REZ, LLC d/b/a SHELLPOINT
MORTGAGE SERVICING

    *Defendant*.

Civil Action No. ELH-20-1282

**MEMORANDUM OPINION**

In this putative class action, plaintiff Manda Richards lodges claims against defendant NewRez, LLC ("NewRez"), d/b/a Shellpoint Mortgage Servicing ("Shellpoint"), alleging deceptive and unlawful mortgage service practices. Richards initially brought suit in the Circuit Court for Anne Arundel County. ECF 2. Richards, joined by Matthew Maldonado, subsequently filed an Amended Complaint in that court. ECF 3. Thereafter, defendant removed the case to federal court (ECF 1), asserting subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1337; diversity jurisdiction, pursuant to 28 U.S.C. § 1332; and federal question jurisdiction, pursuant to 28 U.S.C. § 1331.

The Amended Complaint (ECF 3) included three counts: violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.* (Count I); violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.* (Count II); as well as various claims for violations of the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code (2013 Repl. Vol., 2021 Supp.) §§ 14-204 *et seq.* of the Commercial Law Article ("C.L."), and the Maryland Consumer Protection Act ("MCPA"), C.L. §§ 13-301 *et seq.* (Count III). Counts I and

II were brought on behalf of Richards and Maldonado, in their individual capacities, as well as on behalf of a putative class.  Count III was asserted solely by Richards.

Shellpoint  moved to dismiss the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6).  ECF 13.  Relevant here, Shellpoint claimed that the Court lacked personal jurisdiction over Shellpoint as to Maldonado's claims as well as those brought by the out-of-state class members.  *Id.* at 11-15.  In addition, defendant claimed that plaintiffs lacked standing to pursue the claims alleged in Counts I and II.  *Id.* at 25-29.  Further, the motion posited that, to the extent Count II was predicated on Shellpoint's failure to send periodic statements to Richards, it was subject to dismissal.  *Id.* at 18-25.  And, defendant sought dismissal of plaintiff's State law claims in Count III on the ground that plaintiff failed to allege the requisite elements of a MCDCA claim.  *Id.* at 31-34.  Shellpoint also asked the Court to strike plaintiffs' proposed class definitions. *Id.* at 30-31.

By Memorandum Opinion (ECF 20) and Order (ECF 21) of March 18, 2021, I granted Shellpoint's motion in part and denied it in part.  In particular, I dismissed Maldonado from the suit.  ECF 20 at 27-31.  I also determined that Count II was subject to dismissal to the extent that it relied on Shellpoint's alleged failure to send periodic statements.  *Id.* at 49-53.  And, I dismissed plaintiffs' class allegations, without prejudice and with leave to amend.  *Id.* at 53-57.  But, I denied Shellpoint's motion to the extent that defendant claimed Richards and the putative class members lacked standing to bring claims under RESPA and FDCPA.  *Id.* at 34-39.  And, I concluded that Shellpoint's contentions with respect to Richards's State law claims were also without merit.  *Id.* at 57-62.

Richards has again amended her complaint.  ECF 24 (the "Second Amended Complaint" or "SAC").  The SAC asserts the same three causes of action set forth in the Amended Complaint,

except that Count II does not include a claim based on Shellpoint's purported failure to provide periodic statements to Richards. *See* ECF 24 at 1 n.2. Richards also alleges several additional facts and proposes new class definitions.

In particular, Count I is styled as a claim brought by plaintiff in her individual capacity and on behalf the "Untimely Hello Letter Class." The class is defined as follows, *id.* ¶ 68(a):

> Those persons who are residents in the states which are within the jurisdiction of the United States Courts of Appeals for the Third, Fourth, Sixth, Seventh, Eleventh, and District of Columbia Circuits for whom: (i) Shellpoint provided a 12 U.S.C.A § 2605(c) notice in the three years preceding the filing of this action; and (ii) In relation to their personal, residential mortgage loan.

And, concerning Count II, plaintiff brings a claim on behalf of herself and the "Untimely Notice Class." That class is defined in ¶ 68(b):

> Those persons who are residents in the states which are within the jurisdiction of the United States Courts of Appeals for the Third, Fourth, Sixth, Seventh, Eleventh, and District of Columbia Circuits for whom: (i) Shellpoint acquired the servicing and collection rights on their personal, residential mortgage loans no longer than one year before May 4, 2020 on behalf of another; (ii) When it believed the mortgage loan to be in default or otherwise delinquent for 30 or more consecutive days at the time Shellpoint began servicing or collecting upon it; (iii) It provided 12 U.S.C.A. § 2605(c) notice substantially similar to the one provided to the Named Plaintiff; and (iii) [sic] It attempted or did collect alleged fees incurred before the servicing transfer to Shellpoint.

Shellpoint has moved to dismiss the SAC, pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6). ECF 25. The motion is supported by a memorandum (ECF 25-1) (collectively, the "Motion"), as well as three exhibits. *See* ECF 25-3; ECF 25-4; ECF 25-5.

Richards opposes the Motion (ECF 26, the "Opposition") and has submitted three exhibits. See ECF 26-1; ECF 27-1; ECF 27-2.[1] Defendant has replied. ECF 28. And, Richards has directed

---

[1] Plaintiff submitted three exhibits with the Opposition. *See* ECF 26-1; ECF 26-2; ECF 26-3. Two of the exhibits were improperly filed, however. Therefore, Richards submitted revised versions, which are docketed at ECF 27-1 and ECF 27-2.

the Court's attention to supplemental authority decided after the completion of the briefing on the Motion. ECF 29; ECF 30; ECF 33; ECF 36. In addition, Shellpoint has filed a notice of supplemental authority (ECF 31), to which Richards has responded. ECF 32.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.  Factual Background[2]

Shellpoint is a Delaware limited liability company that, according to plaintiff, is both a mortgage servicer and a debt collector. ECF 24, ¶¶ 3, 4, 15(b)-(c). It is wholly owned by another limited liability company, Shellpoint Partners, LLC, which, in turn is wholly owned by NRM Acquisition, LLC and NRM Acquisition II, LLC. *Id.* ¶ 15. Both NRM Acquisition entities are wholly owned by New Residential Mortgage, LLC. *Id.* New Residential Mortgage, LLC is wholly owned by a publicly-traded corporation, New Residential Investment Corporation ("NRZ"). *Id.*

Richards is a borrower with respect to a mortgage loan for real property located in Bethesda, Maryland (the "Property"). *Id.* ¶ 14. Richards acquired the Property on or about August 31, 2005, for the sum of $169,500.00. *Id.* ¶ 28. To accomplish the purchase, Richards borrowed $159,030.00 from American Home Mortgage Acceptance, Inc. (the "Richards Loan"). *Id.*; *see* ECF 25-3 ("Deed of Trust"). According to plaintiff, this loan qualified at origination as a "federally related mortgage." ECF 24, ¶ 28.

On April 4, 2014, the Richards Loan was sold to Wilmington Savings Fund Society, FSB, as trustee for the PrimeStar-H Fund I Trust ("Primestar"). *Id.* ¶ 29. Statebridge Company LLC was the loan servicer. *Id.* When Primestar owned the Richards Loan, "it agreed to the Primestar

---

[2] Where appropriate, I have drawn on plaintiff's allegations as recounted in my Memorandum Opinion of March 18, 2021. ECF 20. As necessary, I have supplemented the facts. The facts are usually presented in chronological order, to the extent feasible.

Settlement," which was approved in July 2016.  ECF 24, ¶ 30.[3]  Pursuant to this settlement, Primestar "agreed that it was not entitled to attempt to collect from Richards any *in personam* deficiency sums related to the Richard's [sic] loan and it was limited to *in rem* relief only (when permitted to do so under Maryland law)."  *Id.*

Thereafter, on October 26, 2016, Primestar sold the Richards Loan to Wilmington Savings Fund Society, FSB as trustee for the Brougham Fund I Trust ("Brougham").  *Id.* ¶ 31.  From October 13, 2016, to about November 1, 2019, Servis One, Inc. d/b/a BSI Financial Services ("BSI") acted as the mortgage servicer on behalf of Primestar and then Brougham.  *Id.* ¶ 33.

In the interim, on October 8, 2019, Brougham sold the Richards Loan to Morgan Stanley Mortgage Capital Holdings LLC ("Morgan Stanley").   *Id.* ¶ 31.  Richards claims she was never notified of Morgan Stanley's acquisition of her loan.  *Id.*  Rather, she learned of it "from a review of Maryland land records in February 2020 and later in correspondence to her dated March 22, 2021."  *Id.*

BSI entered into a stipulation and Consent Order with the Consumer Financial Protection Bureau ("CFPB") on May 15, 2019, related to BSI's mortgage servicing and transfer practices.  *Id.* ¶ 25(a).  The CFPB concluded that "BSI had routinely transferred to subsequent servicers mortgage loan data information that was incomplete . . . ."  *Id.*

Then, on November 1, 2019, Shellpoint acquired from BSI the mortgage servicing rights ("MSR") to the Richards Loan, along with "certain putative class member loans."  *Id.* ¶ 25; *see*

---

[3] The SAC states that the Primestar Settlement was approved by "this Court on July 5, 2016."  ECF 24, ¶ 30.  But, this assertion appears to have been copied directly from the Amended Complaint, filed in the Circuit Court for Anne Arundel County and referencing that court.  *See* ECF 3, ¶ 34.

*also* ECF 24, ⁋ 33.  When the Richards Loan was transferred to defendant, "Shellpoint believed that the Richards Loan was in default . . . ."  *Id.* ⁋ 39.

According to plaintiff, Shellpoint had "knowledge that its predecessor servicer—i.e. [BSI] ha[d] been subject to regulatory and private enforcement actions in which it has been disclosed that BSI's mismanagement of mortgage loans it services . . . has been subjected to multiple erroneous errors."  ECF 24, ⁋ 25; *see id.* ⁋⁋ 33-34.  In particular, plaintiff points out that in *Graham v. Servis One, Inc*., No. 2:18-cv-4377 (E.D. Pa.), it was "disclosed that a coding error in BSI's electronic systems related to certain borrowers, including Richards, caused it to send inaccurate statements to borrowers from May 1, 2018 to November 1, 2019."  ECF 24, ⁋ 25 (b).

Richards claims that Shellpoint took "no reasonable steps to inquire about the accuracy of loan data it received from BSI related to Richards or any other former BSI borrower whose loan was transferred to it." *Id.* ⁋ 34.  Instead, Shellpoint "has simply utilized that incorrect information and adopted it into its own records thereby infecting the accuracy of the loan account it manages related to Richards and the Richards Loan . . . ."  *Id.* ⁋ 37.

Plaintiff was involved in bankruptcy proceedings that are also relevant.  In 2015, in the Bankruptcy Court in the District of Maryland, Richards filed for bankruptcy under Chapter 7 of the Bankruptcy Code.  *Id.* ⁋ 35; *see In re Richards*, No. 15-25605 (Bankr. D. Md. May 31, 2017).[4] On May 31, 2017, Richards "received a discharge of her personal liability from the Richards Loan pursuant to 11 U.S.C. § 727."  ECF 24, ⁋ 35; *see* ECF 55, *In re Richards*, No. 15-25605 (Bankr. D. Md. May 31, 2017).

---

    [4] Richards does not indicate whether she lived at the Property when she filed for bankruptcy.

Then, in 2018, Richards sought further protection under Chapter 13 of the Bankruptcy Code. ECF 24, ¶ 35; *see In re Richards*, No. 18-15772 (Bankr. D. Md.). In that case, Richards "received an order confirming her proposed bankruptcy plan"; "notified BSI and all her other creditors of her change in mailing address"; and "disputed BSI's purported proofs of claim which claimed Richards owed sums in excess of what was due and owing on the Richards Loan." ECF 24, ¶ 35.

According to plaintiff's approved bankruptcy plan, as of September 10, 2018, plaintiff was in arrears in the amount of $41,527.37 in connection with the Richards Loan. *See* ECF 28, *In re Richards*, No. 18-15772 (Bankr. D. Md. Sept 18, 2018). However, plaintiff later objected to BSI's "purported proof of claim which claimed Richards owed sums in excess of what was due and owing on the Richards Loan." ECF 24, ¶ 35. And, BSI later filed an amended claim, stating that plaintiff was in arrears in the amount of $39,017.07. *See* ECF 10-2 at 2, *In re Richards,* No. 18-15772 (Bankr. D. Md. May 16, 2019); *see also* ECF 27-2.

On March 3, 2020, plaintiff filed a motion to dismiss her bankruptcy petition, pursuant to 11 U.S.C. § 1307(b), which was granted by Order of March 5, 2020. *See* ECF 110, *In re Richards*, No. 18-15772 (Bankr. D. Md. Mar. 3, 2020); ECF 111 (Mar. 5, 2020). And, on September 11, 2020, plaintiff's Chapter 13 standing trustee submitted a "Final Report and Account" confirming that plaintiff was in arrears in the amount of $39,017.07. ECF 116 at 2, 3, *In re Richards*, No. 18-15772 (Bankr. D. Md. Sept. 11, 2020).

Richards asserts that Shellpoint knew that, during her bankruptcy proceedings, she had married and changed her last name from Fordyce to Richards. ECF 24, ¶ 36. Nonetheless, Shellpoint "continued to communicate with her using her former name." *Id.* And, Richards

highlights that "even after commencement of this action when Shellpoint knew she was represented by counsel, it continued to directly communicate with her . . . ." ECF 24, ⟨ 36.

Plaintiff lodges a host of allegations against Shellpoint.  She claims that, "as a matter of standard policy and practice, Shellpoint disregards the express requirements" of its statutory and regulatory obligations to borrowers.   ECF 24, ⟨ 6. In particular, Richards complains about Shellpoint's (i) "fail[ure] to timely and reasonably identify itself to federally related mortgage borrowers"; (ii) "utilizing knowingly incorrect loan data transferred to it without making . . . any reasonable investigation to correct the inaccuracies"; and (iii) "imposing loan charges and fees to the borrowers in secret that had been waived by its predecessors."  *Id.*

Plaintiff also avers that she was harmed by defendant's (i) "knowing utilization of incorrect loan data obtained by its predecessor(s) servicers while imposing and collecting improper fees and charges to the Named Plaintiff's and the putative class members' loan accounts with no proper notice to them; (ii) reporting of same derogatory information to the credit reporting agencies while not disclosing the information to the borrowers; and (iii) concealment of material loan information to Named Plaintiff and class members."  *Id.* ⟨ 7.  And, Richards contends that Shellpoint "knows that the information transferred to it by its predecessor servicers is infected and prone to multiple errors but takes no reasonable steps to correct those errors but simply compounds the errors by utilizing the flawed data as part of its business practice and routine."  *Id.* ⟨ 6.

Further, Richards states: "Shellpoint makes more money . . . by churning fees and making advances related to borrowers it believes are delinquent or in foreclosure and there is 'limited risk' that those sums will not be reimbursed to it—even if it has no right to impose the fees and charges in the first instance."  *Id.* ⟨ 15(a).  According to plaintiff, "as part of its routine business practice," Shellpoint "imposes, churns, and collects a varied of [sic] collection fees related to Plaintiff's and

class members' mortgage accounts including late fees, property valuation fees, property inspection fees, breach letter fees, etc." ECF 24, ⁋ 27.

In addition, plaintiff complains that Shellpoint did not timely notify Richards of the loan transfer, as required by 12 U.S.C. § 2605(c) ("Hello Letter"). ECF 24, ⁋ 39. In particular, Richards complains that she did not receive a Hello Letter from Shellpoint until January 22, 2020. *Id.* Furthermore, according to plaintiff, the Hello Letter was "materially defective" because it was sent to Richards's former address, where she had not resided for more than a year. *Id.* ⁋ 39(a). The notice was dated November 12, 2019, even though it was not delivered to Richards until January 22, 2020—68 days after the time required under 12 U.S.C. § 2605(c). *Id.* ⁋ 39(b).

Based on the address that Shellpoint used for its Hello Letter, plaintiff believes that Shellpoint "simply incorporated BSI's knowingly inaccurate loan data transferred to it for addressing the Hello Letter and never sought to verify the accuracy of the data and information." *Id.* ⁋ 40; *see also id.* ⁋ 37. According to plaintiff, Shellpoint "had reason to know that the address" it was using was wrong because it "received notice of the returned mail or inaccuracy from the United States Postal Service that indicated that the address it utilized was wrong. . . ." *Id.* ⁋ 44.

Richards asserts that she continued to make her mortgage payments to BSI in November 2019 and February 2020, "pursuant to her agreements in the bankruptcy case," because Shellpoint had failed to properly disclose its interest to the bankruptcy court and had not sent Richards a timely Hello Letter "that would identify Richard's [sic] account number . . . and its payment address." *Id.* ⁋ 45. Plaintiff believes that BSI "forwarded" Richards's payments to Shellpoint, but "Shellpoint has not cashed the payments." *Id.*

In March 2020 Richards sent Shellpoint two payments, each in the amount of $1,000. *Id.* ⁋ 46. But, neither check was ever cashed or returned. *Id.* According to plaintiff, both payments

"were mailed to the address provided on Shellpoint's belated Hello Letter."   ECF 24, ⁋ 46. Richards claims that Shellpoint and BSI have received payments "for thousands of dollars" from Richards, but Richards has not received credit for any of them.  *Id.* ⁋ 47.

In addition, since the time that Shellpoint became the mortgage servicer for the Richards Loan, Shellpoint has allegedly "imposed and/or collected" numerous fees and charges as to Richards's account, other than principal and interest, and including "fees waived by BSI previously."  *Id.* ⁋ 49.  Yet, Shellpoint "never disclosed those fees to Richards . . . ." *Id.*  The fees include, *id.*:

|   | Description | Transaction Date | Amount |
|---|---|---|---|
| a. | "Other Fee Assessment" | November 18, 2019 | $105.00 |
| b. | "Other Fee Disb" | November 18, 2019 | $105.00 |
| c. | "Late Charge Assess" | February 12, 2020 | $60.23 |
| d. | "Late Charge Assess" | February 17, 2020 | $59.82 |
| e. | "Other Fees Disc." for Title Costs | March 10, 2020 | $350.00 |
| f. | "Legal Fees Disb." | March 24, 2020 | $900.00 |

Plaintiff alleges that these fees and charges constitute "actual damages to Richards."  *Id.* ⁋ 50.  She explains that Shellpoint was "not entitled to impose" such fees and charges because "it did not timely disclose its Hello Letter . . . ."  *Id.*  Alternatively, plaintiff contends that these fees are not "permitted because they each appear to be sums barred by the Primestar Settlement."  *Id.* According to plaintiff, "the errors and improper charges by Shellpoint are directly the result of NRZ's business practices in relation to the MSRs it has acquired from another to churn all sorts of non-bona fide fees and advances which it will recoup under its business model . . . ."  *Id.*

And, plaintiff claims that between January 2020 and April 2021, Shellpoint furnished false information related to the Richards Loan to credit reporting agencies, including TransUnion and Experian.  Specifically, plaintiff avers that Shellpoint repeatedly reported to these agencies that Richards was "personally liable on the Richards Loan when in fact she [had been] personally discharged of any liability."  ECF 24, ⁋ 51; *see id.* ⁋⁋ 37(a)-(b), (d).  Further, she alleges that defendant falsely reported to Experian that plaintiff was "personally subjected to foreclosure proceedings in relation to the Richards loan . . . ."  *Id.* ⁋ 37(c).

Moreover, plaintiff avers that on March 18, 2021, she provided Shellpoint with written notice of her objections concerning the adverse information that Shellpoint had reported to Experian.  *Id.* ⁋ 37(e).  She asserts that "[a]s of April 10, 2021  Shellpoint was required to suppress all derogatory information reported by it to Experian in relation to Richards and the Richards Loan," pursuant to 12 U.S.C. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).  *Id.*[5]  Nevertheless, Shellpoint furnished "adverse, disputed information to [Experian] regarding payments" on a monthly basis.  *Id.*[6]  According to plaintiff, this "willfull and recklessly indifferent false reporting [was] done by Shellpoint for the purpose of attempting to coerce Richards into making payments

---

[5] Section 2605(e)(3) of 12 U.S.C. provides: "During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 1681a of Title 15)."

And, under 12 C.F.R. § 1024.35(i)(1), upon receipt of a notice of error, "a servicer may not, for sixty days, furnish adverse information to any consumer reporting agency regarding any payment that is the subject of the notice of error."

[6] The SAC asserts that Shellpoint furnished this false, disputed information to Experian within "sixty days of Freedom's receipt of each of Ms. Richards' QWR/Notice of Error . . . ."  ECF 24, ⁋ 37(e).  Plaintiff does not provide any explanation as to the import of "Freedom's" receipt of the notice.  In fact, Richards does not otherwise reference an entity named Freedom throughout the remainder of the SAC.

on the Richards Loan for sums and charges she does not even owe or were [not] even disclosed to her." ECF 24, ⁋ 51.

The SAC also includes several new allegations pertaining to plaintiff's attempt to apply for a loss mitigation program. *See id.* ⁋⁋ 48(c), 52-65. Richards claims that Shellpoint "wrote to Richards" on April 27, 2020, "and invited her to apply for loss mitigation to modify the payment terms on the Richards Loan." *Id.* ⁋ 48(c). Thereafter, on July 7, 2020, Richards submitted an application for the loss mitigation program, which, *inter alia*, included "the information necessary to consider her for a mortgage modification," as well as "indicated her new legal name as a result of her marriage." *Id.* ⁋ 52.

Approximately one month later, on August 10, 2020, Shellpoint asked Richards to provide additional information necessary for consideration of her application, which Richards subsequently provided. *Id.* ⁋⁋ 54-55. On September 10, 2020, Shellpoint "notified Richards through its web-portal that the Richards Application . . . had been 'approved' and requested that she make four trial periods [sic] payments" between September 15, 2020 and December 1, 2020. *Id.* ⁋ 56. Plaintiff states: "No other conditions were made by Shellpoint as part of the trial plan." *Id.* Richards made the trial period payments, as requested. *Id.* ⁋ 57.

On December 17, 2020, Shellpoint wrote to Richards, stating: "Congratulations, you are eligible for a Loan Modification, which will permanently change the terms of your mortgage!" *Id.* ⁋ 58. (emphasis omitted). The message instructed plaintiff to complete, sign, and return two original versions of the "Loan Modification Agreement" by December 31, 2020. *Id.* And, it specified: "If the Loan Modification Agreement has notary provisions at the end, you must sign both original versions before a notary public and return the notarized original versions to us." *Id.*

Pursuant to the terms of this agreement, plaintiff owed an outstanding principal of $197,147.51, with a forty-year term, and a fixed interest rate of 3.5%. ECF 24, ℙ 59; *see* ECF 25-5 (the "Loan Modification Agreement") at 2, ℙ 3(B). Moreover, under the agreement, plaintiff was required to make monthly payments of $941.04, beginning on February 1, 2021. ECF 24 ℙ 59; *see* ECF 25-5 at 2, ℙ 3(C). Notably, the Loan Modification Agreement addressed plaintiff as Manda Fordyce, which was her name before she was married. *See* ECF 25-5 at 1, 4

Richard alleges that she "signed the modification agreement . . . with her legal married name [Manda Richards] . . . before a notary public and timely returned the signed and completed instruments to Shellpoint by depositing it with the United States Postal Service for delivery to Shellpoint on December 23, 2020." ECF 24, ℙ 60. However, "[u]pon receipt of Richards' completion of the loan modification, Shellpoint by its counsel misstated and misrepresented that Richards had failed to properly sign the modification and indicated that she should have signed using her former, non-legal name before a notary." *Id.* ℙ 61. According to Richards, Shellpoint's counsel "requested Richards provide Shellpoint proof of her name change," which she did on January 22, 2021, for the sole purpose of "re-printing the loan modification documents with her current, legal name . . . ." *Id.* ℙ 62. And, plaintiff avers: "Shellpoint's attorney never stated any purpose or plan by Shellpoint to rewrite the other material modification terms—just simply to update Ms. Richard's [sic] name on the instrument." *Id.*

On February 24, 2021, "Shellpoint's counsel provided to Ms. Richards a new modification agreement which materially differed from the terms of the December 17, 2020 Loan Modification Agreement . . . ." *Id.* ℙ 63. In particular, the new agreement represented that Richards owed a principal balance of $216,938.97, with a monthly loan payment of $1,017.71. *Id.* But, according to Richards, "Shellpoint's counsel concealed that Shellpoint was seeking to unfairly, deceptively

and abusively change the terms of the First Modification with no further consideration or legitimate purpose." ECF 24, ⁋ 63.

Accordingly, on March 18, 2021, plaintiff notified Shellpoint of its errors in the Loan Modification Agreement, as well as "false, derogatory credit reporting in correspondence it received at its address published for qualified written requests, notices of errors, and inquiries . . . ." *Id.* ⁋ 65. However, Richards claims that, as of the date of the filing of the SAC, she had not received a response from Shellpoint. *Id.*

Because Shellpoint used data relating to the Richards Loan that contained errors, plaintiff contends that Shellpoint "has harmed Richards by not conveying accurate and timely disclosures and imposing and collecting fees and charges with no proper notice to Richards." *Id.* ⁋ 66. She also claims that she "has been furthered damaged by Shellpoint's unfair and deceptive loan modification fees and charges and failure to honor the December 17, 2020 Loan Modification Agreement." *Id.* In addition, plaintiff complains that she has been "harmed by Shellpoint's improper and unfair credit reporting that she remains personally delinquent on the Richards Loan which is a violation of her bankruptcy discharge order and is done in willful and reckless disregard of Richard's [sic] rights and protections." *Id.* And, Richards has also allegedly "suffered informational injuries as a result of Shellpoint's conduct . . . ." *Id.* ⁋ 67.

## II.    Standard of Review

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir.

2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).[7] A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 305; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally

---

[7] Defendant also moved to dismiss the SAC as to the out-of-state class members for want of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2). ECF 25-1 at 37-38. But, as Shellpoint recognizes (*id.* at 38), the Court previously rejected this argument in resolving Shellpoint's first motion to dismiss, on the ground that it was premature. *See* ECF 20 at 32-34. And, according to Shellpoint, it included the argument in the Motion solely for the purpose of preserving the issue for later stages of litigation, if necessary. ECF 25-1 at 38. Thus, I do not discuss the argument in this Memorandum Opinion.

insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy

16

sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"  *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'"  *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).  *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v.*

17

*LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).  In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]"  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167.  Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper."  *Id.*  Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true."  *Id.*

Moreover, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment.  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).  In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."  *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it*

18

*contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Relevant here, Shellpoint filed a copy of plaintiff's Deed of Trust (ECF 25-3); the Hello Letter (ECF 25-4); and the initial version of the Loan Modification Agreement that plaintiff attempted to enter with Shellpoint (ECF 25-5). The SAC expressly references both exhibits, and plaintiff's claims are predicated on them. *See* ECF 24, ¶¶ 28, 39, 58-60. There is no challenge to the authenticity of these exhibits, and they are integral to plaintiff's suit. Therefore, I may consider them in resolving the Motion. *Chesapeake Bay Found., Inc.*, 794 F. Supp. 2d at 611.

And, with the Opposition, plaintiff filed a "Notice of Change of Address" (ECF 26-1) and a claims register (ECF 27-2), both of which were filed on a public docket in connection with plaintiff's bankruptcy case. She also submitted a copy of the docket sheet in that proceeding (ECF 27-1). All of these exhibits are matters of public record. Therefore, I may rely on them in resolving

19

the Motion. *See Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x. 200 (4th Cir. 2016); *see* Fed. R. Evid. 201(b)(2); *see also Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n. 1 (4th Cir. 1990) (holding that a district court may "properly take judicial notice of its own records"); *Schultz v. Braga*, 290 F.Supp.2d 637, 651 n. 8 (D. Md. 2003) (taking judicial notice of dockets in state proceedings).

### III.    Discussion

### A. Rule 12(g)(2)

As mentioned, the Court previously granted in part and denied in part defendant's motion to dismiss the Amended Complaint, filed pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6). *See* ECF 20; ECF 21. And, the Court granted plaintiff leave to amend her suit to allow plaintiff to revise the putative class. ECF 20 at 57. Plaintiff then filed the Second Amended Complaint. ECF 24. It did not include claims that the Court had dismissed, nor did it name Maldonado as a plaintiff. The SAC asserted a new definition of the two putative classes (*id.* ¶¶ 68(a)-(b)), and it set forth several new allegations concerning Shellpoint's loan modification agreement. *See id.* ¶¶ 48(c), 52-65. Thereafter, Shellpoint filed the Motion, which presents several new arguments challenging the viability of plaintiff's claims. ECF 26.

In Richards's view, the Motion was filed in violation of Fed. R. Civ. P. 12(g)(2). *Id.* It states: "[A] party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Accordingly, plaintiff claims that Shellpoint is "not permitted a second bite at the apple designed simply to improperly tax the Court's and Plaintiff's resources." ECF 26 at 14-15 (citations omitted). Consequently, plaintiff urges the Court to deny the Motion on the ground that

it is predicated on arguments that Shellpoint "has already raised or could have raised previously . . . ." ECF 26 at 13.[8]

Defendant responds that Richards's claim misses the mark.  It asserts that "the defense of failure to state a claim cannot be waived by failing to raise it in the first motion to dismiss" and "even if any arguments could have been raised previously, courts generally rule on the merits of a successive Rule 12 motion because those same arguments could be raised in a motion for judgment on the pleadings."  ECF 28 at 3.

To be sure, Rule 12(g)(2) precludes a party from bringing a successive Rule 12 motion that raises a defense that was previously available to the moving party but nonetheless omitted from an earlier motion.  And, a technical reading of the Rule might "bar [a defendant] from filing a successive pre-answer motion to dismiss . . . ."  *Aviles-Cervantes v. Outside Unlimited, Inc.*, 276 F. Supp. 3d 480, 487 (D. Md. 2017).  But, "courts routinely exercise discretion in applying this rule" as to successive motions to dismiss for failure to state a claim.  *Id.* This is because "'a complaint is always vulnerable to a challenge for legal sufficiency, [and] it is far more efficient to treat the arguments prior to more extensive discovery.'"  *Id.* (quoting *Dart Drug Corp. v. Corning Glass Works*, 480 F. Supp. 1091, 1095 n.3 (D. Md. 1979)).

Rule 12(h)(2) is also relevant here.  It provides:  "Failure to state a claim upon which relief can be granted . . . may be raised: (A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial."  Thus, "Rule 12(h)(2) specifically preserves the Rule 12(b)(6) defense against waiver; though 12(h)(2) lists specific points in time when the 12(b)(6)

---

[8] Plaintiff's reference to arguments "already raised" appears to concern Shellpoint's argument that the Court should dismiss plaintiff's class allegations as to the out-of-state class members.  But, as mentioned, Shellpoint expressly reasserted this claim for the purpose of preserving the issue for later stages of litigation. ECF 25-1 at 37-38.  Accordingly, I do not address the merits of this contention.

defense can be raised, courts have applied the rule permissively and allowed the 12(b)(6) defense to be raised at other times as well." *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1059 (D. Md. 1991).  Indeed, courts have found that because "the basic purpose of Rule 12(h)(2) probably is to preserve the defenses, rather than to delimit the precise timing of their assertion, this [ ] approach seems sound and within the spirit, if not the letter, of the provision."  5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE CIV., § 1392 (3ed. Apr. 2021).

As Shellpoint indicates, if the Court were to deny the Motion as improperly filed, defendant could merely "file an answer and then assert the exact same arguments in a motion for judgment on the pleadings shortly thereafter."  ECF 28 at 4.  Such an outcome would needlessly delay the resolution of this case and cause the parties to incur additional costs.  Further, this result would be contrary to the direction of Fed. R. Civ. P. 1, which instructs that the federal rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."

In light of the substantive briefing that has been presented to the Court, I am persuaded that it is prudent to address Shellpoint's arguments on the merits.  Therefore, I decline to reject the Motion based on Rule 12(g)(2).

### B.  Count I: RESPA

In Count I of the Second Amended Complaint, plaintiff, individually and on behalf of the putative "Untimely Hello Letter Class," asserts that Shellpoint, in its capacity as a mortgage servicer, failed to comply with the statutory obligations outlined in 12 U.S.C. § 2605(c). ECF 24, ¶¶ 84-91.

The SAC alleges that Shellpoint violated § 2605(c) by failing to "provide timely notice [of this transfer] to the Named Plaintiff and certain members of the Untimely Hello Letter Class."

ECF 24, ¶ 87.  It adds: "Shellpoint had notice that its purported 12 U.S.C.A. § 2605(c) notices were not timely delivered to the Named Plaintiff and certain of the Untimely Hello Letter Class members from the United States Postal Service and other customary sources . . . but it took no action to use that notice to resend 12 U.S.C.A. § 2605(c) notices to corrected addressers for the borrowers."  *Id.* ¶ 88.  As a result, Richards, along with members of the putative Untimely Hello Letter Class were "damaged by Shellpoint's imposition and collection of fees and charges onto their accounts transferred to Shellpoint . . . ."  *Id.* ¶ 89.

In the Motion, Shellpoint argues that, according to plaintiff's own allegations, Shellpoint complied with the obligations imposed on it by § 2605(c) and its implementing regulations.  ECF 25-1 at 5-10.  In particular, Shellpoint contends that, within 15 days of the date it began servicing the Richards Loan, it mailed a Hello Letter to plaintiff at the address listed on her loan documents.  *Id.* at 5-6.

Congress enacted RESPA in 1974 in order "to insure that consumers . . . are provided with greater and more timely information on the nature and costs of the [mortgage loan] settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices . . . ."  12 U.S.C. § 2601(a); *see* Pub. L. 93-533, 88 Stat. 1724 (1974).  Section 2605 is part of RESPA.

RESPA was amended in 2010, pursuant to the Dodd–Frank Wall Street Reform and Consumer Protection Act (the "Dodd–Frank Act"), Pub. L. No. 111–203, 124 Stat. 1376 (2010).  Among other things, Section 1463 of the Dodd–Frank Act added certain sections to RESPA that address the duties of servicers of federally related mortgage loans with regard to responding to borrower requests for information or claims of error.  In addition, the statute created the CFPB, which was tasked with promulgating rules and regulations, "as may be necessary to achieve"

RESPA's purpose.  12 U.S.C. § 2617(a); *see generally Edwards v. First American Corp.*, 798 F.3d 1172, 1179 (9th Cir. 2015) (discussing transfer of authority for rulemaking, enforcement, and compliance with RESPA from Department of Housing and Urban Development to CFPB).

Section 2605(c)(1) states: "Each transferee servicer to whom the servicing of any federally related mortgage loan is assigned, sold, or transferred shall notify the borrower of any such assignment, sale, or transfer."  And, that notice "shall be made to the borrower not more than 15 days after the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made)." *Id.* § 2605(c)(2)(A).

The Mortgage Servicing Rules, otherwise known as Regulation X, were "repromulgated by the CFPB in 2013 and became effective on January 10, 2014 . . . ." *Sutton v. CitiMortgage, Inc.*, 228 F. Supp. 3d 254, 261 (S.D.N.Y. 2017); *see Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act)*, 78 Fed. Reg. 10696–899 (February 14, 2013), codified as 12 C.F.R. §§ 1024 *et seq.* (hereinafter, "Regulation X").   "The CFPB has issued Regulation X to interpret and implement RESPA." *Morgan v. Caliber Home Loans, Inc.*, ___ F.4th ___, 2022 WL 519220, at *3 (4th Cir. Feb. 22, 2022).

In 12 C.F.R. § 1024.33(b)(1), titled "Mortgage servicing transfers," it provides, in part: "[E]ach transferor servicer and transferee servicer of any mortgage shall provide to the borrower a notice of transfer for any assignment, sale, or transfer of the servicing of the mortgage loan." *Id.* Further, the provision states: "The notice must contain the information described in paragraph (b)(4) of this section."

In turn, 12 C.F.R. § 1024.33(b)(4) states that "notices of transfer shall include," among other things, "the effective date of the transfer of servicing"; "the name, address, and a collect call or toll-free telephone number for an employee or department of the transferee servicer that can be

contacted by the borrower to obtain answers to servicing transfer inquiries"; and a "statement that the transfer of servicing does not affect any term or condition of the mortgage loan other than terms directly related to the servicing of the loan."  And, consistent with 12 U.S.C. § 2605(c), Regulation X requires that the "transferee servicer . . . provide the notice of transfer to the borrower not more than 15 days after the effective date of the transfer."  12 C.F.R. § 1024.33(b)(3)(i).

Whether Shellpoint satisfied its obligation under Regulation X turns here on whether the mailing of the Hello Letter to the address listed in plaintiff's loan documents constituted "provid[ing] to the borrower a notice of transfer . . . of the servicing of the mortgage loan."  *Id.* § 1024.33(b)(1).  As Shellpoint notes, however, Regulation X does not expressly state how a transferee can effect notice on a borrower.  ECF 25-1 at 6.  Principles of regulatory construction are implicated.

Regulations promulgated pursuant to notice and comment are analyzed in accordance with the principles set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See, e.g., Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165–75 (2007); *Christensen v. Harris County*, 529 U.S. 576, 586-88 (2000); *Auer v. Robbins*, 519 U.S. 452, 457–58 (1997).  In *Auer*, the Supreme Court said that an agency's interpretation of its own regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'"  *Auer*, 519 U.S. at 461 (citation omitted).

More recently, in *Kisor v. Wilke*, ___ U.S. ___, 139 S. Ct. 2400, 2415 (2019), the Supreme Court clarified that deference to an agency's interpretation does not apply unless the regulation is "genuinely ambiguous." *See Romero v. Barr*, 937 F.3d 282, 291 (4th Cir. 2019).  Moreover, to be entitled to deference, a reasonable agency interpretation must be the agency's "'authoritative' " or "'official'" position.  *Kisor*, 139 S. Ct. at 2416 (citation omitted).  And, the interpretation must "in

some way implicate [the agency's] substantive expertise." *Id.* at 2417.   In addition, the interpretation must reflect a "'fair and considered judgment.'"   *Id.* (citation omitted).

Before "concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Id.* at 2415 (citation omitted). To do so, the "court must carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* (internal quotes omitted).   "If uncertainty does not exist, there is no plausible reason for deference.  The regulation then just means what it means—and the court must give it effect, as the court would any law." *Id.*   And, even if the regulation is ambiguous, the "agency's reading must still be reasonable." *Id.* (internal quotes omitted).   "In other words, it must come within the zone of ambiguity the court has identified after employing all of its interpretive tools." *Id.* at 2415-16.

The task of interpreting a regulation, like a statute, begins with the text. *See Murphy v. Smith*, ___U.S.___, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific [ ] language in dispute.").  Construing regulations "is a holistic endeavor, and at a minimum must account for [its] full text, language as well as punctuation, structure, and subject matter." *U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 455 (1993) (internal quotes omitted).  And, terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *accord United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020).

The parties' briefing does not substantively address whether 12 C.F.R. § 1024.33(b) is genuinely ambiguous as to the manner in which a servicer can effect notice of a transfer on a borrower.  Defendant asserts that because Regulation X "does not define how a servicer 'shall provide' the Hello Letter, the interpretation of the promulgating agency, the [CFPB], is

'controlling unless plainly erroneous or inconsistent with the regulation.'" ECF 25-1 at 6 (quoting *Auer*, 519 U.S. at 461). And, plaintiff does not respond to Shellpoint's argument on this point. *See* ECF 26 at 11-21.

In light of the plain text of 12 C.F.R. § 1024.33(b), and its place within the structure of Regulation X as a whole, I am persuaded that the regulation plainly allows for a service provider to give the requisite notice through the means that Shellpoint employed in this case. *See Kisor*, 139 S. Ct. at 2415 (instructing that a court must look to the "text, structure, history, and purpose of a regulation, in all the ways it would have if it had no agency to fall back on"); *Naimoli v. Ocwen Loan Servicing*, 22 F.4th 376, 383-84 (2d Cir. 2022) (finding that 12 C.F.R. § 1024.35(b) was not so vague as to render the CFPB's interpretation of that provision controlling).

As stated, 12 C.F.R. § 1024.33(b)(1) specifies, in part: "[E]ach transferor and transferee servicer of any mortgage loan shall provide to the borrower a notice of transfer for any assignment, sale, or transfer of the servicing of the mortgage loan." But, as mentioned, 12 C.F.R. § 1024.33 does not define the permissible means by which a servicer must provide notice of a transfer to a borrower. In light of the information required to be included in the notice, as delineated in § 1024.33(b)(4), it is evident that the regulation contemplates that the notice will be delivered in some written form.

Another provision of Regulation X, 12 C.F.R. § 1024.11, is relevant here. It states:

> The provisions of this part requiring or permitting mailing of documents shall be deemed to be satisfied by placing the document in the mail (whether or not received by the addressee) addressed to the addresses stated in the loan application or in other information submitted to or obtained by the lender at the time of loan application or submitted or obtained by the lender or settlement agent, except that a revised address shall be used where the lender or settlement agent has been expressly informed in writing of a change in address.

As I see it, because 12 C.F.R. § 1024.33 does not limit the means by which notice of a servicing transfer can be provided to a borrower, it follows that, pursuant to § 1024.11, a servicer may fulfill its obligations under § 1024.33 by mailing a notice of the transfer, containing all required information, to the address specified in the relevant loan documents.  Should the borrower seek to change that address, the borrower must do so expressly, and in writing, in compliance with 12 C.F.R. § 1024.11.   On this point, Regulation X speaks plainly.[9]

Alternatively, to the extent Regulation X is ambiguous as to how a servicer must affect notice on a borrower, this interpretation of 12 C.F.R. § 1024.33 accords with the CFPB's official commentary.  *See* 12 C.F.R. § 1024, Supp. I (the "Commentary").   With respect to a servicer's obligations under 12 C.F.R. § 1024.33, the Commentary instructs: "A servicer mailing the notice of transfer must deliver the notice to the mailing address (or addresses) listed by the borrower in the mortgage loan documents, unless the borrower has notified the servicer of a new address (or addresses) pursuant to the servicer's requirements for receiving a notice of a change of address." 12 C.F.R. § 1024 Supp. I, ¶ 33(b)(3).

Further, "to the extent a rule is ambiguous, its preamble—even if not itself reviewable as final agency action—may help explain the promulgating agency's intent."  *Safer Chemicals, Healthy Families v. U.S. Environmental Protection Agency*, 943 F.3d 397, 419 (9th Cir. 2019) (citations omitted).  *See* 33 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE, JUD. REV. § 8437 (2d ed. 2021) ("The information generated as part of the notice-and-comment process for rulemaking can provide additional grist for the interpretative mill.  This process requires agencies

---

[9] The Court expresses no opinion as to whether a servicer may discharge its responsibilities under 12 C.F.R. § 1024.33(b) by providing notice to a borrower through means other than those identified in 12 C.F.R. § 1024.11.  Rather, for the purpose of the Motion, it is sufficient to note that Regulation X, read as a whole, reflects that a servicer can comply with 12 C.F.R. § 1024.33 by mailing notice of a transfer to a borrower at the address specified in the relevant loan documents.

to publish explanatory statements of basis and purpose, sometimes called 'preambles,' to justify and explain their rules.")

Of import here, the Agency included an explanation of 12 C.F.R. § 1024.33 with its promulgation of the final rule.  The preamble states: "The Bureau believes that servicers should be responsible for providing a notice to the address listed by the borrower in the mortgage loan documents or different addresses they have received through their own procedures, consistent with § 1024.11[ ] and applicable case law."[ ]  Regulation X, 78 FR 10696, 10728.  And, as described above, 12 C.F.R. § 1024.11 instructs a servicer to mail documents to the "address stated in a borrower's loan application or in other information submitted to or obtained by the lender at the time of loan  application or submitted or obtained by the  lender or settlement agent."   A servicer is only to use a revised address "where the lender or settlement agent has been expressly informed in writing of a change in address."  *Id.*

According to the preamble, the "applicable case law" pertains to a decision of the Eastern District of California, *Rodriguez v. Countrywide Homes*, 668 F. Supp. 2d 1239, 1245 (E.D. Cal. 2009).  *See* Regulation X, 78 FR at 10728 n.87.  In *Rodriguez*, 668 F. Supp. 2d at 1245, the court found that the then-operative version of "RESPA requires a lender to send a Good Bye letter to the Mailing Address listed by the borrower in the loan documents.  When the borrower submits an express change of mailing address, the lender is required to send the Good Bye letter to the new address."   However, the *Rodriguez* Court stated that Regulation X did not require a mortgage servicer to use "reasonable diligence to search for Plaintiffs' last known address because they were on notice that the Property Address was an undeliverable address after the Welcome Letter was returned."  It reasoned: "To impose such a duty . . . would require the lender to undertake a detailed investigation where the borrowers failed to abide by their responsibilities to (1) ensure that the

documents they signed under penalty of perjury were accurate; and (2) abide by the lender's policies." *Id.*

The Deed of Trust governs the means by which Shellpoint was required to provide notice to Richards, and it contains the address for such notice. *See* ECF 25-3 (Deed of Trust). In relevant part, it provides, *id.* § 15 (emphasis added):

> All notices given by Borrower or Lender in connection with this Security Instrument *must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail . . . . The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender.* Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. *Any notice to Lender shall be given by delivering it or mailing it by first class mail* to *Lender's address stated herein unless Lender has designated another address by notice to Borrower.*

Notably, "Security Instrument" is defined as "this document, which is dated February 26, 2007 together with all Riders to this document." ECF 25-3 at 1. The parties have not referenced any riders. Moreover, there is no allegation in the SAC that BSI, Shellpoint's predecessor in relation to the Richards Loan, or Shellpoint itself, adopted different procedures for plaintiff to provide notice of a change in her address.

As the terms of the Deed of Trust indicate, any notice between Richards and her lender was required to be sent, in writing, via U.S. mail. *Id.* § 15. And, notice was required to be sent to Richards at the "Property Address," which the Deed of Trust identified as 11710 Old Georgetown Road 224, Bethesda, Maryland 20817. *Id.* at 3. As Shellpoint observes, plaintiff has not alleged that she informed "either BSI or Shellpoint in writing that she wished to receive notices at her current address." ECF 25-1 at 7. Therefore, under the terms of the Deed of Trust, Shellpoint was contractually obligated to mail the Hello Letter to the Property Address. *See Saenz v. JP Morgan*

*Chase Bank, N.A.*, 7:13-CV-156, 2014 WL 12538134, at *2 (S.D. Tex., Feb. 14, 2014) (explaining that because "Plaintiff failed to update his notice address as contractually required, . . . the notice address remained the mortgaged property, the default under the Deed of Trust").

The Hello Letter is dated November 12, 2019.  ECF 25-4 at 2.  Shellpoint contends that it mailed the Hello Letter to the Property Address on November 12, 2019, which was within fifteen days of November 1, 2019, when it acquired the right to service the Richards Loan.  ECF 25-1 at 7; *see* ECF 24, ¶ 25 (reflecting plaintiff's allegation that defendant acquired the servicing right with respect to the Richards Loan on November 1, 2019).  In defendant's view, it complied with its statutory obligations under § 2605(c) of RESPA as well as Regulation X, 12 C.F.R. § 1024.11, "by placing the document in the mail (whether or not received by the addressee) addressed to the address[ ] stated in the loan application."

However, the text of the Hello Letter indicates that it was sent to plaintiff at 15955 Frederick Road, No. 2544, Rockville, Maryland 20855-2322.  *See* ECF 25-4 at 1, 2.  That is not the Property Address specified in the Deed of Trust.  Nevertheless, plaintiff has not disputed Shellpoint's assertion that it mailed the Hello Letter to the Property Address.  *See* ECF 26 at 20-29. Instead, she maintains that the notice should not have been sent to the Property Address, and instead should have been mailed to an updated address.

In the SAC, plaintiff states that the Hello Letter was "[n]ot addressed to Richard's [sic] then actual mailing address but was knowingly and deceptively addressed to a former address which she had not resided at for a year or more."  ECF 24, ¶ 39(a).[10]  Plaintiff filed an exhibit with the Opposition, titled "Notice of Change of Address."  ECF 26-1 at 2.  It was filed in the Bankruptcy Court about one year before Shellpoint mailed the Hello Letter on November 12, 2019.

---

[10] This assertion arguably implies that the Hello Letter was sent to the Property Address.

*See* ECF 25-4.  The document reflects that, effective October 24, 2018, plaintiff updated her mailing address from the Property Address to a new address, 10205 Washington Boulevard #348, Gaithersburg, Maryland 20878.  ECF 26-1 at 2.

According to plaintiff, BSI was made aware of her change of address on October 24, 2018, when she filed a notice highlighting her change of address in the bankruptcy case to which BSI was a party.  ECF 26 at 22; ECF 24, ¶ 35; *see* ECF 26-1 at 2.  She asserts that BSI received this notice "through the bankruptcy court's CM/ECF system."  ECF 26 at 22.  Further, she claims: "[B]ecause her bankruptcy case was on-going [sic] at the time Shellpoint allegedly acquired the servicing [right] on November 1, 2019 . . . Shellpoint had a duty . . . to notify Richards and the Bankruptcy Court of its interest in the loan," but "it did not timely do so."  *Id.*  Thus, she implies that if Shellpoint had filed a timely disclosure of its interest in the bankruptcy proceeding, it would have obtained notice of her change in address.  However, the notice filed in the bankruptcy case did not satisfy the obligation of plaintiff to notify her lender of her change of address, in accordance with the terms outlined in the Deed of Trust.  *See* ECF 25-3 § 15.

Plaintiff advances the argument that her initiation of bankruptcy proceedings did not relieve Shellpoint of its obligation to mail a timely Hello Letter to plaintiff.  *See* ECF 26 at 23.  But, Shellpoint made no argument to the contrary.  Rather, defendant maintains that it satisfied its obligations as set forth in § 2605(c) because, within fifteen days of acquiring the right to service the Richards Loan, it mailed a Hello Letter to plaintiff at the address listed in the Deed of Trust.  ECF 25-1 at 5-10.  The fact that the Richards Loan was subject to bankruptcy proceedings has no bearing on Shellpoint's contention.

Further, plaintiff asserts that the Court should resolve the dispute in her favor in light of RESPA's broad, remedial purpose, as articulated in a recent decision of the Fourth Circuit in

*Harrell v. Freedom Mortg. Corp.*, 976 F.3d 434 (4th Cir. 2020). *See* ECF 26 at 24-27. To be sure, RESPA is a broad, remedial statute. As the Fourth Circuit explained in *Harrell*, 976 F.3d at 437-39, Congress enacted RESPA in order to "to provide 'consumers throughout the Nation . . . with greater and more timely information on the nature and costs of the [real estate] settlement process.'" (Alteration in *Harrell*) (quoting 12 U.S.C. § 2601(a)). Further, the *Harrell* Court recognized that Congress "authorized the [CFPB] to administer RESPA by 'prescrib[ing] . . . rules and regulations . . . necessary to achieve [RESPA's] purposes.'" *Harrell*, 976 F.3d at 437 (some alterations in *Harrell*) (quoting 12 U.S.C. § 2617(a)).

But, as Richards concedes, *Harrell* did not concern the scope of a mortgage servicer's obligations under § 2605(c). ECF 26 at 25. Rather, it discussed a mortgage servicer's duty to pay taxes. *Harrell*, 976 F.3d at 437. Simply put, pointing to RESPA's broad, remedial purpose does not establish that a mortgage servicer is required to ferret out a borrower's change of address for purposes of sending a Hello Letter in compliance with 12 U.S.C. § 2605(c).

In sum, plaintiff's filing of the notice of change of address in the bankruptcy case did not give rise to a legal duty obligating defendant to utilize that address. The parties were bound by the requirements of the Deed of Trust. Accordingly, plaintiff has not pleaded any facts that, if proven, would establish that Shellpoint breached its duty by mailing the Hello Letter to the Property Address. Therefore, plaintiff's RESPA claim is subject to dismissal.

### C. Count II: FDCPA

In Count II, plaintiff asserts a claim under the FDCPA. *See* Pub. L. 95–109, 91 Stat. 874 (1977). She lodges the claim in her individual capacity and on behalf of the putative Untimely Notice Class. ECF 24, ¶¶ 92-99.

The FDCPA, which was enacted in 1977, is concerned with "rights for consumers whose debts are placed in the hands of professional debt collectors . . . ." *DeSantis v. Computer Credit, Inc.*, 269 F.3d 159, 161 (2d Cir. 2001); *see Ruth v. Triumph Partnerships*, 577 F.3d 790, 797 (7th Cir. 2009). "A significant purpose" of the FDCPA is the elimination of "abusive practices by debt collectors . . . ." *Brown v. Card Service Center*, 464 F.3d 450, 453 (3d Cir. 2006); *see also Moore v. Blibaum & Assoc., P.A.*, 693 F. App'x 205, 206 (4th Cir. 2017).

The FDCPA protects consumers from debt collectors who engage in "abusive, deceptive, and unfair debt collection practices," while also "insur[ing] that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and . . . promote[s] consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); *see Henson v. Santander Consumer USA, Inc.*, ___ U.S. ___, 137 S. Ct. 1718, 1720 (2017) (stating that the FDCPA "authorizes private lawsuits and weighty fines designed to deter wayward collection practices"); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 576 (2010); *Ben-Davies v. Blibaum & Assoc., P.A.*, 695 F. App'x 674, 676 (4th Cir. 2017); *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 135 (4th Cir. 1996). As a remedial statute, the FDCPA is construed liberally in favor of the debtor. *Brown*, 464 F.3d at 453; *see, e.g., Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 393 (4th Cir. 2014) (recognizing the canon of statutory interpretation that remedial statutes are to be construed liberally) (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561-62 (1987)); *Glover v. F.D.I.C.*, 698 F.3d 139, 149 (3d Cir. 2012); *Hamilton v. United Healthcare of La.*, 310 F.3d 385, 392 (5th Cir. 2002).

To establish a claim under the FDCPA, "a plaintiff must prove that: '(1) the plaintiff has been the object of collection activity arising from consumer debt; (2) the defendant is a debt

34

collector as defined by the FDCPA; and (3) the defendant has engaged in an act or omission prohibited by the FDCPA.'" *Boosahda v. Providence Dane LLC*, 462 F. App'x 331, 333 n.3 (4th Cir. 2012) (quoting *Ruggia v. Wash. Mut.*, 719 F. Supp. 2d 642, 647 (E.D. Va. 2010)); *see Webster v. ACB Receivables Mgmt., Inc.*, 15 F. Supp. 3d 619, 625 (D. Md. 2014); *Stewart v. Bierman*, 859 F. Supp. 2d 754, 759 (D. Md. 2012).

Of import here, plaintiff asserts violations of 15 U.S.C. § 1692f, *i.e.*, the "Unfair Practices" section of the FDCPA. Section 1692f states: "A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." The statute provides a list of conduct that violates the section, but it also "allows the court to punish any other unfair or unconscionable conduct not covered by the FDCPA." *Lembach v. Bierman*, 528 F. App'x 297, 303 (4th Cir. 2013). Richards does not claim that defendant violated a particular subsection of § 1692f, however. Rather, she relies on the statute's catch-all provision, asserting that Shellpoint "acted unfairly or with unconscionable means . . . ." ECF 24, ⁋ 96.

According to plaintiff, Shellpoint engaged in unconscionable or unfair conduct because it failed "to provide the Plaintiff and the Untimely Notice Class members with Hello Letters pursuant to 12 U.S.C.A § 2605(c) while charging fees and other charges to their loans . . . ." ECF 24, ⁋ 96. In addition, Richards avers that Shellpoint violated 15 U.S.C. § 1692f because it did not employ "reasonable procedures and practices to either (i) ensure the addresses it purports to mail . . . notices are correct or (ii) updated when it receives notice from the United States Postal Service of non-delivery while continuing to charge fees and other charges . . . ." *Id.* And, Richards claims that Shellpoint violated § 1692f "[b]y boarding and utilizing knowingly inaccurate loan data into its own systems from its predecessors with no adequate policies, practices, and procedures [sic] to

make sure the information is reasonably true and correct and then attempting to collect fees and charges . . . ."  *Id.* ⁋ 97.[11]

In the Motion, defendant does not dispute that Richards has been the subject of collection activity or that Shellpoint qualifies as a debt collector within the meaning of the FDCPA.  Rather, Shellpoint contends only that Count II must fail because the conduct complained of does not amount to a violation of 15 U.S.C. § 1692f.  *See* ECF 25-1 at 14-24.  To that end, defendant argues that plaintiff's first two allegations amount to no more than "purported RESPA violations that are improperly bootstrapped to Plaintiff's FDCPA claim . . . ."  *Id.* at 15.  Further, defendant maintains that the plaintiff has pled only "regurgitated legal conclusions," rather than the kind of  factual allegations necessary to support a claim arising under the FDCPA.  *Id.*  And, defendant contends that "there was nothing unfair or unconscionable about charging fees to Plaintiff or putative class members."  *Id.*

In essence, plaintiff's claim is predicated on the allegation that Shellpoint failed to comply with its statutory obligations under 12 U.S.C. § 2605(c).  *See* ECF 24, ⁋ 96.  But, as explained above, plaintiff's mailing of the Hello Letter to the Property Address did not constitute a RESPA violation.

Even assuming a violation of Maryland or federal law, the FDCPA may not be used as a means to enforce such statutes.  *See Richards v. PAR, Inc.*, 954 F.3d 965, 969 (7th Cir. 2020) (explaining that the "broad and vague language" of § 1692f "does not transform every violation of state or federal law into a violation of the FDCPA"); *Carlson v. First Revenue Assur.*, 359 F.3d 1015, 1018 (8th Cir. 2004) ("The FDCPA was designed to provide basic, overarching rules for

---

[11]  Plaintiff's reference to "boarding" appears to pertain to a procedure known as loan boarding. This is the "process of entering new loans in a servicing company's software system." *CFPB v. Ocwen Financial Corp.*, 17-CV-80495 (S.D. Fla. Sept. 5, 2019), ECF 52 at 4 n.1.

debt collection activities; it was not meant to convert every violation of a state debt collection law into a federal violation."); *Eul v. Transworld Systems*, No. 15 C 7755, 2017 WL 1178537, at *4 (N.D. Ill. Mar. 30, 2017) (explaining that plaintiffs may not "use the FDCPA as a vehicle for enforcing matters governed by state law"); *Large v. LVNV Funding, LLC*, 1:09-cv-689, 2010 WL 3069409, at *4 (W.D. Mich. Aug. 2, 2010) (finding that "'permit[ting] a simultaneous claim under the FDCPA would allow through the back door what [the plaintiff] cannot accomplish through the front door—a private right of action.'" ) (some alterations in *Large*) (quoting *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 504, 510 (9th Cir. 2002)); *Daley v. A & S Collection Assocs., Inc.*, 717 F. Supp. 2d 1150, 1156 (D. Or. 2010) (stating "violations of other federal laws that provide remedial measures do not violate the 1692(f) prohibition on unfair and unconscionable means to collect or attempt to collect a debt").

Certainly, RESPA's implementing regulations require mortgage servicers to maintain "policies and procedures that are reasonably designed to achieve" certain enumerated objectives. 12 C.F.R. § 1024.38(a).  Pertinent here, Regulation X requires a servicer to enact policies and procedures to ensure that it can "access and provide timely and accurate information" to borrowers as well as to "facilitate the transfer of information during servicing transfers."  *Id.* § 1024.38(b). However, as Judge Xinis of this Court recently explained: "[N]o private cause of action exists for violations of [12 C.F.R. § 1024.38]."  *Richards v. Servis One, Inc.*, PX-20-3683, 2021 WL 3930130, at *6 (D. Md. Sept. 2, 2021) (citing, *inter alia*, *Smith v. Nationstar Mortg.*, RHC-15-13019, 2015 WL 7180473, at *3-4 (E.D. Mich. Nov. 16, 2015), and *Best v. Newrez, LLC*, GJH-19-2331, 2020 WL 5513433, at *28 (D. Md. Sept. 11, 2020)); *see* Regulation X, 78 FR at 10818 ("[B]orrowers do not, however, have a private right of action under the Bureau's rules to enforce the requirements set forth in § 1024.38 . . . .").

Richards relies on a forty-year old case, *In re Scrimpsher*, 17 B.R. 999, 1014 (Bankr. N.D.N.Y. 1982), to support the contention that "[a] debt collector should not be able [to] escape its legal duties under the FDCPA by failing to update borrower addresses in its files so the borrowers have the information they are required to have in relation to their mortgage loans." ECF 26 at 37. The Court is unaware of recent, reported authority that suggests that a FDCPA claim can be predicated solely on an allegation that a debt collector failed to use adequate procedures and practices to ensure the accuracy of its loan data. *See Richardson v. Midland Funding, LLC*, CCB-13-1356, 2013 WL 6719110, at *7 (D. Md. Dec. 18, 2013) (stating that the Court was "aware of no case in which a court found a plaintiff had alleged a claim under the FDCPA on a debt collector's alleged general pattern and practice of debt collection alone").

And, *In re Scrimpsher* cuts against plaintiff's position. In that case, a debtor brought a counterclaim against a debt collector under the FDCPA for failing to include a return mailing address on a written notice that was mailed to the debtor. *In re Scrimpsher*, 17 B.R. at 1012-13. In resolving the debtor's motion for summary judgment as to the FDCPA counterclaim, the court found that the debt collector was liable to the debtor because of the particular defective notice at issue. *Id.* at 1014. It did not root its decision in a generalized pattern or practice of sending defective notices.

In addition, Shellpoint argues that plaintiff's FDCPA claim should be dismissed on the ground that neither the Deed of Trust nor the Primestar Settlement prohibited fees of the kind that Shellpoint imposed. ECF 25-1 at 20-24. It is not clear to the Court that Count II is predicated on such an assertion. But, in any event, plaintiff did not respond to the argument in the Opposition. And, a plaintiff who fails to respond to an argument for dismissal is deemed to have abandoned the claim. *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 783 (D. Md. 2010).

Therefore, to the extent that plaintiff's FDCPA claim could be construed as including an assertion that Shellpoint's imposition of fees was unlawful because it violated the Primestar Settlement, and thus was in violation of the FDCPA, plaintiff has abandoned the claim.

In sum, plaintiff has not alleged facts that, if proven, would establish that Shellpoint's conduct amounted to an "unfair or unconscionable means to collect or attempt to collect any debt" in violation of 15 U.S.C. § 1692f.  Thus, I am persuaded that Count II is subject to dismissal.

### D.   Class Allegations

Shellpoint also moves to dismiss plaintiff's proposed class definitions on the ground that they are impermissibly broad.  ECF 25-1 at 33-37.  In my view, the argument is moot because plaintiff's individual RESPA and FDCPA claims fail as a matter of law, and plaintiff has not put forward a separate theory of liability as to either putative class.

In such circumstances, dismissal of the class claims must follow.  *See* Fed. R. Civ. P. 23(c)(1)(a); *Richards*, 2021 WL 3930130, at *8 ("'When the plaintiff's own claim is dismissed, he can no longer be the class representative.  At that point, either another class representative must be found or the suit is kaput.'") (quoting *Collins v. Village of Palatine*, 875 F.3d 839, 846 (7th Cir. 2017)); *Lienhart v. Dryvit Sys. Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) (explaining that "'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members'") (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

### E.   Count III: State Law Claims

In Count III, plaintiff claims that defendant's conduct violated various provisions of the MCDCA, C.L. §§ 14-201, *et seq.*, and the MCPA, C.L. §§ 13-101, *et seq.*  ECF 24, ¶¶ 100-19. Notably, the same factual allegations undergird defendant's purported violations of both statutes.

In particular, plaintiff maintains that Shellpoint violated these statutes by attempting to collect "sums" from Richards to which it allegedly was not entitled. *See id.* ¶¶ 101, 114. She also complains that Shellpoint failed to credit her for the sums she paid to Shellpoint and its predecessor. *See id.* ¶¶ 103-04, 111. In addition, Richards states that defendant failed to comply with its obligations under State law when it furnished false information to credit reporting agencies. *See id.* ¶¶ 105, 116. And, she complains that Shellpoint's alterations of the Loan Modification Agreement amounted to a violation of the MCDCA and the MCPA. *See id.* ¶¶ 107, 115.

Shellpoint challenges each contention. *See* ECF 25-1 at 24-33. In response, Richards does not provide much substantive analysis concerning the import of many of defendant's arguments. But, contrary to defendant's assertion in the Reply (ECF 28 at 15-17), plaintiff has not abandoned Count III. The closing pages of the Opposition make clear that plaintiff opposes the dismissal of her State law claims. *See* ECF 26 38-43. Thus, I shall address the merits of defendant's arguments.

### 1. Furnishing False Information

As mentioned, the SAC asserts that Shellpoint furnished false information to credit reporting agencies with respect to the Richards Loan. ECF 24, ¶¶ 37(a)-(e). And, plaintiff appears to assert that Shellpoint is liable for such conduct under both the MCPA and the MCDCA. *See id.* ¶¶ 105, 116. Defendant argues that these claims may not proceed because State statutory claims for such conduct are preempted by the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq. See* ECF 25-1 at 30-31.

"The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. Const. art.

VI, cl. 2); *see also Va. Uranium, Inc. v. Warren*, ___U.S.___ 139 S. Ct. 1894, 1901 (2019) ("The Supremacy Clause supplies a rule of priority.").   As a result, "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (citation omitted); *see also Merck Sharp & Dohme Corp. v. Albrecht*, ___U.S. ___, 139 S. Ct. 1668, 1678 (2019) (observing that "'state laws that conflict with federal law are without effect'") (citation omitted); *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472 (2013). "Put simply, federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 162 (2016).

"Federal law may preempt state law under the Supremacy Clause in three ways-by 'express preemption,' by 'field preemption,' or by 'conflict preemption.'" *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007) (citation omitted); *see also Cox v. Duke Energy Inc.*, 876 F.3d 625, 635 (4th Cir. 2017); *Decohen v. Capital One, N.A.*, 703 F.3d 216, 223 (4th Cir. 2012). Express preemption occurs when federal law explicitly preempts state law. *See, e.g.*, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95-98 (1983).   Field preemption applies where "'Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law.'" *Hughes*, 578 U.S. at 151 (citation omitted); *see, e.g.*, *Arizona*, 567 U.S. at 401-02.   And, conflict preemption arises where state law "actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U. S. 72, 79 (1990).   These three types of preemption are forms of "ordinary preemption" that serve as federal defenses to a state law claim. *Lontz v. Tharp*, 413 F.3d 435, 441 (4th Cir. 2005); *see Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 238 (2d Cir. 2014).

Shellpoint does not expressly identify the theory of preemption that is pertinent here.   But, it directs the Court's attention to a provision of the FCRA that, according to defendant, indicates

that plaintiff may not bring a claim under State law for furnishing false information to a credit reporting agency.  ECF 25-1 at 31.   Thus, I shall assume that defendant relies on a theory of express preemption.

Preemption is governed by "the two cornerstones of . . . preemption jurisprudence."  *Wyeth*, 555 U.S. at 565.  First, preemption of state law "is 'fundamentally . . . a question of congressional intent.'"  *Cox*, 876 F.3d at 635 (quoting *English*, 496 U.S. at 79); *see Hughes*, 578 U.S. at 162 (observing "'the purpose of Congress is the ultimate touchstone in every pre-emption case'") (citation omitted).  Second, respect for our federalist system of government demands that courts presume that Congress did not intend to displace State law.  *Wyeth*, 555 U.S. at 565 n.3; *see Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008).  The presumption against preemption is especially strong "when Congress has legislated in a field traditionally occupied by the States."  *Altria Grp.*, 555 U.S. at 77; *see Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (stating that courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."); *cf. Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (applying presumption against preemption in case concerning domestic relations, a field historically occupied by the states).  In such a case, the statute cannot be set aside absent "clear evidence" of a conflict. *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000).  These principles apply whether the federal law in issue is a statute or a regulation. *See id.* at 874.

As mentioned, Shellpoint argues that the FCRA preempts plaintiff's State law claims predicated on the furnishing of false information to a credit reporting agency.  The FCRA is "a comprehensive statutory scheme designed to regulate the consumer reporting industry."  *Ross v. F.D.I.C.,* 625 F.3d 808, 812 (4th Cir. 2010). Among other things, it creates a duty for furnishers

of credit information to provide accurate information to credit reporting agencies as well as a duty to correct inaccuracies and to investigate disputed information upon notice from a consumer.  15 U.S.C. § 1681s–2.

In evaluating whether the FCRA preempts State law claims for the furnishing of false information to a credit reporting agency, two provisions are relevant.  The first is § 1681h(e), which was enacted in 1970 as part of the original FCRA.  It states (emphasis added):

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report *except as to false information furnished with malice or willful intent to injure such consumer.*

In short, this section clearly appears to exempt certain state law tort claims—those alleging falsity and malice—from the preemptive reach of the FCRA.

The second relevant provision, § 1681t(b)(1)(F), was added to the FCRA in 1996.  It appears to preempt *all* state law claims, but is in tension with § 1681h(e). It provides:

> No requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681s–2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies . . . .

District courts have struggled to reconcile the apparent breadth of § 1681t(b)(1)(F) with the explicit allowance for certain State law tort claims in § 1681 h(e).  *See Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1166 (9th Cir. 2009) (noting conflict among district courts).  Indeed, "[o]n its face, the broad preemption of Section 1681t appears to conflict with the malice-exception in Section 1681h(3)." *White v. Green Tree Servicing, LLC*, 118 F. Supp. 3d 867, 872 (D. Md. 2015).   Accordingly, "[t]o reconcile these provisions, district courts, including [in

the District of Maryland], have adopted the 'statutory approach,' which applies Section 1681t for state statutory claims, and applies Section 1681h for state common law claims." *Id.* (citing *Jacobs v. Seterus, Inc.* ELH-13-2578, 2013 WL 4852243, at *4 (D. Md. Sept. 9, 2013) *and Davenport v. Sallie Mae, Inc.*, PJM-12-1475, 2013 WL 4010983, at *5 (D. Md. Aug. 2, 2013)); *see also Meaney v. Nationstar Mortg.*, TDC-16-2959, 2018 WL 1014927, at *13 (D. Md. Feb. 21, 2018); *Magruder v. Educ. Sys. Fed. Credit Union*, 194 F. Supp. 3d 386, 389-91 (D. Md. 2016); *Beuster v. Equifax Info. Servs,*.435 F.Supp.2d 471, 478 (D. Md. 2006).  In other words, under the statutory approach "state statutory claims arising from reporting inaccurate information to credit reporting agencies are 'squarely preempted by the plain language of the FCRA'" *White*, 118 F. Supp. 3d at 872 (quoting *Ross,* 625 F.3d at 813).

Richards has asserted claims for the furnishing of false information to credit reporting agencies under two State statutes, the MCDCA and the MCPA.  *See* ECF 24, 105,116.  Thus, these claims "run 'into the teeth of the FCRA preemption provision.'" *White*, 118 F. Supp. 3d at 872 (quoting *Ross*, 625 F.3d at 813).  Accordingly, I shall dismiss Count III to the extent it is predicated on plaintiff's assertion that Shellpoint furnished false information to credit reporting agencies.

## 2.  MCDCA

I next address whether any of plaintiff's remaining claims are actionable under the MCDCA.  This statute prohibits certain enumerated actions by a debt collector in "collecting or attempting to collect" an "alleged debt arising out of a consumer transaction."  C.L. §§ 14-201(b), 14-202; *see also* C.L. § 14-202(1)-(11) (enumerating prohibited actions).

Relevant here, plaintiff invokes C.L. §§ 14-202(8) and § 14-202(11).  ECF 24, ¶¶106, 107.  Section 14-202(8) prohibits a debt collector from "[c]laim[ing], attempt[ing], or threaten[ing] to enforce a right with knowledge that the right does not exist."  And, § 14-202(11) prohibits a debt

collector from "engag[ing] in any conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act."  I begin with C.L. § 14-202(11).

### a.  C.L. § 14-202(11)

Plaintiff asserts that Shellpoint collected unlawful sums, in violation of § 1692e and 1692f of the FDCPA and thus C.L. § 14-202(11).  The elements of a claim under § 1692f were set forth above, and I need not repeat them here.  As to § 1692e, it states: "A debt collector may not use any false, deceptive or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  The provision then sets forth a list of sixteen, non-exhaustive means by which a debt collector violates the statute.  Richards does not state that Shellpoint's conduct violated any particular subsection of § 1692e.

### i.       Collecting Sums

Richards claims that Shellpoint violated C.L. § 14-202(11) because it "attempted to collect and did in fact collect unlawful sums from Richards without giving her credit for the payments made and the agreements governing her loan . . . ."  ECF 24, ⁋ 103.  Presumably, plaintiff's reference to "unlawful sums" pertains to the "fees and charges" that Shellpoint allegedly "imposed and/or collected . . . onto Richard's loan account" between November 2019 and March 2020.  *Id.* ⁋ 49.  Specifically, plaintiff identified the imposition of six fees during this period, which collectively amounted to a sum of $1,580.05.  *Id.*  They were assessed for various reasons, such as late charges, title costs, and legal fees.  *Id.*

To the extent that plaintiff contends that the imposition of these fees was unlawful because Shellpoint did not provide plaintiff with a timely Hello Letter, her claim fails as a matter of law. As explained above, Shellpoint timely mailed a Hello Letter, and thus complied with its obligations under RESPA.  Accordingly, such conduct did not amount to a FDCPA violation under 15 U.S.C.

§ 1692f.  Further, as Shellpoint observes (ECF 25-1 at 25), plaintiff has not pointed to any misleading statement contained within the Hello Letter that could conceivably amount to a violation of 15 U.S.C. § 1692e.

However, Richards also alleges that the collection of these fees violated the Primestar Settlement.  As set forth above, plaintiff claims that the Primestar Settlement prohibited Primestar from "attempt[ing] to collect from Richards any *in personam* deficiency sums" related to the Richards Loan.   ECF 24, ⁋ 30.  Further, she avers: "Neither Brougham nor Morgan Stanley are entitled to any greater rights than their assignor(s) had to give them." *Id.* ⁋ 32.  Thus, she asserts that "Brougham and Morgan Stanley are not permitted to violate the terms of the Primestar Settlement indirectly through Shellpoint . . . ." *Id.*    And, she claims that the fees Shellpoint imposed between November 2019 and March 2020 "appear to be sums barred by the Primestar Settlement." *Id.* ⁋ 50.

Generally speaking, in the context of a case like this one, deficiency sums arise "follow[ing] foreclosure proceedings" and constitute a  "remedy to a lender or party in interest that sells the property for less than the balance of the debt." *Pulliam v. Dyck-O'Neal, Inc.*, 243 Md. App. 134, 145, 219 A.3d 141, 148 (2019).  And, under Maryland law, a "motion for deficiency judgment converts the foreclosure action from an *in rem* proceeding to an *in personam* proceeding, . . . ." *Id.*   Thus, in context, and as defendant contends, the Primestar Settlement's prohibition against the collection of "*in personam* deficiency sums" appears to apply where a foreclosure proceeding has previously occurred. ECF 25-1 at 25-26.  And, Richards does not assert that any such proceeding has transpired.  To the contrary, the SAC expressly states that Richards was *not* subjected to foreclosure proceedings in relation to the Richards Loan.  ECF 24, ⁋ 37(c).

But, the Court has not been provided with a copy of the Primestar Settlement.  Nor does

the SAC specify how or whether the Primestar Settlement defined "*in personam* deficiency sums*.*"

ECF 24, ¶ 30.  Further, plaintiff claims that the collection of these fees violated the Primestar

Settlement.  *Id.* ¶ 50.  And, at this juncture, the Court must accept plaintiff's allegations as true.

*See King*, 825 F.3d at 214 (indicating that, when resolving a motion to dismiss, courts should not

"'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'")

(quoting *Edwards*, 178 F.3d at 243).

Accordingly, plaintiff has adequately pleaded that Shellpoint's conduct violated the

Primestar Settlement.  And, as a result, plaintiff has also stated a plausible claim under the FDCPA.

Notably, 15 U.S.C. § 1692f(1) prohibits the "collection of any amount . . . unless such

amount is expressly authorized by the agreement created the debt or permitted by law."  And,

accepting the allegations in the SAC as true, if the imposition of fees violated the Primestar

Settlement, Shellpoint's conduct arguably amounts to "the collection of any amount" in violation

of 15 U.S.C. § 1692f(1) and thus C.L. § 14-202(11).  *See Blackburn v. Mapother, P.S.C.*, 3:14-

CV-55-R, 2014 WL 1418224, at *3 (W.D. Ky. Apr. 14, 2014) (explaining that the alleged attempt

to collect sums in violation of a settlement agreement could plausibly amount to a claim for

violation of 15 U.S.C. § 1692f(1)).

### ii.  Failure to Credit Payments

Plaintiff alleges that Shellpoint collected payments from Richards without giving her credit

for them, and that Shellpoint refused "to give Richards credit for the sums she paid its predecessors

. . . ."  ECF 24, ¶¶ 103-04.  These allegations appear to pertain to plaintiff's assertion that she made

mortgage payments to BSI in November 2019 and February 2020, which were forwarded to

Shellpoint, but never cashed or credited against her debt.  *Id.* ¶ 45.  Further, plaintiff alleges that

she sent two payments to Shellpoint, one in February 2020 and one in March 2020, each in the amount of $1,000. *Id.* ¶ 46. But, according to Richards, Shellpoint did not cash these payments. *Id.* Rather, both of the payments that she sent to Shellpoint "were mailed to the address provided on Shellpoint's belated Hello Letter." *Id.*

Defendant responds by pointing out that the Deed of Trust "explicitly permits Shellpoint to return a partial payment if the payment is insufficient to bring the loan current." ECF 25-1 at 32. Specifically, the Deed of Trust provides, in relevant part, ECF 25-3 at 4, ¶ 1:

> Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current without waiver of any rights hereunder or prejudice to its rights to refuse such payments or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.

Accordingly, Shellpoint argues that under this provision, it is not required to apply any partial payments to the loan balance. ECF 25-1 at 32. Rather, it can return any such payments that are insufficient to bring the loan current. *Id.* And, the SAC does not allege that plaintiff's checks were sufficient to bring the Richards Loan current. Indeed, plaintiff's Chapter 13 bankruptcy proceeding reflects that, as recently as September 2020, Richards was in arrears in the approximate amount of $39,000. *See* ECF 116 at 2, 3, *In re Richards*, No. 18-15772 (Bankr. D. Md. Sept. 11, 2020). Nor does plaintiff make any claim in the Opposition that the SAC should be read to allege that the Richards Loan would have been made current by the acceptance of the partial loan payments.

Shellpoint contends that it was "entitled to return (and not give credit for) any such payments under the documents governing this loan." ECF 25-1 at 32. Plaintiff does not offer any reason why the first paragraph of the Deed of Trust does not dispose of her claim.

Moreover, the Court is not aware of any legal authority that suggests a debt collector's refusal to accept a partial payment amounts to a violation of the FDCPA. Indeed, district courts across the country have reached the opposite conclusion. *See*, *e.g*., *Medrano v. Great Mercantile Agency, Inc.*, 1:17-cv-1392, LJO-JLT, 2018 WL 3105026, at *3-4 (E.D. Cal. Jun. 20, 2018); *Hill v. Woods*, 1:16-cv-00916-JMS-DKL, 2017 WL 529601, at *7 (S.D. In. Feb. 9, 2017); *Beeks v. ALS Lien Servs*., 12-cv-2411-FMO (PJWx), 2014 WL 7785745, at *14 (C.D. Cal. Feb. 18, 2014); *Memmott v. One West Bank*, No. 10-3042-CL, 2011 WL 1560985, at *13 (D. Or. Feb. 9, 2011).

For example, in *Beeks*, 2014 WL 7785745, at *13-14, the plaintiff argued that the defendant's refusal to accept a partial payment on the plaintiff's home association dues amounted to a violation of the FDCPA. The district court rejected plaintiff's contention, pointing out that the FDCPA "says nothing about whether a debt collector is required to accept partial payments." *Id.* at *14. Further, it explained, *id.*:

> The Fair Trade Commission's annual report acknowledges that "some conduct about which consumers complain does not violate the FDCPA. For example, a consumer may complain that a debt collector will not accept partial payments on the same installment terms that the original lender permitted when the account was current. Although a collector's demand for accelerated payment or larger installments may be frustrating to the consumer, such a demand generally does not violate the FDCPA."

*Id.* (quoting *Federal Trade Commission, Annual Report 2011: Fair Debt Collection Practices*, FED. TRADE COMM'N, at 3 (2011), https://tinyurl.com/mm7hds6 (last visited Feb. 10, 2022). In light of the FTC's report, the court concluded: "[D]efendant's refusal to accept partial payments does not violate the FDCPA." *Beeks*, 2014 WL 7785745, at *14.

*Beeks* is persuasive. Further, plaintiff has not alleged that Shellpoint employed any false, misleading, or deceptive representations or means in connection with its failure to accept these

payments.  Thus, I am persuaded that these allegations do not amount to a violation of the FDCPA and thus C.L. § 14-202(11).

### iii.    Loan Modification Agreement

Plaintiff complains that Shellpoint violated the MCDCA by making misleading representations to plaintiff when it rewrote material terms of the Loan Modification Agreement after she agreed to its provisions.  ECF 24, ¶¶ 107, 115.  She complains that she executed the agreement in compliance with Shellpoint's directives by signing the Loan Modification Agreement with her legal married name before a notary public, and mailed the executed agreement to defendant.  *Id.* ¶ 60.  However, according to plaintiff, Shellpoint's counsel subsequently stated that plaintiff "should have signed [the Loan Modification Agreement] using her former, non-legal name before a notary." *Id.* ¶ 61.  Accordingly, Shellpoint's counsel asked plaintiff to provide proof of her name change so that Shellpoint could revise the Loan Modification Agreement to accurately reflect her legal name.  *Id.* ¶ 62.  Plaintiff claims: "Shellpoint's attorney never stated any purpose or plan by Shellpoint to rewrite the other material modification terms—just simply to update Ms. Richard's [sic] name on the instrument."  *Id.*

Thereafter, Shellpoint returned a revised version of the Loan Modification Agreement with terms that were materially different from the version to which plaintiff had agreed.  In particular, plaintiff claims that the revised version of the Loan Modification Agreement reflected a principal balance that was more than $19,000 greater than the principal balance included in the initial version of the Loan Modification Agreement.  *Id.* ¶ 63.  Further, plaintiff alleges that Shellpoint's counsel "concealed" the change that Shellpoint made to the agreement.  *Id.*  Richards avers that Shellpoint had no "just basis" to make these changes.  *Id.* ¶ 64.  And, according to plaintiff, when she brought

the changes to Shellpoint's attention, it failed to respond to her concerns. *Id.* ¶ 65. Thus, in her view, Shellpoint's conduct constitutes a violation of 15 U.S.C. §§ 1692e, 1692f. *Id.* ¶ 107.

Shellpoint counters that plaintiff's "theory is contradicted by the very document Plaintiff cites . . . ." ECF 25-1 at 26. In particular, defendant urges the Court to consider two provisions included in the Load Modification Agreement. *Id.* at 26-27; *see* ECF 25-5. These provisions state, ECF 25-5 at 3:

> J.    I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program.

> \* \* \* \* \*

> M.    If any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.N shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such a replacement.

Shellpoint maintains that a plain reading of these terms indicates that it "possessed the right to require execution of corrective documents, or the right to void incorrect documents." ECF 25-1 at 27. Therefore, in defendant's view, it did not engage in an unfair or deceptive trade or practice by altering the terms of the Loan Modification Agreement.

As I see it, Shellpoint's argument miscasts plaintiff's allegations. The SAC does not assert that Shellpoint violated the FDCPA solely on the ground that, after the fact, it rewrote the terms of the Loan Modification Agreement. Rather, plaintiff claims that Shellpoint's conduct is actionable because it made misleading or false statements in the revision process.

In particular, plaintiff claims that Shellpoint represented to her that it was revising the Loan Modification Agreement solely for the purpose of reflecting plaintiff's married name. ECF 24, ¶¶ 61-62. But, when the document was returned to plaintiff, the Loan Modification Agreement contained material changes, including to the outstanding loan balance and plaintiff's required monthly payments. *Id.* ¶ 63. Further, plaintiff claims that Shellpoint's attorney endeavored to "conceal" that these changes had been made. *Id.*

Accordingly, even assuming, *arguendo*, that Shellpoint is correct to assert that it retained the right to redraw the terms of Loan Modification Agreement or void the agreement in its entirety, it does not necessarily follow that plaintiff's allegations fail to state a claim under the FDCPA or C.L. § 14-202(11). Plaintiff adequately alleges that Shellpoint made "false, deceptive, or misleading representation[s]" in connection with revising the Loan Modification Agreement, in violation of 15 U.S.C. § 1692e and C.L. § 14-202(11). *See Rockridge Trust v. Wells Fargo, N.A.*, 985 F. Supp.2d 1110, 1137-38 (N.D. Cal. 2013) (explaining that where plaintiff alleged that defendant made misleading statements in connection with negotiating a loan modification agreement, she had adequately stated a claim under 15 U.S.C. §§ 1692e, 1692f); *cf. Carroll v. Specialized Loan Servicing, Inc.*, 4:18-cv-00773-NKL, 2018 WL 6574788, at *2 (W.D. Mo. Dec. 13, 2018) (finding that plaintiff's allegation that a mortgage servicer's "refusal to cooperate with [plaintiff] regarding her loan modification" did not amount to a FDCPA violation because plaintiff

did not identify "any representation made or conduct by [the mortgage servicer] that was false, deceptive, or misleading") (internal quotations omitted).

### b.  C.L. § 14-202(8)

I turn to whether plaintiff has adequately stated a claim under C.L. § 14-202(8).  As mentioned, this provision prohibits a debt collector from "[c]laim[ing], attempt[ing], or threaten[ing] to enforce a right with knowledge that the right does not exist."  *Id.*  Thus, to state a claim under C.L. § 14-202(8), a plaintiff "'must set forth factual allegations tending to establish two elements: (1) that Defendants did not possess the right to collect the amount of debt sought; and (2) that Defendants attempted to collect the debt knowing that they lacked the right to do so.'"  *Healy v. BWW Law Group, LLC*, PWG-15-3688, 2017 WL 281997, at \*5 (D. Md. Jan. 23, 2017) (quoting *Lewis v. McCabe Weisberg & Conway*, DKC 13-1561, 2014 WL 3845833, at \*6 (D. Md. Aug. 4, 2014)).

"Maryland Courts have consistently interpreted the MCDCA to require plaintiffs to allege that defendants acted with knowledge that the 'debt was invalid, or acted with reckless disregard as to its validity.'"  *Lembach*, 528 F. App'x at 304 (quoting *Shah v. Collecto, Inc.*, DKC-2004-4059, 2005 WL 2216242, at \*11 (D. Md. Sept. 12, 2005)).  Further, as the Maryland Court of Appeals recently explained, a "plaintiff may invoke § 14-202(8) when the amount claimed by the debt collector includes sums that the debt collector, to its knowledge, does not have the right to collect."  *Chavis v. Blibaum & Assocs., P.A.*,  476 Md. 534, 264 A.3d 1254, 1270 (2021).

In the SAC, plaintiff alleges that defendant's conduct amounted to a violation of this provision because "Shellpoint knows its legal duties, but has continuously asserted rights which did not exist even after it had notice of this action during the last twelve months."  ECF 24, ¶ 108.  Defendant challenges this claim, stating: "While certain methods of collection may be challenged

under [the provision], if another statute makes the method of collection improper, the validity of sums collected is not a proper subject of a claim . . . ." ECF 25-1 at 27 (emphasis omitted). Further, Shellpoint argues that even if the statute provides a basis to challenge the validity of the debt at issue, the claim is subject to dismissal because plaintiff failed to allege that "a collector [sought] to collect a sum for which no right existed (and knowledge of the same)." *Id.* at 28.

In response, plaintiff argues that her claims under the MCDCA concern "the methods of collection [Shellpoint] uses which are unfair, unconscionable, and otherwise is [sic] an attempt to enforce a right with knowledge that [it] does not exist." ECF 26 at 41. Moreover, Richards directs the Court's attention to a recent decision from the Maryland Court of Appeals, *Chavis*, 476 Md. 534, 264 A.3d 1254. *See* ECF 29. In that case, the State high court interpreted C.L. § 14-202(8) and found that "nothing in the MCDCA generally, or in § 14-202 specifically" limited the provision's applicability to methods of debt collection. *Chavis,* 476 Md. 534, 264 A.3d at 1269. The *Chavis* Court added: "Although it is not inaccurate to say that § 14-202(8) deals with methods of debt collection,[ ] it is more accurate to describe the statute as regulating the conduct of a person while engaged in debt collection." *Id.* Further, it said: "[T]he remedial nature of the MCDCA requires that we interpret § 14-202(8) to reach any claim, attempt, or threat to enforce a right that a debt collector knows does not exist." *Id.* Thus, in its view, "a plaintiff may invoke § 14-202(8) when the amount claimed by the debt collector includes sums that the debt collector, to its knowledge, does not have the right to collect." *Id.*

To state a claim under C.L. § 14-202(8), a plaintiff must plead facts that, if proven, would establish that the debt collector did not possess the right it was seeking to enforce. *Chavis* does not obviate that requirement. And, as explained above, plaintiff has failed to plead facts that, if proven, would establish that Shellpoint lacked the right to refuse partial payments from Richards.

Therefore, *Chavis* notwithstanding, plaintiff may not bring a claim under C.L. § 14-202(8) based on this aspect of Shellpoint's conduct. *See Garey v. BWW Law Group, LLC*, PWG-19-3112, 2021 WL 4521329, at *9 (D. Md. Oct. 4, 2021) (finding no violation of the MCDCA where defendant "claimed a right that it did possess . . . .") (emphasis omitted).

However, as explained above, I am of the view that plaintiff plausibly alleged that Shellpoint violated the Primestar Settlement by imposing a series of fees against plaintiff between November 2019 and March 2020. In other words, Shellpoint allegedly attempted to claim a right to which it was not entitled, in violation of C.L. § 14-202(8). *See Chavis*, 476 Md. 534, 264 A.3d at 1270 ("[A] plaintiff may invoke § 14-202(8) when the amount claimed by the debt collector includes sums that the debt collector, to its knowledge, does not have the right to collect."). Therefore, I am persuaded that, based on this conduct, plaintiff plausibly states a claim for which relief may be granted under C.L. § 14-202(8).

Likewise, plaintiff may state a claim under C.L. § 14-202(8) for Shellpoint's alleged misrepresentations in connection with the Loan Modification Agreement. As explained above, plaintiff asserts that after Richards executed the Loan Modification Agreement, Shellpoint informed her that she would be required to execute a new version of the agreement, ostensibly so that the form would reflect plaintiff's new legal name. ECF 24, ⁋ 60-62. But, according to plaintiff, the revised version of the agreement contained materially different terms, including an increase of plaintiff's principal balance by nearly $20,000. *Id.* ⁋ 63. And, Richards states that there was no "just basis" for Shellpoint to increase the amount of her debt. *Id.* ⁋ 64. In sum, Richards asserts that Shellpoint knowingly sought to attempt to collect a debt from Richards in excess of what it had a right to claim.

Thus, in my view, plaintiff has alleged facts that, if proven, would establish a violation of C.L. § 14-202(8) for Shellpoint's misrepresentations made in connection with the Loan Modification Agreement. *See Alexander v. Carrington Mortg. Servs.*, 23 F.4th 370, 375-80 (4th Cir. 2022) (remanding case for district court to consider whether, in light of *Chavis*, plaintiff can state a claim under C.L. § 14-202(8) where defendant charged an unlawful five-dollar convenience fee to borrowers who paid monthly mortgage bills online or by phone).

### 3.   MCPA

The MCPA prohibits certain "unfair or deceptive trade practices." C.L. § 13-301. Further, the MCPA makes it unlawful for a person to use unfair or deceptive trade practices related to the extension of consumer credit or the collection of consumer debts. C.L. § 13-303(4)-(5); *see Piotrowski v. Wells Fargo Bank, N.A.*, DKC-11-3758, 2013 WL 247549, at *10 (D. Md. Jan. 22, 2013). It defines an unfair or deceptive trade practice, *inter alia*, as: "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;" and "Failure to state a material fact if the failure deceives or tends to deceive." C.L. § 13-301(1), (3); *see Marshall v. James B. Nutter & Co.*, 816 F. Supp. 2d 259, 266 (D. Md. 2011) (explaining that "the MCPA prohibits both the use of false or misleading statements and also the omission of material facts"). And, to state a claim under the MCPA, a consumer must allege "(1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury." *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012) (citing *Lloyd v. General Motors Corp.*, 397 Md. 108, 143, 916 A.2d 247 (2007)).

Of import here, any violation of the MCDCA constitutes a violation of the MCPA. *See* C.L. § 13-301(14)(iii). Defendant's alleged representations in connection with the Loan

Modification Agreement, as well as the imposition of fees allegedly in violation of the Primestar Settlement, would, if proven, amount to violations of C.L. §§ 14-202(8), (11).  It follows that plaintiff has stated a claim under the MCPA as to these allegations.

Moreover, plaintiff has otherwise stated a claim under the MCPA based on Shellpoint's conduct with respect to the Loan Modification Agreement.  As mentioned, plaintiff alleges that she initially executed the Loan Modification Agreement in accordance with Shellpoint's instructions by signing the document using her married name before a notary public.  ECF 24, ¶ 60.  Thereafter, according to Richards, Shellpoint's counsel "misstated and misrepresented that [plaintiff] had failed to properly sign the modification and indicated that she should have signed using her former non-legal name before a notary." *Id.* ¶ 61. Further, plaintiff claims that Shellpoint requested "proof of her name change," so that it could revise the Loan Modification Agreement to reflect plaintiff's married name.  *Id.* ¶ 62.  According to Richards, Shellpoint's attorney "never stated any purpose or plan by Shellpoint to rewrite the other material modification terms . . . ." *Id.*

Nonetheless, when plaintiff received the revised version of the Loan Modification Agreement, it reflected a substantially higher principal balance and monthly payment. *Id.* ¶ 63. Further, Richards claims that Shellpoint "concealed" these changes from her.  *Id.*  And, in sum, she maintains that "Shellpoint's bait and switch tactics related to the December 17, 2020 loan modification . . . violate[d] [the MCPA]."  *Id.* ¶ 116.  Accordingly, plaintiff's allegations plainly state that Shellpoint engaged in an unfair trade practice by failing to advise plaintiff of material changes to the Loan Modification Agreement, including the principal balance and monthly payment, after previously informing Richards that it was revising the Loan Modification Agreement solely to ensure that the document reflected plaintiff's married name.

Thus, Richards has adequately alleged that Shellpoint engaged in an "unfair or deceptive trade practice" within the meaning by the MCPA.  *See* C.L. §§ 13-301(3), 13-303(4); *see also Barry v. EMC Mortg. Corp*, DKC-10-3120, 2012 WL 3595153, at *6-8 (D. Md. Aug. 17, 2012) (finding that plaintiff's MCPA claim could withstand summary judgment where there was sufficient evidence showing that a lender made misrepresentations to the plaintiff in connection with offering a loan modification agreement).  And, Shellpoint has not otherwise challenged the viability of this aspect of plaintiff's MCPA claim.

In contrast, plaintiff's other allegations fail to state an independent claim under the MCPA.  As defendant points out (ECF 25-1 at 29-30), a plaintiff who brings an MCPA claim is "'required to allege the time, place, and contents of the false misrepresentations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  *Amenu-El v. Select Portfolio Servs.*, RDB-17-2008, 2017 WL 4404428, at *3 (D. Md. Oct. 4, 2017) (quoting *Marchese v. JP Morgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 465 (D. Md. 2013)).  And, as explained above, Richards does not indicate that Shellpoint made any misrepresentations to plaintiff or otherwise engaged in deceptive conduct in connection with its collection of fees or the failure to credit payments to plaintiff's outstanding principal.  Thus, plaintiff has failed to state an independent claim under the MCPA for this conduct.

### IV.    Conclusion

In light of the foregoing, I shall grant the Motion in part and deny it in part.  I shall dismiss Counts I and II against plaintiff in her individual capacity.  Accordingly, plaintiff's class action claims are also dismissed.

Count III is also subject to dismissal to the extent it includes a claim for Shellpoint's furnishment of false information to credit reporting agencies and Shellpoint's failure to credit partial payments to the Richards Loan.  The Motion is otherwise denied.

An Order follows, consistent with this Memorandum Opinion.


Date: March 4th, 2022                                    _____/s/_____

                                                         Ellen L. Hollander
                                                         United States District Judge

59